**J. B. TAYLOR and George Bennett et al., Plaintiffs,**

v.

**E. P. PERINI, Superintendent, Marion Correctional Institution, Defendants.**

Civ. No. C69–275.

United States District Court,
N. D. Ohio, W. D.

April 9, 1979.

See also, D.C., 455 F.Supp. 1241.

Richard S. Walinski, Chief Counsel, Columbus, Ohio, for George F. Denton.

Cary Rodman Cooper, Toledo, Ohio, Sp. Counsel, for E. P. Perini.

Niki Z. Schwartz, Cleveland, Ohio, for plaintiffs.

## ORDER

DON J. YOUNG, District Judge.

This action came to be heard upon the Sixth Report of the Special Master on the Defendants' State of Compliance with the Court's order of July 20, 1978. The parties have filed no objections to that report. The Court being fully advised in the premises, it is ordered that the report is in all respects confirmed. Said report is attached as an appendix hereto, incorporated herein by reference, and made a part hereof as fully for all intents and purposes as if set forth at length herein.

NOW, THEREFORE, FOR GOOD CAUSE SHOWN, it is hereby

ORDERED that the defendants conduct a review of the Chief Inspector's performance as outlined in the Conclusion of the Sixth Report of the Special Master on the Defendants' State of Compliance and that they perform all actions to which they have agreed in the letter which is included as Appendix C in that report.

IT IS FURTHER ORDERED that subparagraph 10(d)(2) of the Court's order of

July 20, 1978, be amended to read as follows:

Upon receipt of the notice, the Job Counselor shall post information concerning the vacancy on the next regularly scheduled working day in a central location or central locations which will inform all inmates of the opening. In addition, the information as to the opening should contain a detailed job description analysis or a reference to the Job Description Manual, which shall be readily available to all inmates. This vacancy notice shall be posted for at least three working days. All inmates shall be allowed to apply for the position on written application forms readily available to them, and these forms shall be submitted to the Job Counselor. The appropriate job assignment committee shall choose an inmate to fill the position from the top five senior inmates in prison seniority (as defined in part (e) below) who have applied. In the event that none of the five senior applicants for a job meets the basic requirements for the job contained in the Job Description Manual, the job assignment committee may select an inmate below the five senior applicants. In such a case, the job assignment committee shall fully document its decision.

IT IS FURTHER ORDERED that paragraph 10 of the Court's order of July 20, 1978, be amended by the addition of the following language:

(h) *Involuntary job transfers*

(1) A disciplinary job transfer is one which is effected as a result of a disciplinary infraction or poor work performance. Any job transfer which is based upon a disciplinary infraction may be approved only when the infraction is job related and manifests an inability on the part of the violator to function in the job in question.

(2) A disciplinary job transfer may be recommended only by the Rules Infraction Board or the inmate's job supervisor. All such recommendations shall be approved or disap-

proved by the Reclassification Committee in the case of transfers within the stockade and by the Honor Dormitory Reclassification Committee in the case of transfers within the honor dormitory.

(3) A job transfer for medical reasons may be recommended by the institution physician. Such recommendations shall be approved or disapproved by the Reclassification Committee in the case of transfers within the stockade, and by the Honor Dormitory Reclassification Committee in the case of transfers within the honor dormitory.

(4) The provisions of this subparagraph shall apply to both intrashop and intershop involuntary job transfers.

(5) The Superintendent may order a non-disciplinary job transfer when he determines that an inmate must be transferred to protect the safety and security of the inmate, of other inmates, or of the staff. In such instances, the Superintendent shall forthwith provide the Job Counselor, the appropriate reclassification committee and the affected inmate with written notice of the inmate's removal from his job as well as with reasons therefor. No copy of this notice will be placed in the inmate's institutional records. The Job Counselor shall consult with the affected inmate and assign him to a job which is agreeable to the inmate. In the event that such agreement is not forthcoming, the inmate shall be permitted to lay in for a period not to exceed 15 working days, during which time he may bid on all intershop job openings which are posted. At the end of 15 days, if the inmate has not been assigned a job, the appropriate reclassification committee shall assign him to a job. In this event, the inmate may bid on any intrashop job opening in the shop to which he has been assigned as well as on any intershop job opening, and other bidding inmates shall not be

given a preference over the transferred inmate because the latter has been on his new job for less than 90 days at the time of his bid. In all instances of involuntary transfer under this subparagraph, the inmate's record regarding the transfer shall only reflect that the transfer was made, e. g., "(date)—reassigned to (new job) from (former job)." Any involuntary transfer under this subparagraph shall be grievable.

IT IS FURTHER ORDERED that subparagraph 10(h) of the Court's order of July 20, 1978, be renumbered 10(i) and that subparagraph 10(i) of the Court's order of July 20, 1978, be renumbered 10(j).

The Court finds that the defendants have remained in substantial compliance with the provisions of the Court's order of July 20, 1978. THEREFORE, FOR GOOD CAUSE SHOWN, it is

FURTHER ORDERED that the Special Master appointed in this cause on December 1, 1975, be dismissed.

## SIXTH REPORT OF THE SPECIAL MASTER ON THE DEFENDANTS' STATE OF COMPLIANCE *

### TABLE OF CONTENTS

Introduction .............................. 1291
Paragraph 4 Interference with Legal Mail .... 1292
Paragraph 5 Maintenance of Inmate Legal Services Program ................. 1293
Paragraph 6 Provision of Supplies, Postage, and Photocopy Service in Connection with Legal Documents ......... 1296
Paragraph 7 Censorship of Incoming Publications ...................... 1297
Paragraph 8 Imposition of Disciplinary Sanctions Without Fair Notice ...... 1299
Paragraph 9 Correctional Cell Conditions ..... 1304
Paragraph 10 Inmate Job Assignments ....... 1307

Paragraph 11 Publication and Distribution of Staff Manual ................ 1313
Paragraph 12 Inclusion of Statement of Nondiscrimination Policy on Staff Job Descriptions and Employment Application Forms ............... 1314
Paragraph 13 Staff Orientation ............. 1314
Paragraph 14 Pre-hire Psychological Testing of Correctional Officers .......... 1314
Paragraph 15 In-Service Staff Training ...... 1315
Paragraph 16 Inmate Orientation ............ 1316
Paragraph 17 Annual Audit by Chief Inspector 1317
Paragraph 18 Racial Balance in Housing Units 1318
Paragraph 19 Placing of Grievance References in Inmates' Files .............. 1320
Paragraphs 20 and 21 Racial Discrimination, Harassment, Intimidation, and Insult ........ 1320
Paragraph 22 Resident Councils ............. 1320
Paragraph 23 Inspector of Institutional Services 1326
Paragraph 24 The Chief Inspector ........... 1328
Paragraph 25 The Grievance System ......... 1328
Conclusion ................................ 1334
Appendix A .............................. 1335
Appendix B .............................. 1337
Appendix C .............................. 1386

## INTRODUCTION

On July 20, 1978, the Court adopted the fifth report of the Special Master on the defendants' state of compliance with the Court's order of September 12, 1972.[1] On that same date the Court issued an order, based upon an agreement entered into among the parties to this litigation, which abrogated its earlier order and established new and precise standards against which to measure compliance.[2] In addition, the Court found that the defendants were in substantial compliance with the order of September 12, 1972, and ordered that the Special Master be dismissed "subject to his reviewing the state of the Defendants' compliance with the Court's final order in this

---

* Submitted by Vincent M. Nathan, Professor of Law, The University of Toledo.

1. *Taylor v. Perini,* 455 F.Supp. 1241, 1255 (N.D. Ohio 1978). Previous reports may be found at 446 F.Supp. 1184, 1186 (1977); 431 F.Supp. 566, 570 (1977); 421 F.Supp. 740, 742 (1976); 413 F.Supp. 189, 198 (1976). The Court's order

of September 12, 1972, to which the first five reports relate, may be found at 413 F.Supp. 189, 194 (1976).

2. *Taylor v. Perini,* 455 F.Supp. 1241 (N.D.Ohio 1978).

cause and reporting his findings to the Court by December 31, 1978." [3]

Between July 20, 1978 and mid-December, 1978, the Special Master had little contact with members of the staff of Marion Correctional Institution as well as of the Department of Rehabilitation and Correction. He made no visits to the prison. He did receive and answer correspondence from inmates, but he generally made no effort to affect the defendants' conduct regarding complaints which were brought to his attention.

On December 12, 1978, the Special Master met with the departmental Chief Inspector in Columbus in order to review the activities of that office. During the following three days, he conducted an on site inspection in Marion. In this he was assisted by Mr. Fraser McAlpine, a former assistant, who made himself available for this purpose at the request of the Special Master. During this inspection, the Special Master and Mr. McAlpine interviewed a large number of staff members and inmates, met with both resident councils, and studied and copied voluminous records maintained in the prison. During every phase of this inspection, the Superintendent and his staff were both courteous and cooperative, and all requests for data and information were met promptly.

The Special Master conducted a second on site inspection on December 28–29, 1978. At this time he was assisted by Mr. Daniel Cron, a third year law student at The University of Toledo. The format for the second visit to M.C.I. was much like the first, and that trip permitted the Special Master to obtain more specific information which was needed as a result of his examination of the data and information gained two weeks earlier.

On January 1, 1979, Mr. Cron visited M.C.I. for the purpose of conducting an audit of law library holdings in the stockade and the honor dormitory. The report that follows is based upon the information gained during the course of these three trips and through examination of records maintained by the defendants and provided to the Special Master.

On February 15, 1979, the Special Master issued a draft copy of this report to all counsel. The discussions and negotiations that followed resulted in some amendment and produced agreement regarding the appropriate steps to be taken to correct the deficiencies and to resolve the problems reflected in this report. Those steps are described in the conclusion of this report, p. 1334 *infra.*

The Special Master wishes to express his appreciation to Mr. McAlpine and to Mr. Cron for their assistance in conducting this review of the defendants' state of compliance, and particularly to Mr. McAlpine for the role that he played in the preparation of the text of this report. Since his association with the Special Master in January of 1977, Mr. McAlpine has sustained a heavy burden of responsibility in connection with this case and has discharged that responsibility with exceptional professionalism and effectiveness.

The purpose of this report is to describe the defendants' state of compliance or non-compliance with the Court's order of July 20, 1978. The injunctive portion of that order commences with Paragraph 4 and concludes with Paragraph 25. Corresponding numbers have been utilized throughout the text of the report to identify the provision under consideration. Throughout the body of the report, the Special Master has related the information he learned during the course of his review, has recommended in some instances that the defendants take or be required to take certain actions to achieve a higher level of compliance, has suggested that several revisions be made of the language of the Court's order of July 20, 1978, and has made findings regarding the defendants' state of compliance with each paragraph of that order.

## PARAGRAPH 4

*Interference with legal mail.* Only three significant incidents of improper handling

---

**3.** *Id.* at 1254.

of incoming legal mail were reflected by logs maintained by the institution's mail room personnel. In two of these cases, the envelopes bore return addresses of persons who identified themselves as attorneys, and letters of apology were sent by the Superintendent to these individuals. In the third case, the return address was simply "clerk" and the envelope bore the legend, "legal mail." In this case it was not possible for the Superintendent to send a letter of apology without reading the letter, and he did not do so. Two other incidents reflected on the error log, the opening of letters addressed by inmates to attorneys and "returned to sender," are explained by the fact that mail room personnel are not accustomed to legal mail in that form. No inmate complained to the Special Master of any incident of improper handling of legal mail not reflected by the institution's error log.

In view of the large quantity of mail received at M.C.I. on a daily basis, the record of compliance with this provision of the Court's order is remarkable.

## FINDINGS REGARDING COMPLIANCE

It is the finding of the Special Master that the defendants have remained in full compliance with Paragraph 4 of the Court's order of July 20, 1978.

## PARAGRAPH 5

*Maintenance of inmate legal services program.* The Special Master has discovered no evidence of interference, inappropriate sanctioning, or harassment of inmate law library clerks. Likewise, no other inmate has complained to the Special Master of such treatment resulting from efforts to assist another inmate in the preparation, conduct, or defense of legal actions.[4]

Inmates are provided with a place to work on legal matters in both law libraries in the institution. Law library hours in the stockade are 5:30 p. m. until 8:15 p. m. on Monday through Friday, 9:15 a. m. until 10:45 a. m. and 12:30 p. m. until 3:15 p. m. on Saturday, and 1:00 p. m. until 3:45 p. m. and 4:30 p. m. until 8:30 p. m. on Sunday. Law library hours in the honor dormitory commence at approximately 5:30 a. m. and extend through 11:00 p. m., less two hours per day when the library is closed. In the stockade at least, if an inmate law clerk needs to work with an inmate during the latter's normal working hours, the law clerk may request approval of a pass by the Director of Education, and such passes generally are approved. (Some difficulty has been encountered, apparently, when officers at the shop area crash gates have refused to honor these passes.)

At the time of the Special Master's on site inspections of the institution in December, 1978, neither law library in the institution contained all of the law books required by this paragraph of the Court's order. In an audit conducted on September 20 and 22, 1978, the Chief Inspector of the Department of Rehabilitation and Correction discovered that certain required law books were not present, and on September 28, 1978, the departmental Legal Services Assistant issued instructions to the Business Administrator at Marion Correctional Institution to order the missing volumes. According to the Business Administrator's response of October 6, 1978, all of the mandated volumes had been ordered by that date. The volumes found to be missing and the action reported by the Business Administrator are as follows:

---

4. One inmate, a former inmate law clerk, filed a grievance because he was deprived of a special pass (issued only to such clerks) when he transferred from his job in the law library. The Inspector of Institutional Services took the position that the inmate was no longer entitled to any special privileges accorded to inmate law clerks, but that he was free to use the law library and to assist other inmates with their legal problems in every other way. The Special Master believes that this was a proper resolution of this matter.

<u>Stockade Library</u>

| TITLE | Action Taken by Business Administrator |
| --- | --- |
| Volumes 273–299, Federal Reporter (2d series) | Ordered August 30, 1978 |
| Volumes 180–199, Federal Supplement | Ordered August 30, 1978 |
| Rules of Local Federal Courts | Direct purchase order in process, October 6, 1978 |
| Current supplement for Title 29, Page's Ohio Revised Code | Direct purchase order in process, October 6, 1978 |
| Schroeder & Katz, *Ohio Criminal Law Practice and Forms* | Ordered August 30, 1978 |
| Cohen, *Legal Research in a Nutshell* | Ordered August 30, 1978 |
| Israel, LaFave, & Wayne, *Criminal Procedure in a Nutshell* | Ordered August 30, 1978 |
| Sokol, *Federal Habeas Corpus* | Direct purchase order in process, October 6, 1978 |

<u>Honor Dormitory Library</u>

| TITLE | Action Taken by Business Administrator |
| --- | --- |
| Volumes 273–299, 538, 539, Federal Reporter (2d series) | Ordered August 30, 1978 |
| Volumes 180–199, Federal Supplement | Ordered August 30, 1978 |
| Rules of Local Federal Courts | Direct purchase order in process, October 6, 1978 |
| Titles 1, 19, 21, 23, 25–27, 29, 37, 51–53 and current supplements as well as Appendix and Civil Rules volumes, Page's Ohio Revised Code | Direct purchase order in process, October 6, 1978 |
| Schroeder & Katz, *Ohio Criminal Law Practice and Forms* | Ordered August 30, 1978 |
| Shepard's United States Citations ("Ivory Special Intermediate" supplements and second part of 1978 Cumulative Supplement) | Direct purchase order in process, October 6, 1978 |
| Supplement to Palmer, *Constitutional Rights of Prisoners* | Ordered August 30, 1978 |
| Sokol, *Federal Habeas Corpus* | No action indicated |

The Chief Inspector conducted a second audit of the institution's compliance on November 21, 1978. In his report of that audit, the Chief Inspector stated that

the required law books and updating supplements have been ordered, but only about half of the missing volumes have been received at the institution thus far. The remaining volumes are expected to arrive in the near future.

On January 1, 1979, the Special Master's assistant conducted a survey of holdings in the two institutional libraries. As of that date the only materials listed above that had been received at M.C.I. were Schroeder & Katz, *Ohio Criminal Law Practice and Forms* (stockade and honor dormitory), Page's Ohio Revised Code Annotated, Titles 1, 19, 21, 23, 25–27, 29, 37, and 51–53 (honor dormitory), the current supplement for Title 29 of Page's Ohio Revised Code Annotated (stockade), and the 1974–1978 statutory supplement (Ivory Special Intermediate) and the second part of the 1978 Cumulative

Supplement to Shepard's United States Citation. (Still missing in the honor dormitory is the 1976–1978 Ivory Special Intermediate case supplement to these materials.) In addition, it appears that the second edition of Sokol, *Federal Habeas Corpus* is the latest edition of that work, and both libraries contain a copy of this treatise.

In addition to the missing volumes disclosed by the Chief Inspector's audit, the Special Master's assistant found the following materials missing at the time of his inspection on January 1, 1979:

### Stockade Library

42 United States Code Annotated §§ 1981–1984

Volume 574, Federal Reporter 2d series

Volumes 349–355, Northeastern Reporter 2d series (Ohio Cases)

Titles 25–27, Page's Ohio Revised Code Annotated

Page's Ohio Revised Code, up to date inserts for "Current Material" Binder

### Honor Dormitory Library

Binder and # 4 Legislative Bulletin for "Current Material" of Page's Ohio Revised Code Annotated

According to information received from Professor Rhoda Berkowitz, Associate Law Librarian at The University of Toledo, deliveries from major law book publishers should occur, in all but the most exceptional circumstances, within 30 days of the publisher's receipt of the order.

Three inmate law clerks have been assigned to the stockade law library and two such clerks have been assigned to the honor dormitory law library. Stockade law clerks are permitted to assist inmates in the library itself and may go to the infirmary area to assist inmates requesting legal advice. They are not permitted, however, to have contact with inmates incarcerated in the correctional cell area in the institution.

Although a separate job classification exists for law clerks in the stockade, no such job classification appears in the honor dormitory job manual. Inmate law clerks in the latter unit are included within the general classification, "dormitory help." As a result, under existing job procedures, it is possible for an inmate law clerk in the honor dormitory to be assigned by the dormitory maintenance supervisor to duties outside the law library. This possibility came to the attention of the Special Master when a general library clerk in the honor dormitory was assigned on a temporary basis to duties outside the library because of his classification as general dormitory help. In order to prevent the assignment of law library inmate clerks to other unrelated duties that may interfere with the level of legal assistance provided in that unit, law clerks in the honor dormitory should hold a separate job classification which limits their working activity to the law library. In addition, there is no reason for honor dormitory inmate law clerks to be denied specific job classifications as law clerks since this is the existing practice with respect to inmate law clerks in the stockade.

By and large, supplies of paper, pens and other necessary items are made available in the law libraries. Lengthy delays sometimes occur following an order, and requisitions for law library supplies examined by the Special Master reflect that numerous standard items often are out of stock. At the time of the Special Master's on site inspection on December 13–15, 1978, adequate supplies were on hand in both libraries. This resulted, in all probability, from a memorandum dated December 6, 1978, from the Legal Services Assistant of the Department of Rehabilitation and Correction to the Business Administrator at M.C.I.:

If the office supplies requested and ordered by the inmate law libraries have not yet been obtained from State Office Supply, take the necessary action to purchase the supplies and get them delivered to the law libraries this week.

This memorandum tends to confirm statements made by the inmate law clerks to the effect that necessary supplies often are not available at the time that they are ordered.

FINDINGS REGARDING COMPLIANCE

No finding of substantial compliance with Paragraph 5 can be made until the defendants obtain all required legal materials for both law libraries. In addition, steps must be taken to maintain adequate supplies of paper, pens, typewriter ribbons, tape and other necessary supplies for the law libraries so that orders can be filled promptly. Finally, a separate and specific job classification for honor dormitory inmate law clerks should be developed and included in the honor dormitory job manual. In all other respects, the defendants are in compliance with the provisions of this paragraph of the Court's order.

## PARAGRAPH 6

*Provision of supplies, postage, and photocopy service in connection with legal documents.* As was pointed out in the discussion of Paragraph 5, *supra*, supplies of paper are provided to the inmate law library clerks both in the stockade and in the honor dormitory. According to the individuals assigned to these positions, this paper is made available to inmates in the general population upon request so long as adequate supplies are available. On occasion, sufficient paper is reported not to be available, and requisitions for supplies for the two law libraries confirm this. Pens are supplied to the law libraries in very small quantities that are sufficient only to meet the needs of the law library clerks themselves.

A "legal kit," consisting of one legal pad, five sheets of legal size carbon paper, 10 sheets of legal size, onion skin paper, 10 sheets of legal size, bond paper, five sheets of 8½" by 11" carbon paper, 12 sheets of 8½" by 11" bond paper, and a ball point pen, is for sale in both commissaries in the institution. The cost of the kit is $1.50. In a consent judgment entered by Judge Joseph Kinneary on June 28, 1978, in the case of *Cox v. Patterson*, C–2–75–661 (S.D.Ohio 1978), inmates at the Columbus Correctional Facility who earn or receive less than $5.00 per month *and* who do not have on deposit at any time during the previous 30 days more than $4.99 are entitled to one legal kit

per month free of charge. On July 11, 1978, in a memorandum signed by the Director of the Department of Rehabilitation and Correction and his legal assistant, all managing officers—including Superintendent Perini—were informed that this policy would be applied throughout the entire department and that inmates eligible for free legal kits would also be provided with free postage for all documents or correspondence directed to a court of law.

All inmates at Marion Correctional Institution are assigned to jobs that result in monthly payments of $5.00 or more; thus, none are entitled to free legal kits or postage in accordance with the policy directive resulting from *Cox v. Patterson*. Nonetheless, since the Court's order in *Taylor v. Perini* requires that legal supplies be made available on credit whenever the inmate is unable to pay for such supplies from his institutional account, the legal kit should be made available on credit to any inmate whose account balance at the time he seeks to make the purchase at the commissary is less than $1.50. By limiting an inmate to one legal kit per week on credit, the defendants are assured that sufficient funds will be credited from the next state pay to cover any accumulated indebtedness.

The availability of legal kits in both commissaries is mandated by Administrative Regulation 5120–9–48, and the departmental policy in this regard is confirmed by the policy statement directed to all managing officers on July 11, 1978. Availability of the kits generally should be regarded as a requisite for compliance with this paragraph of the Court's order in *Taylor v. Perini*. The availability of these legal kits in the commissary, whether or not on credit, will not relieve the defendants of their obligation to continue to make available adequate quantities of paper and other supplies in the two law libraries in the institution.

Records submitted by the defendants indicate that postage, including certified and special delivery postage, continues to be made available on credit for the mailing of legal papers by inmates who do not have the necessary funds to purchase such post-

age.[5] Likewise, notarial service continues to be provided, without charge, by several staff members, and the Special Master received no significant complaints about the availability of this service. Finally, photocopy services are provided through an outside commercial photocopy company, and records submitted to the Special Master indicate that the service is being used on a regular and widespread basis by inmates. The cost of this service is $.12 per page, the usual and customary charge for such services in Marion, Ohio.

## FINDINGS REGARDING COMPLIANCE

The defendants are in compliance with those portions of Paragraph 6 that require the provision of notarial services, postage, and photocopy services, without charge or on credit, for the preparation and mailing of legal documents and legal correspondence. With the implementation of the policy regarding legal kits discussed above, the defendants will be in full compliance with respect to the provision of paper, pencils, and pens as well.

## PARAGRAPH 7

*Censorship of incoming publications.* Between July 20, 1978 and December 1, 1978, the institutional Publications Review Committee considered 16 cases that were referred to it. In six of these cases, involving 10 publications, the printed material was excluded by unanimous vote of the committee; in four cases, the material was admitted (in three cases by a unanimous vote and in one case by a vote of two to one); in five cases, the material was sent out of the institution or destroyed at the inmate/recipient's request without a hearing; finally, in one case one publication was excluded by a unanimous vote and one publication was admitted by a vote of two to one.

The following chart indicates the titles of excluded publications as well as the grounds for exclusion relied upon by the committee:

| TITLE | GROUNDS |
|---|---|
| Honkey Magazine | Obscenity |
| 215 Choice Men | Obscenity |
| Best of Golden Boys | Obscenity |
| Hard Boys | Obscenity |
| Chicken Pickup | Obscenity |
| Popular Mechanics (9/78) | Inflammatory |
| Beaver Feaver | Obscenity |
| Classy Asses | Obscenity |
| Screw # 499 | Obscenity |
| Hustler Magazine (10/78) | Obscenity |
| Purple Magazine (10/78) | Obscenity |

All of the excluded materials had been sent out of the institution or destroyed by the time of the Special Master's on site inspection in December of 1978. Many of the same titles, however, were evaluated by the Special Master in connection with previous reports, and it is probable that those publications that were excluded on the basis of obscenity fall within the guidelines promulgated by Paragraph 7 of the Court's order. In the case of the September, 1978 issue of *Popular Mechanics*, the issue contained an article on the fabrication of weapons. For this reason, it was properly excludable under the definition of "inflammatory" contained in the Court's order of July 20, 1978.

The institutional committee consists of three staff members, only one of whom has primary responsibility in the area of custody. In all cases, the affected inmate received notice of the interim prohibition and the reasons therefor by the end of the working day following receipt of the material in the institution. In those cases in which hearings were held, they took place within one week of the receipt of the publication; indeed in virtually all cases the hearing was held within two or three days of receipt. Inmates were advised of their right to attend the hearing on the notice informing them of the interim prohibition, and in five cases the inmate did so appear.

---

5. Several inmates complained to the Special Master that the institutional mail room will not provide registered mail service for outgoing mail. According to United States postal officials contacted by the Special Master, registered mail should be utilized only when the contents of the mail possess intrinsic value.

Furthermore, the mail room within the institution is not authorized by the Marion postal officials to accept registered mail. Thus, there does not appear to be any basis for recommending amendment to the language of Paragraph 6 of the Court's order to include postage for registered mail.

The institutional committee informed inmates of their right to appeal in all cases of exclusion and provided inmates with proper appeal forms upon request. Two exclusions resulted in appeals to the departmental Publication Screening Committee, and in both cases the exclusions were upheld. In both of these cases the departmental committee provided the affected inmate with notice of its decision on appeal within 28 working days of receipt of the appeal. Finally, all records of institutional committee actions are maintained in a file by the committee chairman, and a perusal of files of inmates involved in cases of exclusion satisfied the Special Master that no records of such committee proceedings are kept in any inmate's file.

The Special Master feels some concern about the phenomenon of sending out or destroying printed material at the inmate's request without a hearing which occurred in five cases. While the Special Master is satisfied that all of these inmates were made aware of their right to a hearing and that all waived such a hearing and requested the disposal of the materials, the institutional committee chairman must take care to be certain that the waiver in such cases is truly voluntary. The inmate should sign a written waiver in these instances and the committee chairman should schedule a hearing unless he is completely satisfied that the inmate's decision is free of coercion, real or imagined.

In October, 1978, the Director of Social Services, who serves as chairman of the institutional Publications Review Committee, caused the departmental Publication Screening Committee's "to be permitted" and "not to be permitted" lists to be posted in various locations within both the stockade and the honor dormitory.[6] The direction which accompanied these lists instructed personnel to forward to the inmate/addressee any publication on the "to be permitted" list and to forward to the Publications Review Committee any publication on the "not to be permitted" list. Although it appears that the "not to be permitted" list was being used only for the purpose of initial screening, the Special Master pointed out to the chairman of the Publications Review Committee that Paragraph 7(e) of the Court's order of July 20, 1978, provides that such a list "shall not be *considered* by the Institutional Publications Review Committee in making its decisions." (emphasis added) It was the opinion of the Special Master that this language prohibited any reference to the "not to be permitted" list by institutional officials charged with screening incoming publications. As a result, on November 6, 1978, the chairman of the institutional committee sent a memorandum to all affected staff requiring the removal of the "not to be permitted" list from bulletin boards throughout the institution. In the future, according to the committee chairman, the "not to be permitted" list will be destroyed upon its arrival in the institution.

Any possible reliance by M.C.I. officials upon the departmental "not to be permitted" list has been a matter of concern to the Special Master because the list continues to proscribe publications which are clearly admissible under the standards established by the Court's order of July 20, 1978.[7] On October 24, 1978, for example, the item "personal pictures" was added to the list. Other proscribed publications include Knight's *Black Voices from Prison, Freedom Now*, a publication of the Socialist Workers Party, *Lesbianism and the Women's Movement*, and *Malcolm X Talks to*

---

**6.** These lists are published by the departmental Publication Screening Committee from time to time. The "to be permitted" list contains publications which are approved for admission at all institutions; the "not to be permitted" list contains publications which have been proscribed by the committee and which may not be admitted to any institution. All institutions other than Marion Correctional Institution are bound by the "not to be permitted" list and

such publications are excluded summarily from those prisons.

**7.** Such exclusions are equally violative of the provisions of the Department's own Administrative Regulation 5120–9–19 which incorporates the same standards for "obscenity" and for "inflammatory" printed material as are contained in the Court's order of July 20, 1978.

*Young People.* In the opinion of the Special Master, the emergence of a policy calling for the destruction of the "not to be permitted" list upon its arrival at M.C.I. is a fitting if somewhat ironic denouement.

## FINDINGS REGARDING COMPLIANCE

It is the finding of the Special Master that the defendants have remained in full compliance with the provisions of Paragraph 7 of the Court's order.

## PARAGRAPH 8

*Imposition of disciplinary sanctions without fair notice.* On September 7, 1978, the new inmate manual was distributed to all residents in the stockade; the new honor dormitory manual was distributed to residents in that unit on November 8, 1978. The purposes of these new manuals were to provide a comprehensive set of rules and to apprise inmates of the sanctions which are applicable to violations thereof. In addition, the new manuals contain a verbatim copy of the Court's order of July 20, 1978.

In order to determine the extent to which these new manuals appeared to be providing notice of all offenses with which inmates are charged, the Special Master reviewed a large number of conduct reports issued under Class II–16, "any act not specifically set forth herein, knowingly done which constitutes an obviously immediate and direct threat to the security of the institution, its staff, other inmates, or the inmate himself," Class III–14, "aiding and abetting Class III rule violations" and Class III–15, "violation of any other published institutional rules, regulations, or procedures." All Class II–16 and Class III–14 conduct reports reflected alleged conduct that is proscribed in the inmate manual. The same is generally true with respect to Class III–15 conduct reports. In this category, however, a number of inmates were charged with and convicted of taking extra food in the stockade cafeteria. There is no reference to this subject in the cafeteria rules in the stockade inmate manual.

While it appears that the institution's staff is making a conscientious effort to relate conduct reports to rules contained in the inmate manuals, the omission of any reference to extra helpings of food in the cafeteria rules points up the need to revise the manuals as needed and to post other written rules in areas where they will be seen by inmates. Particularly with the issuance of new administrative regulations outlining the nature of Class II and Class III offenses, as well as disciplinary hearing procedures, the need for updating has become all the more apparent.[8] In particular, these manuals—because they are the first effort of the administration to provide a comprehensive set of rules of conduct—contain occasionally misleading or incorrect information in spite of the sincere efforts of the Superintendent and his staff to achieve clarity and accuracy. A careful and thorough revision at this point is likely to produce a manual that will be usable for a substantial period of time.

One extremely serious violation of Paragraph 8 did occur during the period between the issuance of the Court's order of July 20, 1978 and December 13, 1978, when the Special Master conducted the first of his two on site investigations. On December 5, 1978, an inmate in the honor dormitory delivered to a staff member an envelope addressed to an inmate in the stockade, with a request that it be delivered via inter-departmental mail. At or about the same time, the honor dormitory inmate sent a letter, via inter-departmental mail, addressed to the Chairman of the Stockade Resident Council. Both letters were intercepted by the Superintendent who, on December 6, 1978, sought and obtained from Director Denton permission to read the contents of the envelopes. The basis for the request for permission to read was as follows:

> Several Honor Dorm inmates have informed us that certain Honor Dorm in-

---

8. According to the Associate Superintendent for Custody, the new Administrative Regulations were distributed to all inmates on January 30, 1979. Thus, to this extent, updating has occurred.

mates were going to circumvent our regulations in an effort to make us appear in a bad light when Special Master Vincent M. Nathan comes to the institution next week to make his final report on our compliance with *Taylor v. Perini.*

We wish to examine the contents of these envelopes in an effort to forestall any difficulties in this area.

The envelope addressed to the Chairman of the Stockade Resident Council contained a copy of a letter written by honor dormitory inmates to the Superintendent announcing the resignation of the Honor Dormitory Resident Council.[9] The envelope addressed to another inmate in the stockade contained a copy of a publication entitled "The Jailhouse Lawyer's Manual" as well as a personal letter from the honor dormitory inmate to the stockade inmate. The pertinent portion of the text of that letter was as follows:

> I'm going to try to bring this grievance system to a stop out here, because it is not working and this is the only way that (I see) we can show the Court that it's not working. If no inmate here at M.C.I. file grievance, then the Court is going to ask why?
>
> And then we can say that it's because the system do not work. I received a letter from Tripp today stating that if an inmate wants to file an appeal with the Chief Inspector, the appeal must go through his office. You know that I do not like this approach and I don't think an appeal should have to go through

Tripp's officer if the inmate don't want it to, we only have 5 days to appeal and Tripp can say he never received the appeal or anything else he want to say about the appeal. Like I sent him an appeal to mail to the Chief Inspector on 12/1/78 and he sent the appeal back today and stated that I would have to put a stamp on it and mail it myself, that costed me two (2) days of my appeal time. I'm going to talk to (the Chairman of the Stockade Resident Council) about stoping the grievance system in there see what he thinks about it.

On December 19, 1978, following the Special Master's first on site inspection in Marion but before his second, a conduct report was prepared and issued against the honor dormitory inmate. Before issuing the conduct report, the Associate Superintendent for Treatment Services sought and obtained advice on the matter from a person serving as in-house counsel for the Department of Rehabilitation and Correction. Having been advised that, consistent with the Court's order in *Taylor v. Perini*, the honor dormitory inmate could be charged with a disciplinary offense, the Associate Superintendent issued the following conduct report. Only the names of inmates referred to in the body of the conduct report are omitted.

At the above time and date Inmate _____ requested that Sgt. W. Robinson, MCI Mail Supervisor, deliver an envelope via inter-departmental mail to an inmate at MCI Main Stockade. The hand print-

---

**9.** The text of this letter was as follows:

Due to the posting of a rule curtailing telephone privileges here at the Honor Dormitory, we, the members of the Honor Dormitory Affairs Council, have no choice except to respectfully resign.

We cannot understand the rationale behind the recent curtailment of the telephone privileges and we feel that this ruling can only lead to a more chaotic situation here at the Honor Dormitory. We are of the opinion that this privilege was revoked as a result of what has become an often used and, often abused, cliche—another threat to security! Since the July 4th incident, you have either refused to discuss the major items of importance to all the inmates here at the Honor Dormitory or you have totally ignored our

repeated requests to meet with you. We have submitted several agendas for your approval and, to date, you have deemed them to have no merit. Quite frankly, we feel that we understand your position and we acknowledge your right to curtail, rescind and eliminate any and all privileges of the inmate population, but we also feel as a result of *Taylor v. Perini*, that the Council should have the courtesy of discussing these "problem areas" with you. After all, the whole purpose of a council is to have open communication between the inmate population and the administration . . . and this is obviously not occurring.

As a result, we the members of the Honor Dormitory Affairs Council, hereby resign and our resignation is effective immediately.

ed name was Mr. _____. The envelope was dated 12–5–78 and marked and circled "legal papers". Inter-departmental mail had been used in the past to smuggle contraband into Correctional Cells and to solicit unauthorized business activity. Also, the named inmate (addressee), had been cited by RIB for attempting to use the mails to send U.S. cash currency to a person in the State of New York. Sgt. Robinson brought the envelope to the Superintendent's Office expressing his concern, as he felt something was not correct. On 12–6–78 Supt. Perini requested to view the contents of the envelope as the MCI Administration had received information that attempts would be made to discredit MCI and it's attempt to continue compliance in Taylor vs. Perini C–69–275 prior to the audit of the Special Master Professor Vincent M. Nathan, who was scheduled to be at MCI on 12–13, 14, 15–78. The Director of DR & C gave permission to view the contents (note: 1st Class U.S. Mail Service was not involved). The envelope contained a 48 page manual entitled; *The Jailhouse Lawyer's Manual*, a letter addressed to _____, dated 12–5–78, indicating the address of Inmate _____ brother _____ in _____, _____ (who was involved with the paying for the making of jewelry boxes in violation of MCI Arts and Crafts Policy), the whereabouts of a typewriter and a categorical statement of the sender that he was going to try to stop the Grievance Procedure at MCI which was authorized by the Federal Court in Taylor vs. Perini and the Administrative Regulations of DR & C, specifically; AR # 5120–9–31. Specifically the writer stated he would try to stop the grievances at the Honor Dormitory and would (5th paragraph) talk to _____ (Chairman of the Main Stockade Resident Council) about stopping the grievance system in the Main Stockade at MCI.

In addition to the material to _____, another envelope was in the larger envelope containing a carbon copy of a letter sent to Supt. Perini by _____ under the date of 12–4–78 and was sent to Stockade Council Chairman _____. This carbon copy advised Supt. Perini that the Honor Dormitory Council had resigned their elected positions at the Honor Dormitory Affairs Council. It may be noted that in August of 1978 the Special Master in his 5th Report of Compliance, required of the MCI Administration to make the grievance (system) work as well as the Inmate Councils at the Honor Dormitory and the Main Stockade. Based on the above information it is felt that Inmate _____ failed to follow the dictates of the Federal Court and higher authority, attempted to disrupt the operations of the MCI Grievance Procedure and attempted to enlist others into a scheme to establish a plan of action to show the Federal Court that the grievance system does not work at MCI. As the Federal Court does not establish sanctions against inmates (who) would attempt to violate the provisions of a Federal Court Order, we are submitting the direction of the Special Master in his 5th Report on Compliance, page 71, section (8), paragraph 4;

> "False accusations and statements by inmates or staff may be subject to disciplinary action when made in a knowingly, deliberate, and malicious attempt to cause significant injury to another party and the potential for such injury is substantiated."

The honor dormitory inmate was charged with violation of the following rules of conduct: Class II–1 (Disobedience of a direct order, which shall include aggravated insubordination); Class II–16 (Any act not specifically set forth herein, knowingly done which constitutes an obviously immediate and direct threat to the security of the institution, its staff, other inmates, or the inmate himself); and Class II–22 (attempt to violate a Class II rule). The Class II rule which the inmate was accused of attempting to violate was Class II–21 (conspiracy to violate a rule of conduct).[10]

---

10. Counsel for the defendants have asserted that the inmate could arguably have been charged under Class II–4, "Creating a minor disturbance (singly or in a group, attempting to

At this point it should be noted that on October 20, 1978, an amended version of the Department's Administrative Regulation 5120–9–06 prescribing rules of conduct was issued. In that amended version, Class II–16 became, "any act not specifically set forth herein, knowingly done which constitutes *an obvious* threat to the security *of or a disruption to the operation* of the institution, its staff, other inmates, or the inmate himself." (new language emphasized).[11] At the time the conduct report in question was issued, these amended regulations had not been substituted for the former regulations contained in the inmate manuals, although the Special Master was told that the new regulations had been placed by that time in the two law libraries and in copies of the Administrative Regulations which are required to be kept in each of the housing units in the institution. In view of the fact that inmates were never notified that the language contained in their manuals was no longer controlling, they were entitled to rely upon the information contained in the manuals and were not required to double check that language against the text of the administrative regulations themselves.

This change of text is important because the conduct report itself describes Class II–16 as "an act knowingly done which could cause the disruption to the operations of the institution." Apart from the fact that action which "could cause" a disruption should not be punishable under even the new text of the rule, the charging staff member's reliance upon the amended language constitutes the clearest example of an attempt to impose a disciplinary sanction without fair notice of the rule which is alleged to have been violated.

On the same day that the conduct report was issued, the honor dormitory inmate was brought into the stockade for a hearing before a hearing officer. The inmate pleaded not guilty, claiming that "these were only his thoughts, not his intent." The hearing officer referred the matter to the Rules Infraction Board with the notation that the charging staff member was to be present.

On December 21, 1978, the honor dormitory inmate was brought before the Rules Infraction Board. He pleaded not guilty and summarized his own position as follows:

I am entitled to my own opinions and feelings. I felt the grievance procedure wasn't working. I made the statement that just because we had a large number of grievances doesn't mean it was working. I was just expressing my feelings of which I'm entitled to. I am not trying to stop the grievance system, I was just expressing my opinion.

The inmate was found guilty, apparently on all charges, and the Rules Infraction Board recommended that the inmate's honor status be rescinded. Pending review by the Honor Placement Committee which reviews such recommendations, the inmate was assigned to a housing unit in the stockade. The inmate appealed to the Superintendent, who affirmed the decision of the Rules Infraction Board. At this point, the inmate filed an appeal with the Director of the Department of Rehabilitation and Correction. While that appeal was still pending and before any action had been taken by the Honor Placement Committee, the Special Master learned the facts which have been related above and discussed the matter with the Superintendent, the Chief Inspector, and special counsel employed by the Department for this litigation.

By no stretch of the imagination did the offending letters constitute disobedience of a direct order or insubordination. Apparently, the charging officer felt it was enough that the inmate "failed to follow

disrupt the order of the institution by any means including, but not limited to excessively loud and boisterous activities.)" If this is true, the language of Class II–4 fails to provide adequate notice of conduct which may be punished and thus violates the substance of Paragraph 8 of the Court's order.

11. This new language, in the opinion of the Special Master, is too vague and indefinite to provide fair notice of prohibited conduct and thus, in itself, violates the provisions of Paragraph 8 of the Court's order of July 20, 1978.

the dictates of the Federal Court and higher authority", and he grounded the institution's authority to sanction such conduct on the following proposition:

As the Federal Court does not establish sanctions against inmates (who) would attempt to violate the provisions of a Federal Court Order, we are submitting the direction of the Special Master in his 5th Report on Compliance, page 71, section 8, paragraph 4: 'False accusations and statements by inmates or staff may be subject to disciplinary action when made in a knowingly, deliberate, and malicious attempt to cause significant injury to another party and the potential for such injury is substantiated.'

The language referred to by the charging staff member is found in Paragraph 25 of the Court's order of July 20, 1978.[12] In fact that language relates to false accusations and statements made in the course of the utilization of the grievance process itself, and thus it is irrelevant to the issue at hand. "Giving false information or lying" constitutes a Class II–24 offense, but the description in the inmate manual narrows the offense to "knowingly giving false, inaccurate, or misleading information to a member of the staff of M.C.I."

Thus, as the charging staff member appears to concede in the text of the conduct report, any "false accusation" or "statement" made by the inmate in connection with the effectiveness of the grievance system appears not to be an act of disobedience or insubordination against officials at the prison. As for the suggestion that the "Federal Court does not establish sanctions against inmates (who) would attempt to violate the provisions of a Federal Court Order," one would have thought that the course and experience of this litigation would have taught high ranking staff members that the Court is more than able to assert its own authority when faced with disobedience by anyone of any of its orders. In the circumstances of this case, if the Superintendent believed that the actions of the honor dormitory inmate constituted a violation on the latter's part of any provision of the Court's order of July 20, 1978, the Superintendent's appropriate course of action was to file a motion to show cause why the inmate should not be held in contempt. If, on the other hand, he feared that the inmate's actions would result in the destruction of the inmate grievance system mandated by Paragraph 25 of the Court's order, and thus in a possible charge of contempt against himself, the Superintendent should be assured that his inability to comply with any portion of the Court's order, to the extent that such compliance is rendered impossible by inmates' actions that are beyond the Superintendent's control, would not be contumacious.

Likewise, it is clear that the inmate's letters did not constitute an act which constitutes "an obviously immediate and direct threat to the security of the institution, its staff, other inmates, or the inmate himself," the relevant portion of the text of the Class II–16 offense. Whether they might constitute an obvious threat of a disruption to the operation of the institution, etc., is beside the point, as this language was not sufficiently brought to the attention of the inmate population to permit sanctions to be imposed for violations thereof in accordance with Paragraph 8 of the Court's order of July 20, 1978.

Finally, in view of what has been said above, the inmate could not possibly be guilty of an "attempt" to "conspire" to violate a rule of conduct, since the conduct to which he allegedly attempted to conspire would not, in itself, constitute a violation of a rule of conduct.

The Special Master shared these views with the Superintendent, the Chief Inspector, and special counsel and made it clear that he regarded the issuance of the conduct report, the finding of guilt, and the sanction recommended by the Rules Infraction Board to constitute flagrant violations of Paragraph 8 of the Court's order. In the course of these discussions, the Special Master learned for the first time that the mat-

---

12. *Taylor v. Perini,* 455 F.Supp. 1241, 1254 (N.D.Ohio 1978).

ter of an appropriate response to the inmate's action had been raised with in-house counsel within the Department of Rehabilitation and Correction, that the course of conduct pursued had been approved as non-violative of the provisions of the Court's order in *Taylor v. Perini,* and indeed that the language of the conduct report itself had been reviewed and approved by in-house counsel. For this reason and for no other, the Special Master went to great lengths to explain why he believed that this incident constituted an egregious violation of the Court's order and urged the Superintendent and his special counsel to rectify the matter as best they could by withdrawing the conduct report, returning the inmate to the honor dormitory forthwith, and removing all references to the incident from the inmate's file. Although somewhat perplexed by the conflicting opinion of lawyers on the subject, the Superintendent, upon advice of his special counsel, acquiesced and took the steps requested by the Special Master.

This incident has been described at such length because, in the opinion of the Special Master, it carried the potential of setting back enormously the progress which the parties have made in this litigation over the past three years. The advice of in-house counsel in Columbus, if followed, would have resulted, at a minimum, in a finding of noncompliance and a recommendation by the Special Master that continued monitoring of the defendants' compliance be required. In view of the attitude displayed by the Superintendent, however, when the Special Master's point of view was brought home to him, the Court may be inclined to treat the matter as a closed incident. Once before in the course of this lawsuit the advice and actions of in-house counsel threatened dire consequences to one of the defendants in this case. But for the availability of special counsel then and now, the outcome of relying upon such advice could have been most unfortunate.

Thus while it is the recommendation of the Special Master that the Court accept the corrective actions taken by the Superintendent as sufficient to indicate a continuing commitment on his part to comply with the substance of Paragraph 8 of the Court's order, the defendants should understand that the Court's acceptance of the Special Master's recommendation, if that in fact occurs, will be a matter of grace rather than right.

## FINDINGS REGARDING COMPLIANCE

The Special Master finds that the current inmate manuals are in need of revision and recommends that the Court require that revisions be made to cause the manuals to reflect current rules and practices and that revised manuals be distributed to all inmates no later than June 1, 1979. Otherwise, apart from the incident described at length in the immediately preceding portion of this report and for the reasons stated therein, the Special Master finds that the defendants have remained in compliance with the provisions of Paragraph 8 of the Court's order of July 20, 1978.

## PARAGRAPH 9

*Correctional cell conditions.* By and large, the defendants have maintained the conditions in the correctional cells which are mandated by this provision of the Court's order. Inmates incarcerated in these cells have received normal institutional meals, although several complained that food is cold by the time it is served. Adequate clothing, bedding, toilet facilities and toilet articles are provided on a routine basis. The library book cart makes daily rounds to these cells, and inmates enrolled in educational programs are permitted to keep their textbooks. Normal mail privileges are provided. Clergymen and social services personnel are permitted to visit the area, and log books reflect that such visits in fact are made. While no attorneys have actually visited in this area, the Special Master has received no reports that access to attorneys is denied inmates held in these cells. The light is adequate for reading during the day, and, although the area is never completely dark at night, the lighting is sufficiently subdued to permit sleeping. Final-

ly, inmates in the correctional cells are given an opportunity to exercise at least once every third day.[13]

Only three of the eleven subparagraphs of Paragraph 9 require further discussion. Subparagraph 9(a) proscribes the incarceration of an inmate in a correctional cell for a period exceeding 15 days or for a total of more than 30 days within a six months period. Either of these limits may be exceeded only when an inmate's transfer to another correctional institution has been approved by the Department of Rehabilitation and Correction. The purpose of the exception is to permit the inmate to be confined in a correctional cell pending transfer to a maximum security institution and to avoid the necessity of placing such an inmate in the general population after a decision has been made (and approved) that he is not amenable to medium security classification.

Apart from instances in which an inmate has been held awaiting transfer to another institution, the defendants have complied with the requirements of this subparagraph. In one instance, however, involving a person whose transfer had been approved by the Department, the defendants misunderstood the purpose of the exception and utilized it incorrectly.

In this instance an inmate was apprehended after escaping from M.C.I. and the Rules Infraction Board recommended his transfer to maximum security. The recommendation was approved. Subsequently, however, the State of Ohio moved to prosecute the inmate on charges of escape as well as others, and he was held in a correctional cell at M.C.I. from July 24 until August 23, 1978, pending arraignment.

As the Special Master pointed out to the Chief Inspector when this situation came to the former's attention, the purpose of the exception to the general rule in subparagraph 9 is not to permit an inmate to be held in a correctional cell at M.C.I. for a long period of time awaiting arraignment or any other legal proceeding; rather, it is intended to account only for a brief delay which may occur in physically transferring from M.C.I. a prisoner whose transfer to another institution has been approved at the departmental level. In the case in hand, the defendants should have held the inmate in a maximum security institution pending his arraignment and brought him to Marion only when his appearance in court was required.

Subparagraph 9(d) requires that normal medical care be provided to all inmates housed in correctional cells and that a medically trained staff member make rounds of the correctional cells at least once during the course of the first and second employment shifts. The Special Master inspected log books maintained in the correctional cells and determined that medical rounds have been made at least once during the first and second shifts of each day. Indeed, most often, such rounds were made as well on the third shift.

Additionally, however, this subparagraph requires that prescription medication be dispensed in the correctional cell area by medical rather than correctional personnel. While the defendants generally have complied with this standard, there has been some deviation. For an undetermined period of time on one shift, the only medically trained staff person was female, and during this time prescription medication was passed to men in the correctional cells by a correctional officer. On some occasions it may be that the pharmacist performed this function and on others that inmates held in

---

**13.** This information was derived from correctional cell exercise logs maintained by the officers assigned to that area. The procedure is that an inmate will sign the log following his exercise period, indicating that exercise in fact has been provided. In one instance it is clear that an officer signed the inmate's name in the log. The inmate, who was a recent escapee, was regarded as dangerous, and this may explain the officer's actions. Although this isolated incident is not sufficient to cause the Special Master to doubt the reliability of the defendants' correctional cell records in general, the Superintendent should make it unequivocally clear to all staff that when an inmate's signature is called for on an official record, only that signature will suffice. In the event that an inmate refuses to sign such a record, the officer may enter, "refused to sign" followed by his own signature or initials.

correctional cells were brought by the officer out of the cell area into an entrance way where the paramedic dispensed medication. According to persistent and reliable reports from inmates, however, there were other occasions upon which medication was passed directly to the inmate in his cell by the correctional officer on duty.

On December 18, 1978, the Superintendent issued an order to the Infirmary Director that the pharmacist dispense prescription medication to correctional cell inmates when only the female paramedic is on duty; in the absence of the pharmacist, the Superintendent ordered that the inmate be brought from his cell to the entrance way where such medication will be dispensed by the female paramedic. This order was confirmed to infirmary staff by the Infirmary Director on December 22, 1978. If these orders are followed, the problem should not recur in the future.

Finally, the defendants have not adhered to the provisions of subparagraph 9(k) requiring that a correctional officer or other staff member be present within the correctional cell area except for brief, temporary absences or during emergencies and that each occupied correctional cell be visually inspected at least every 30 minutes. The Special Master received reports that the officers assigned to the correctional cell area spent considerable periods outside of that area, particularly during the second and third employment shifts. In order to investigate those reports the Special Master obtained copies of the institution's Daily Report Sheets for September and November, 1978, which indicate the assignment of individual officers to particular areas within the institution. During those months there was only one instance when an officer was not assigned to the correctional cell area. On all other occasions a correctional officer was given the correctional cell area as his primary responsibility.

Conversations with the Superintendent and the Associate Superintendent for Custody disclosed, however, that the correctional officer assigned to the correctional cell area often was given other duties. Three exigencies *regularly* required the officer assigned to the correctional cell area to leave his post and to assume other duties. First, during the second shift, pill-call is held, and because frequently no one is assigned to the pharmacy at that time, the officer covering 6 cellblock (the housing area opposite the correctional cells) or the correctional cells is called upon to supervise the passing of medication. The remaining officer then must cover both areas. Second, during the second and third shifts, the officers receive their own meals from a food cart which commonly is attended by an officer assigned either to 6 cellblock or to the correctional cell area. Again, the remaining officer then must assume surveillance of both areas. The Superintendent stated to the Special Master that this condition never lasted more than "a couple of hours." Third, when an officer became ill or needed to leave the institution for some other reason, he often was relieved by one of the officers assigned to either 6 cellblock or the correctional cells. This too requires "double locking." Because the door to the correctional cell area always is kept locked and is virtually soundproof, the assignment of any other duties to the officer stationed in the correctional cell area is inconsistent with the requirements of subparagraph (k).

It must be noted that during the last six months of 1978 the institution was substantially understaffed, partly because of the problems related to the administration of the MCOPI. *See, infra* at pp. 1314–1315. This required one officer to be assigned frequently to more than one post. Because the Court's order specifically requires continuous and generally uninterrupted staffing of the correctional cell area, however, the defendants may not continue to utilize the officer assigned to that area to perform other functions. Persistent understaffing does not constitute the "emergency" contemplated by the language of subparagraph 9(k), and it is clear that the officer's absence has been more than a "brief, temporary" one in many instances.

FINDINGS REGARDING COMPLIANCE

The Special Master finds that while the defendants have remained generally in

compliance with the provisions of Paragraph 9 of the Court's order of July 20, 1978, steps must be taken to insure that the surveillance mandated by subparagraph 9(k) in fact occurs. In addition, the Superintendent's order relating to the dispensing of prescription medication in the correctional cell area must be adhered to literally. Finally, the defendants must be careful to avoid expanding the transfer exception contained in subparagraph 9(a) beyond the situation for which it was intended.

## PARAGRAPH 10

*Inmate job assignments.* Between June 1, 1978 and December 1, 1978, 594 job changes were effected through the procedures established by this paragraph of the Court's order. Of these, 206 were intershop transfers in the stockade, 192 were intrashop transfers within the stockade, 153 were intershop transfers within the honor dormitory, and 43 were intrashop transfers within the honor dormitory. In addition, new inmates entering the institution during this period were assigned to their initial jobs through the new job assignment procedure.

Since the implementation of these procedures in November, 1977, 1167 job changes have been approved. Of these, 404 were intershop transfers within the stockade, 437 were intrashop transfers within the stockade, 252 were intershop transfers within the honor dormitory, and 74 were intrashop transfers within the honor dormitory. In spite of initial resistance by some inmates and job supervisors, the new system has taken hold and become an institutional fixture. What is more, the procedures are accomplishing their intended effect of eliminating arbitrariness and discrimination in the job assignment and removal processes. The success which has been achieved is to a very large extent attributable to the outstanding commitment and effectiveness of Mr. Gary Mohr, who became Job Counselor when the new procedures were initiated. All job assignments are coordinated by Mr. Mohr whose duties relate exclusively to the job assignment system. The four job assignment committees have operated effectively within their respective areas of responsibility. All are properly constituted except for the Stockade Reclassification Committee which has no representative from the Special Services Department; in place of such a representative, a staff member from the education department sits on that committee. This trivial deviation, in the opinion of the Special Master, is of no significance.

One serious instance of breakdown with respect to the activities of the job assignment committees has come to the attention of the Special Master. On March 23, 1978, an inmate assigned to the paint shop in the stockade received a conduct report alleging the offense of fighting with a weapon. Apparently because the charges were based upon reports of other inmates rather than the personal knowledge of the charging officer, the Rules Infraction Board found the inmate not guilty on March 27, 1978. On the same day, however, the inmate's job supervisor requested that he be "laid in," i. e. kept in his housing area during the normal work period. The reason for the request was some concern on the part of the work supervisor that other inmates in the paint shop would attempt to "get even" with the inmate who had received the conduct report. On April 17, at the job supervisor's request, the inmate appeared before the Stockade Reclassification Committee and was reassigned from the paint shop to the roofing gang.

The following entry was made on the inmate's permanent record:

> Reclass—Out slip for security of the institution. Should be placed away from the Paint Shop. Assign to Roofing Gang. Right of appeal explained.

This action was taken over the objections of two of the three members sitting on the Stockade Reclassification Committee. Apparently, following the initial interview of the inmate, the committee met, *in camera,* and two members of the committee felt that there were no substantiating grounds for transferring the inmate against his wishes. Nevertheless, the inmate was called back into the room and informed by

the Chairman of the committee that he was being transferred to the Roofing Gang.

The inmate filed a grievance with the Inspector of Institutional Services on May 1, 1978. Dissatisfied by the decision of the Inspector to the effect that the actions of the Reclassification Committee had been proper, the inmate appealed to the Chief Inspector who likewise offered no relief. It should be noted that at neither level was the critical issue of the chairman's overriding of his fellow committee members treated, and this is true in spite of the fact that at least one of the objecting committee members brought all of the facts to the attention of the institutional Inspector. On August 9, 1978, after it was clear to all concerned that the Special Master was aware of and interested in the incident, the Inspector of Institutional Services caused the following entry to be made in the prisoner's record:

> NOTICE The Reclass action of 4–17–78 is not to be construed as a disciplinary action. It is to be viewed as protection for inmates due to the physical attacks upon paint shop personnel.

In spite of further efforts by the inmate to obtain relief through the office of the Inspector of Institutional Services and that of the Chief Inspector, no steps were taken to remedy this obvious violation of Paragraph 10(a)(2) of the Court's order of July 20, 1978, which provides, "In the stockade, job transfers shall be made by the Reclassification Committee."

The committee which was convened to hear this matter consisted of the chairman, the inmate personnel officer, and the job counselor. Because the job counselor is a non-voting member of the committee, only two voting members were present. Missing were representatives from the Psychological Services Department and a representative from the Social Services Department. Having convened a rump committee, the chairman proceeded to override the majority on the theory that he had the inherent authority to reclassify an inmate for the security of the institution. In point of fact he has no such authority.

Following discussion in December, 1978, between the Superintendent and the Special Master, the inmate was brought up for review again by the Stockade Reclassification Committee. The chairman disqualified himself and the committee voted by a vote of four to zero to retain the inmate on the Roofing Crew. This resulted apparently from the desire of the inmate to remain on his present job assignment. The following entry was made on the inmate's permanent record:

> Reclass action taken on 4/17/78 reviewed. Comment entered 8/2/78 reviewed. Stress was made of transfer *not* being disciplinary. (The inmate) prefers to stay on roofing crew and not return to paint shop. Committee votes 4–0 to retain on roofing crew.

In view of the inappropriate nature of the proceedings which led to the inmate's original reassignment (at which point he would have preferred to remain in the paint shop), he continues to feel that the original and second entries on his permanent record are prejudicial. Apparently he would be satisfied by an entry to the effect, "4/17/78—reassigned to roofing crew from paint shop—non-disciplinary transfer." Under the circumstances, the request seems to be a reasonable one, particularly in view of the fact that these records are available to the Parole Board at the time of parole hearings. The Special Master believes that the Inspector of Institutional Services ought to be able to accomplish this modest objective.

In addition to constituting a serious breakdown of the procedures for reassignments by the Reclassification Committee, this incident points up the need for revision of the Court's order of July 20, 1978, to delineate the grounds and procedures for job removal. Paragraph 8(c) of the Court's original order of September 12, 1972, provided that

> Job assignment, transfer and removal shall not be employed for punitive purposes, and shall not be related to discipline for rule infractions except insofar as such infractions are job related and

manifest inability on the part of the violator to function in the job in question.[14] Paragraph 8(d) went on to require "defined procedures for making job . . . removals according to the specified substantive criteria, which procedures . . . shall not allow for deference to the wishes of job supervisors or fellow inmates." [15]

No language implementing these objectives appears in the Court's order of July 20, 1978, and this omission appears to have been one of oversight. At the time of his initial report to the Court, the Special Master pointed out that disciplinary job transfers were being effected by the appropriate job assignment committees on the basis of (1) recommendations by the Rules Infraction Board following a conviction and (2) recommendations of job supervisors.[16] At the present time, recommendations for disciplinary job transfers continue to emanate from these two sources, although approximately 40% of the requests by job supervisors and the Rules Infraction Board for disciplinary or work performance related transfers are being refused by the appropriate reclassification committees. In order to institutionalize procedures that will accomplish the objectives of the Court's original order in this case, the Special Master recommends the addition of a new subparagraph (h) to Paragraph 10 of the Court's order of July 20, 1978:

(h) *Involuntary job transfers*

(1) A disciplinary job transfer is one which is effected as a result of a disciplinary infraction or poor work performance. Any job transfer which is based upon a disciplinary infraction may be approved only when the infraction is job related and manifests an inability on the part of the violator to function in the job in question.

(2) A disciplinary job transfer may be recommended only by the Rules Infraction Board or the inmate's job supervisor. All such recommenda-

tions shall be approved or disapproved by the Reclassification Committee in the case of transfers within the stockade and by the Honor Dormitory Reclassification Committee in the case of transfers within the honor dormitory.

(3) A job transfer for medical reasons may be recommended by the institution physician. Such recommendations shall be approved or disapproved by the Reclassification Committee in the case of transfers within the stockade, and by the Honor Dormitory Reclassification Committee in the case of transfers within the honor dormitory.

(4) The provisions of this subparagraph shall apply to both intrashop and intershop involuntary job transfers.

(5) The Superintendent may order a non-disciplinary job transfer when he determines that an inmate must be transferred to protect the safety and security of the inmate, of other inmates, or of the staff. In such instances, the Superintendent shall forthwith provide the Job Counselor, the appropriate reclassification committee and the affected inmate with written notice of the inmate's removal from his job as well as with reasons therefor. No copy of this notice will be placed in the inmate's institutional records. The Job Counselor shall consult with the affected inmate and assign him to a job which is agreeable to the inmate. In the event that such agreement is not forthcoming, the inmate shall be permitted to lay in for a period not to exceed 15 working days, during which time he may bid on all intershop job openings which are posted. At the end of 15 days, if the inmate has not been assigned to a job, the appropriate reclassification commit-

---

14. *Taylor v. Perini*, 413 F.Supp. 189, 196 (N.D. Ohio 1976).

15. *Id.*

16. *Id.* at 249–250.

tee shall assign him to a job. In this event, the inmate may bid on any intrashop job opening in the shop to which he has been assigned as well as on any intershop job opening, and other bidding inmates shall not be given a preference over the transferred inmate because the latter has been on his new job for less than 90 days at the time of his bid. In all instances of involuntary transfer under this subparagraph, the inmate's record regarding the transfer shall only reflect that the transfer was made, e. g., "(date)—reassigned to (new job) from (former job)." Any involuntary transfer under this subparagraph shall be grievable.

With the addition of this subparagraph, the present subparagraph 10(h) should be re-designated 10(i) and the present subparagraph 10(i) should be re-designated 10(j).

All initial job assignments continue to be made by the Classification Committee and the Honor Dormitory Placement Committee. Such assignments are made to specific jobs rather than shops, and the inmate's job assignment is reflected on the daily inmate transfer sheets that are circulated to job supervisors and others throughout the institution.

Most job supervisors are utilizing intrashop transfer procedures to fill vacancies in their shops; only rarely, according to the Job Counselor, is such a vacancy posted for intershop bidding. In only two instances have inmates not among the top five in seniority bidding on the job been assigned to jobs through intrashop procedures. In one of these instances numbers five and six in seniority were selected in order to correct racial imbalance; in the second, the sixth inmate in seniority was selected because three of the top five in seniority did not

meet a basic qualification for the job. In two instances, the choice made by the job supervisor has been disapproved by the appropriate job assignment committee. In one of these, the reason for the disapproval was that the job supervisor had selected the sixth inmate in seniority from among those bidding, and the committee was not satisfied that there were sufficient reasons for deviating from the usual seniority requirement. A substantial amount of the Job Counselor's time is spent supervising and reviewing records of these intrashop transfers, and it appears to the Special Master that the system is working substantially as it was intended to.

Intershop transfers appear to be being posted properly, and all assignments have been made from among the five bidding inmates with highest seniority. The only exceptions to this have occurred when more than five inmates have been required for a particular job.[17] In view of the experience gained over the past year, it appears that "skilled" jobs, like others, are being filled from among the top five in seniority bidding for the job. For this reason, it is the recommendation of the Special Master that the provisions of Paragraph 10(d)(2) of the Court's order of July 20, 1978, permitting selection of an inmate below the top five in seniority in the case of "skilled" positions, be deleted from the order. The process for selecting an inmate below the top five in seniority is cumbersome and adds to the complexity of what is already a complicated process. Therefore, the Special Master recommends the deletion of the following language from Paragraph 10(d)(2) of the Court's order of July 20, 1978:

> unless the job has been designated as a 'skilled' job. If a job is designated as a skilled position in the Job Description Manual, the job assignment committee shall have the authority to choose an indi-

17. In addition there are approximately six positions for inmates who are assigned to work in and about homes occupied by staff and their families on the prison grounds. An inmate who fills one of these positions is selected by the staff member at whose home he will work, but the choice is subject to the approval of the reclassification committee. This constitutes a technical violation of Paragraph 10 of the Court's order. In view of the relationship of trust which is essential for these assignments and because of the very small number of inmates affected, the Special Master believes that the deviation should be disregarded by the Court.

vidual from outside the top five senior applicants. In such a case, however, the job assignment committee shall specifically state in its records why the job constitutes a skilled position and the reasons for selecting the particular inmate.

In place of this language, the Special Master recommends the addition of the following:

In the event that none of the five senior applicants for a job meets the basic requirements for the job contained in the Job Description Manual, the Job Assignment Committee may select an inmate below the five senior applicants. In such a case, the Job Assignment Committee shall fully document its decision.

One advantage to be gained from this change is the elimination of the need to classify certain jobs as "skilled" in the Job Description Manual. The current designations were made more with a view toward appropriate pay scale than the practical requirements of the job. In those instances in which particular skills are required for a job, these skills are designated in the individual job description.

The new job assignment system has been largely successful in eliminating racial imbalance in jobs and shops throughout the institution. As of October 23, 1978 all shops but one within the institution reflected the racial balance of the institutional population ± 20%. The exception was the identification department in the stockade where five black inmates and one white inmate were assigned. Of 255 job classifications, only 19 failed to reflect the mandated racial balance. In the stockade, where the racial balance was 57% black and 43% white, the imbalanced shops were the following:

| Shop and Job | # Black | # White | % Black | % White | % Deviation |
|---|---|---|---|---|---|
| Automobile Mechanics School-Porter | 1 | 3 | 25 | 75 | 32 |
| Cafeteria-Pot & grill worker | 2 | 4 | 33 | 67 | 24 |
| Cafeteria Creamery worker | 0 | 4 | 0 | 100 | 43 |
| Cafeteria-Vegetable room | 0 | 6 | 0 | 100 | 43 |
| Cafeteria-Bakery | 5 | 0 | 100 | 0 | 43 |
| Cafeteria-Pan room | 7 | 1 | 87 | 13 | 30 |
| Cell Block-Porter | 2 | 4 | 33 | 67 | 24 |
| Furniture Factory-Porter | 5 | 0 | 100 | 0 | 43 |
| Furniture Factory-Machine helper | 7 | 2 | 78 | 22 | 21 |
| Furniture Factory-Desk & Chair Assembler | 6 | 12 | 33 | 67 | 24 |
| Furniture Factory-Handsander | 5 | 1 | 83 | 17 | 26 |
| Paint Shop-Painter | 3 | 7 | 30 | 70 | 27 |
| Program Office Clerks-JayCee Cameraman | 0 | 5 | 0 | 100 | 43 |
| Safety & Sanitation-Hall porter | 21 | 5 | 80 | 20 | 23 |
| Sheet Metal-Cabinet assembler | 12 | 3 | 80 | 20 | 23 |
| Sheet Metal Annex-Welder | 1 | 3 | 25 | 75 | 32 |

In the honor dormitory, where the racial balance was 62% black and 38% white, the imbalanced shops were the following:

| Shop and Job | # Black | # White | % Black | % White | % Deviation |
|---|---|---|---|---|---|
| Cafeteria-Cook | 7 | 0 | 100 | 0 | 38 |
| Honor Dormitory Help-Dorm porter | 5 | 1 | 83 | 17 | 21 |
| Validation Plant-Inspector | 13 | 2 | 87 | 13 | 25 |

According to the Job Counselor, while every quarterly report reflects racial imbalance in some shops and jobs, the affected areas change from one reporting period to another. These quarterly racial breakdown reports are prepared by the Job Counselor and distributed to the various job assignment committees, and these committees take steps to eliminate racial imbalance through their ongoing job assignment activities.

Only four job classifications within the stockade have been designated as requiring honor or semi-honor status. These are the following:

| Shop | Job | Number of Positions | Designation |
|---|---|---|---|
| Safety & Sanitation | Front Office Porter | 8 | semi-honor |
| JayCee | Cameraman | 1 | semi-honor |
| Arts & Crafts | Clerk | 1 | honor |
| Administrative Packages | Carrier | 2 | honor |

Three job classifications within the honor dormitory have been designated as "special security" positions. These are the following:

| Shop | Job | Number of Positions |
|---|---|---|
| Garage | Columbus milk run driver | 1 |
| Witzel's Gang | Driver | 1 |
| O.P.I. | Driver | 2 |

Thus it appears that the Superintendent has been entirely reasonable in designating jobs requiring special security status and that no effort has been made to utilize this procedure to avoid the normal operation of the job assignment system. These "special assignments" have been filled in accordance with the usual procedures, except that the Superintendent has exercised his power of approval or disapproval before the assignment actually has been effected.

As required by subparagraph 10(h), the Inspector of Institutional Services has exercised jurisdiction over several grievances involving job supervisors or the Job Counselor. Likewise, the honor dormitory and stockade reclassification committees have been performing annual reviews as part of their ongoing committee activity. There has been no general updating of job descriptions in the Job Description Manual, and, according to the Job Counselor, this should be done in the near future. Finally, no job supervisor has been subjected to discipline under subparagraph 10(i) of the Court's order. Verbal and written communications between the Job Counselor and job supervisors apparently have been sufficient to maintain compliance on the part of the job supervisors. In only one case was it necessary for the Job Counselor to ask the Chairman of the Stockade Classification Committee to intervene, and that action was effective.

Two matters remain to be discussed in connection with this paragraph of the Court's order. First, it appears that the level of education enrollment has fallen far short of that projected by the Director of Education Department at the time of the expansion of the Education Department staff in June of 1976. At that time, the Director of the Education Department projected that 380 inmates would be engaged in full-time educational programs consisting of vocational, GED, College, and adult basic education courses.[18] The purpose of this expansion was to decrease the extent of featherbedding present in the institution in order to lay the groundwork for the development of a rational job assignment system as required by the Court's order of September 12, 1972.[19]

The most recent figures submitted to the Special Master by the Director of the Education Department indicate that 230 inmates are involved in educational program-

**18.** *Taylor v. Perini*, 421 F.Supp. 740, 756 (1976). **19.** *Id.*

ming, of which only 189 are engaged in full-time educational programs. Thus the expansion of the education program which was projected to result in 262 fewer inmates in need of regular jobs [20] has in fact only produced 71 such persons. In the opinion of the Special Master, steps can and should be taken at M.C.I. to develop educational programming that will absorb more inmates and thus reduce the size of the inmate labor force. It was, after all, for this purpose that more than $73,000 was made available to M.C.I. by the Department of Rehabilitation and Correction.

Finally, it is clear to the Special Master that the office and person of a single unassisted Job Counselor are being overtaxed by the demands of the new job assignment procedure. Unfortunately, it is not feasible for the Job Counselor, like other senior administrators, to employ an inmate clerk. The reason for this is that the employment of an inmate clerk will lead to suspicions, at least among some of the general inmate population, that job assignments can be purchased. Based upon a careful evaluation of the activities of the Job Counselor over the past year, it is the conclusion of the Special Master that the entire system is in danger of falling under its own weight, and that this can be eliminated only by the assignment of a full-time assistant to the Job Counselor. This conclusion is reinforced by the obviously inadequate record keeping that occurred during the period that the Job Counselor was on vacation and away from the institution because of illness.

For this purpose, the Special Master recommends that the Department of Rehabilitation and Correction provide funds for the hiring of a person to act as assistant to the Job Counselor. The duties of such a person will not be primarily secretarial, and for that reason the assistant should have abilities other than clerical ones. It may be possible to employ such an assistant as an intern and to attract a college student from the Marion area who would be interested in entering corrections as a career. Whatever the source of the assistant, however, it is the belief of the Special Master that his employment at the earliest possible opportunity is essential if the job assignment system is to continue to operate in the manner contemplated by the Court.

## FINDINGS REGARDING COMPLIANCE

It is the finding of the Special Master that, apart from the incident regarding the involuntary transfer of an inmate from the paint shop to the roofing gang that is discussed above, the defendants have remained in substantial compliance with the provisions of Paragraph 10 of the Court's order of July 20, 1978. In order to improve the operation of the job assignment system, the amendments to the procedure recommended above should be effected. In addition steps must be taken to implement educational programming which will reduce the size of the inmate labor force, as projected by the Director of the Education Department in 1976. Finally, the Special Master finds that continued compliance at the level demonstrated by this report will require the assignment of a staff member to serve as assistant to the Job Counselor.

## PARAGRAPH 11

*Publication and distribution of staff manual.* As of December 1, 1978, all staff members had been given a copy of an M.C.I. staff manual containing written rules prohibiting racial discrimination, harassment, intimidation and insult, coupled with sanctions for their violation. In addition, these employees received a diminutive but readable verbatim copy of the Court's order which is to be stapled to the back inside cover of the manual. When a new staff manual is published, the Court's final order in *Taylor* should be incorporated into the body of the manual itself.

## FINDINGS REGARDING COMPLIANCE

It is the finding of the Special Master that the defendants are in full compliance with the provisions of this paragraph of the Court's order of July 20, 1978.

**20.** *Id.* at 757.

## PARAGRAPH 12

*Inclusion of statement of nondiscrimination policy on staff job descriptions and employment application forms.* The language mandated by the Court's order appears on all position descriptions utilized by M.C.I. In addition, a copy of the language is stapled to Civil Service Exam Interest Form and the State of Ohio Employment Application that must be completed by all job applicants. The language does not appear on the employment application form itself because this uniform application form is utilized for all state employment purposes.

## FINDINGS REGARDING COMPLIANCE

It is the finding of the Special Master that the defendants have remained in full compliance with this provision of the Court's order of July 20, 1978.

## PARAGRAPH 13

*Staff orientation.* All new employees at M.C.I. participate in a week-long orientation program directed by the Training Officer. In the course of this program, employees are exposed to the principles embodied in the Federal Equal Employment Opportunity Act and are apprised of their obligation to refrain from racial discrimination, harassment, and insult against fellow staff members and inmates. The sanctions that will be imposed for such behavior are explained.

## FINDINGS REGARDING COMPLIANCE

It is the finding of the Special Master that the defendants have remained in full compliance with the requirements of this paragraph of the Court's order of July 20, 1978.

## PARAGRAPH 14

*Pre-hire psychological testing of correctional officers.* In the fall of 1978, following the Court's issuance of its order of July 20 of that year, difficulties encountered in the frequent and regular scheduling of the Marion Correctional Officer Psychological Inventory resulted in a critical shortage of correctional officers at M.C.I. Between mid-September and the end of October, the shortage ranged from 27 to 30 correctional officers. This figure takes on concrete meaning when it is compared to the standard component of 35 correctional officers on duty per shift at the institution. In addition, because of his concern that certain federally funded positions might lapse because of the inability of the institution to fill them within 60 days of the occurrence of a vacancy, the Superintendent requested permission to waive the pre-hire administration of the MCOPI with respect to individuals seeking these positions and to test them after they commenced their employment. The Special Master felt constrained to deny this request in view of the importance attached to pre-hire administration by the psychologists who developed the MCOPI, and he so informed the Superintendent on October 6, 1978.

These difficulties occurred in spite of the issuance of the Opinion of the Attorney General 78–044 on June 27, 1978, authorizing the Department of Administrative Services to permit employees of the Department of Rehabilitation and Correction to administer the MCOPI on site at M.C.I. At no time has the Department of Administrative Services relinquished its direct control over the administration of the test. No objection could be made to this but for the fact that the Department of Administrative Services failed to administer the test sufficiently frequently at Marion to permit the institution to meet its hiring needs.

After correspondence between the Special Master and the Chief Counsel to the Attorney General, procedures were developed to remedy this problem. As of mid-December, 1978, the MCOPI was being administered twice per month in Marion by employees of the Department of Administrative Services. The number of unfilled correctional officer positions at that time had fallen to 15 and the Personnel Officer at M.C.I. believed that the new schedule for administration of the test would be sufficient to meet M.C.I.'s needs.

With the exception of former employees who are reinstated and correctional employees transferring to M.C.I. from another of Ohio's prisons, all incoming entry level custody personnel are hired from a Certification Eligibility List prepared by the Department of Administrative Services. This list, in turn, consists exclusively of persons who have achieved a satisfactory score on the MCOPI. Several former employees, certified under the Civil Service test which preceded the MCOPI, have been employed during the past six months, as has one certified correction officer employed at another prison in Ohio. That person too was certified under the former Civil Service test. Thus it appears that no effort is being made by the defendants to circumvent the use of the MCOPI by hiring large numbers of former employees or transfer applicants. Indeed, in two cases, former employees at another institution were not reinstated for the purpose of permitting them to transfer to M.C.I. because it was felt that they would not be satisfactory employees. These persons, had they wished to obtain employment at M.C.I., would have been required to take the MCOPI.[21]

According to a report received by the Special Master from Mr. Norman Peterson of Personnel Decisions Research Institute, the longitudinal empirical validity study which commenced in the late fall of 1977[22] is progressing satisfactorily. At this time some 280 correctional officers at correctional institutions other than M.C.I. have taken the test battery, which includes the MCOPI psychological component as well as several other batteries. P.D.R.I. is proceeding to collect criterion ratings for these persons in order to determine the extent to which performance on the test appears to be predicting accurately on-the-job behavior. In general, Mr. Peterson reported that P.D.R.I. has received cooperation both at the depart-mental and at the institution level, although some difficulties in developing the necessary data have been experienced in at least one institution. According to Mr. Peterson, several superintendents are enthusiastic about the prospect of the adoption of the new test in place of the existing Civil Service test that is being used for employment at all of Ohio's prisons other than M.C.I. pending the outcome of the validation study.

The target date for completion of the longitudinal empirical validity study is October 1, 1979, but P.D.R.I. will ask for an extension of approximately three months in order to prepare its final report. The Special Master recommends that the defendants be required to submit to the Court a copy of this report when it is received.

## FINDINGS REGARDING COMPLIANCE

The Special Master finds that the defendants are in full compliance with the requirements of Paragraph 14 of the Court's order of July 20, 1978, but that they should provide the Court with a copy of the completed final report of the longitudinal empirical validity study being prepared by Personnel Decisions Research Institute.

## PARAGRAPH 15

*In-service staff training.* Following the Court's adoption of the Special Master's fourth report, Director Denton and Superintendent Perini agreed to implement a program of in-service training for all employees at M.C.I. who have significant direct contact with inmates at the institution. This agreement was incorporated into the Court's order of July 20, 1978. New employees who attend the orientation program required by Paragraph 13 of that order and employees who attend a course of in-service training held at the Ohio Peace Officer

21. Because personnel at M.C.I. have access only to the Certification Eligibility List prepared by the Department of Administrative Services, the Special Master has not obtained information concerning the number of persons failing to qualify for employment as a result of the administration of the MCOPI. At the time of the Special Master's fifth report, 12.6% of the persons taking the MCOPI were failing to qualify for employment at M.C.I. *Taylor v. Perini*, 455 F.Supp. 1241, 1264 (N.D.Ohio 1978).

22. *Taylor v. Perini*, 446 F.Supp. 1184, 1212–1213 (N.D.Ohio 1977).

Training Academy in a given year are exempt from further re-training at the institution during that year.

During 1978, 69 employees received re-training at the Ohio Peace Officer Training Academy and obtained from that source the training exposure required by Paragraph 15 of the Court's order of July 20, 1978. In addition, 72 employees attended the new employee orientation program and at least 13 employees assumed duties, such as secretarial, which do not entail significant direct contact with inmates at the institution. No person appears in more than one of these three categories. Thus, 154 persons on the staff on December 2, 1978, were exempt from mandatory participation in the in-service training program developed in accordance with Paragraph 15.

Between January 1, 1978 and December 2, 1978, 233 M.C.I. employees completed the institutional in-service training program. Twenty-one employees employed on December 2 failed to receive any form of re-training during 1978, and none of these persons was exempt from the in-service training requirement of the Court's order. Ten of those individuals, however, are part-time employees who teach only at night, three retired at the end of 1978, two were on extended leaves of absence, and another is the officer who coordinates and serves as instructor at the training sessions. The remaining five persons who did not receive in-service training were supervisory staff personnel who, according to the Superintendent, will participate in an in-service training program early in 1979.

As of December 2, 1978, M.C.I. employed 338 persons, 70 fewer than are accounted for by combining those persons who are exempt from institutional in-service training (154), those persons who received such training (233), and those staff members who were not trained but who were not exempt (21). This discrepancy, in the opinion of the Special Master, is accounted for by the fact that M.C.I. experiences a substantial turnover in employees during the course of a year. Thus a number of employees were trained during 1978 who were not employed by the institution on December 2, 1978. What is clear, however, is that the defendants are maintaining a training capacity which is amply sufficient to provide in-service training for the maximum number of employees who may require such training during the course of a year.

While the Special Master did not examine the employment files of all 338 persons employed by M.C.I. on December 2, 1978, in order to confirm the conclusions supported by the data discussed above, a random check was made of a substantial number of such files. In every case the presence of a certification of in-service training was found confirming the accuracy of the data provided by the Training Officer to the Special Master.

The re-training program administered at M.C.I. continues to contain elements designed to foster sensitivity to racial and ethnic temperament and to improve human relations skills. Additionally, a record indicating the completion of the institutional or Ohio Peace Officer Academy's re-training program is maintained in participants' employment files.

### FINDINGS REGARDING COMPLIANCE

It is the finding of the Special Master that the defendants have achieved substantial compliance with the requirements of Paragraph 15 of the Court's order of July 20, 1978.

### PARAGRAPH 16

*Inmate orientation.* An orientation program for incoming inmates is held every week at M.C.I. The topics dealt with include the Court's order in this case as well as the responsibility of the inmate to refrain from acts of racial discrimination, intimidation, and harassment. This portion of the orientation program is assigned to the Director of the Psychological Services Department.

### FINDINGS REGARDING COMPLIANCE

It is the finding of the Special Master that the defendants have remained in full

compliance with the provisions of Paragraph 16 of the Court's order of July 20, 1978.

## PARAGRAPH 17

*Annual audit by Chief Inspector.* On September 20 and 22, 1978, the Chief Inspector conducted his first audit of the state of compliance at Marion with the provision of the Court's order in *Taylor v. Perini.* His report to the Director was submitted October 16, 1978. The report, which consumes some one and a half pages, reflects the deficiencies which existed in the two law library collections, the failure of the defendants to add a verbatim copy of the Court's order of July 20, 1978 to the staff manual, the absence of required racial balance in 6 cellblock, and the fact that the Inspector of Institutional Services was not conducting in-service training for existing employees.

A second audit was conducted by the Chief Inspector on November 15 and 21, 1978, and his written report was submitted to the Director on November 24, 1978. In it, he reported that all of the problems discovered at the time of the first audit had been corrected with the exception of the missing law library materials. The remainder of his one and a half page report reflects his pleasure at his finding of compliance, his impression that employees are well acquainted generally with the Court's order in this case, his concern about the difficulty of obtaining racial balance in a number of dormitories, and his feeling that remarkable progress has been made in achieving total compliance.

In the opinion of the Special Master, the audit reports submitted by the Chief Inspector do not reflect a careful evaluation of the institution's state of compliance or noncompliance with the Court's order and thus fail to serve the purpose for which they are intended. In addition, more careful follow up would have indicated that racial balance indeed had not been achieved in 6 cellblock.

The purpose of the annual audit and the report thereof is to apprise the Director of the extent to which practices and policies at M.C.I. are falling short of the requirements of the Court's order in *Taylor v. Perini.* In addition, it should provide a factual foundation for findings of compliance. Lacking a better model, the Chief Inspector might consider the various reports of the Special Master in this litigation. By failing to discover and report instances of noncompliance, even when these are explainable and perhaps excusable, the Chief Inspector is doing both the Superintendent of M.C.I. and the Director a disservice. For it is only by receiving this information, unwelcome as it may be, that the Director can take steps to avoid the further involvement of this or another court.

As an example, by the time of his first audit, the Chief Inspector had received several communications (including a grievance appeal) concerning the objection of one inmate at being transferred from the paint shop to the roofing gang on the recommendation of his supervisor.[23] The most cursory investigation by the Chief Inspector would have discovered that the reassignment was ordered over the objections of a majority of the Reclassification Committee. This rather obvious incident of noncompliance, had it been reported accurately to the Director, could have been cured quickly and easily. Likewise, a more thorough inquiry would have disclosed elements of noncompliance relating to the grievance system itself, the principal responsibility of the Chief Inspector. The same is true of a number of other significant incidents of noncompliance disclosed by this report.

## FINDINGS REGARDING COMPLIANCE

It is the finding of the Special Master that, although audits of the extent of compliance with the terms of the Court's order were made and reported by the Chief Inspector, these audits and reports were not sufficiently complete to accomplish the purposes of Paragraph 17 of the Court's order of July 20, 1978.

---

**23.** This incident is discussed at pp. 1307–1308 *supra* of this report.

### PARAGRAPH 18

*Racial balance in housing units.* In his fifth report to the Court, the Special Master indicated that the defendants were in a state of noncompliance with the original order in two cellblocks and in six dormitories.[24] It also was noted that the defendants were out of compliance with the standards of the then proposed Order and Agreement in two cellblocks and in only one dormitory.[25] Although acknowledging the chronic difficulties with achieving strict compliance with the terms of the original order, the fifth report stated: "In the event of a review by the Special Master in December of 1978, however, the defendants should be aware of the fact that they are expected to adhere literally to the provisions of the Court's final order on this subject."[26] This they have not done.

The Court's order of July 20, 1978, requires the assignment of inmates to the various housing units of the institution to reflect the racial balance of the overall population of the stockade and the honor dormitory respectively, allowing for a deviation factor of ± 5% in the cellblocks and ± 15% in the dormitories. Racial balance for cellblocks and dormitories is measured on a monthly basis by averaging the weekly racial balance in the housing units for a period of four weeks. Three of the twelve stockade dormitories are exempted from the provisions of this paragraph so long as they continue to be used to house participants of educational and drug rehabilitation programs. 2B dormitory continues to house participants in the educational program, and 5 and 5E dormitories continue to house inmates participating in a drug rehabilitation program. Compliance with this paragraph is established if no more than one of the nonexempt dormitories has a racial composition which exceeds the deviation factor. (If for nothing else, the Court in *Taylor* can take credit for articulating this "wild card" theory in institutional reform litigation.)

The bed assignment figures for four dates, October 17, October 24, October 31, and November 7, 1978, were selected randomly, averaged, and compared to the racial breakdown in the institution for the date of October 31, 1978. On October 31, 1978 the racial composition of the stockade was 42.45% white and 57.45% black. The following figures indicate the average racial composition in each nonexempt housing unit in the stockade for the four weeks period.

| Housing Unit | # White | # Black | % White | % Black | % Deviation from Stockade Population |
|---|---|---|---|---|---|
| 1 Cellblock | 29.50 | 37.00 | 44.36 | 55.64 | 1.81 |
| 2 Cellblock | 29.75 | 37.00 | 44.57 | 55.43 | 2.02 |
| 3 Cellblock | 27.75 | 39.00 | 41.57 | 58.43 | 0.98 |
| 4 Cellblock | 30.75 | 36.25 | 45.90 | 54.10 | 3.35 |
| 5 Cellblock | 30.25 | 36.00 | 45.66 | 54.34 | 3.11 |
| 6 Cellblock | 33.75 | 33.00 | 50.56 | 49.44 | 8.01 |
| 1 Dormitory | 25.00 | 38.25 | 39.53 | 60.47 | 3.02 |
| 1A Dormitory | 21.75 | 41.25 | 34.25 | 56.48 | 8.03 |
| 2 Dormitory | 15.00 | 48.75 | 23.53 | 76.47 | 19.02 |
| 3 Dormitory | 29.50 | 33.75 | 46.64 | 53.36 | 4.09 |
| 3C Dormitory | 10.25 | 52.50 | 16.33 | 83.67 | 26.22 |
| 4 Dormitory | 19.25 | 44.25 | 30.31 | 69.25 | 12.24 |
| 4D Dormitory | 21.75 | 41.75 | 34.25 | 65.75 | 8.30 |
| 6 Dormitory | 40.75 | 22.50 | 64.43 | 35.57 | 21.88 |
| 6F Dormitory | 30.50 | 32.00 | 48.80 | 51.20 | 6.25 |

24. *Taylor v. Perini,* 455 F.Supp. 1241, 1267 (N.D.Ohio 1978).

25. *Id.* at 1268.

26. *Id.*

Thus, during the period measured, the defendants exceeded the deviation in one of the cellblocks and in three of the dormitories. Because one of the dormitories may be discounted, the defendants were out of compliance in three housing units.[27]

Particularly troublesome is the state of noncompliance found existing in 6 Cellblock, which is considered the most desirable housing unit within the stockade. Accordingly, compliance in 6 Cellblock has been of great interest both to the plaintiffs and to the Court. Although the Special Master previously has demonstrated reluctance to attribute noncompliance in 6 Cellblock to resistance by the defendants, 421 F.Supp. 740, 773, it must be noted that the racial breakdown in 6 Cellblock has exceeded the deviation factor at the time of the Second, Third, and Fifth Reports.[28]

When the Department conducted an audit on October 16, 1978, noncompliance in 6 Cellblock was reported and the Superintendent was directed to take action to correct the problem.[29] On October 30, 1978, the Inspector of Institutional Services at M.C.I. informed the Chief Inspector that "the 6 Cell Block situation has now been resolved. (The Superintendent) and (the inmate personnel officer) discussed this and (the inmate personnel officer) is now in the process of placing 2 or 3 more blacks into 6 CB which will bring it into complete compliance with the plus or minus 5% as required." Nonetheless, on December 5, 1978, the deviation was 11.42%; thus the devia-

tion increased rather than decreased after noncompliance was brought to the attention of the Superintendent.[30]

The practice of having "allotted cells," see 413 F.Supp. 189, 259, has made achieving compliance in 6 Cellblock more difficult and this fact has been acknowledged by the Superintendent. That practice obviously cannot continue if it conflicts with this provision of the Court's order of July 20, 1978. Action must be taken also to alleviate the racial imbalance in at least two of the three imbalanced dormitories.

During the same period of time referred to above, the racial balance in the honor dormitory was 37.02% white and 62.98% black. The average racial composition of the honor dormitory's North Dormitory was 39.25 whites and 78.25 blacks or 33.40% white and 66.60% black. This reflects a deviation from the entire honor dormitory population of 3.62%. In the East Dormitory, the racial breakdown was 42.75 whites and 57.00 blacks or 42.86% white and 57.14% black. This reflects a deviation of 5.84%. Thus both housing units within the honor dormitory were in compliance with this paragraph of the Court's order.

An examination of the bed patterns within the housing units both in the stockade and in the honor dormitory continues to indicate a reasonable degree of integration in the various bed and cell rows. Although there is considerable room for improvement, particularly within the cellblocks, a reasona-

27. It should be noted that during the period covered by this report as well as earlier, the Superintendent was operating under an agreement with the Special Master that no involuntary housing transfers would be effected to achieve racial balance in a unit. Thus, the Superintendent has been somewhat handicapped by this limitation in his effort to achieve full compliance.

28. The racial balance in 6 Cellblock at the time of the first report also did not reflect the racial balance in the stockade population, plus or minus 5%. This, however, was before a standard of compliance had been determined.

29. In the report of his audit, the Chief Inspector stated that the reason for imbalance in 6 Cellblock was that the "Inmate Personnel Officer was not aware that 6 Cellblock must also re-

flect the racial balance in the stockade population, plus or minus 5%." The Inmate Personnel Officer indicated this as well to the Special Master in December, 1978, during the course of the latter's on site inspection at M.C.I. Based upon three years of contact with this staff member, the Special Master believes that this is a truthful explanation.

30. At the time of his own on site inspection in December, 1978, the Special Master was told that racial balance would be achieved in 6 Cellblock by the end of 1978. As of February 9, 1978, 35 black inmates and 33 white inmates were assigned to that housing unit. Thus, although there has been improvement, the deviation is still 6.05% and 6 Cellblock remains out of compliance.

ble degree of racial integration has been established throughout bed rows in the housing dormitories throughout the institution.

## FINDINGS REGARDING COMPLIANCE

It is the finding of the Special Master that racial balance in housing assignments within the stockade has deteriorated since the Special Master's submission of his fifth report to the Court. Under these circumstances, the Special Master is forced to conclude that the defendants have not maintained substantial compliance with the provisions of Paragraph 18 of the Court's order of July 20, 1978.

## PARAGRAPH 19

*Placing of grievance references in inmates' files.* The Special Master examined the files of a large number of inmates who filed grievances between July and December, 1978. In particular, files of persons submitting several grievances were examined. In no case did the Special Master come across any reference or document relating to the filing of a grievance or to a claim that the provisions of the Court's order had been violated.

## FINDINGS REGARDING COMPLIANCE

It is the finding of the Special Master that the defendants are in full compliance with the provisions of Paragraph 19 of the Court's order of July 20, 1978.

## PARAGRAPHS 20 and 21

*Racial discrimination, harassment, intimidation, and insult.* Apart from the matter of racial imbalance in several housing units discussed earlier in this report, no incidents of racial discrimination, harassment, intimidation or insult by staff members against inmates have been verified by the Special Master. Although allegations of racial discrimination, harassment, or insult were made in several grievances, the Inspector of Institutional Services and the Outside Citizens' Review Committee were unable to find substantiating evidence in any of these

cases. The Special Master has reviewed these grievances and he is unable to determine that racial discrimination, harassment, or insult actually occurred.

The principal mechanisms which were developed in order to prevent incidents of this type and to deal with those which inevitably must occur from time to time are the grievance system and the two resident councils. For this reason, the Special Master has not attempted to canvass inmates on a regular and continuing basis in order to learn about such incidents; moreover, when an allegation of racial discrimination or insult has been made, the Special Master has suggested that the inmate utilize the grievance system in order to obtain relief.

## FINDINGS REGARDING COMPLIANCE

It is the finding of the Special Master that the defendants are in compliance with the provisions of Paragraph 20 of the Court's order of July 20, 1978, in that no practice or policy of the institution, apart from housing assignment practices discussed above, has the purpose or effect of racial discrimination. While isolated acts of racial discrimination, harassment, intimidation, and insult by individuals no doubt occur from time to time, there is no evidence of systematic or widespread conduct of this kind.

## PARAGRAPH 22

*Resident Councils.* Resident Councils continue to function both in the stockade and in the honor dormitory. Elections were held in August, 1978, and 18 representatives were elected to the Stockade Resident Council and 6 representatives were elected to the Honor Dormitory Affairs Council. In the honor dormitory, five rather than six alternate representatives were selected, and in the stockade alternate representatives where chosen for 17 out of 18 housing units.[31]

From time to time representatives have resigned their membership. When the Special Master met with the honor dormitory

---

**31.** No alternate representative was chosen for 6 dormitory.

council in mid-December, 1978, it consisted of 5 members and there were no alternates available. At that time, there were several housing units in the stockade which were not represented on the stockade council. No special elections were held in the honor dormitory until December 20, 1978. At that time a sixth representative and four alternate representatives were elected. A special election was held in the stockade in November, 1978, at which time difficulty was encountered as a result of the evening shift commander's refusal to honor duly issued passes permitting council representatives to circulate throughout the institution to hold elections. This problem was resolved and the election was held on the following evening.

Written guidelines for the stockade council have remained unchanged since August 6, 1976.[32] In October, 1977, the stockade council agreed to the establishment of standing committees to be concerned with the areas of food service, mail and visiting, medical service, recreation, safety and sanitation, and policy.[33] Although these committees, in addition to the executive committee, have functioned since that time, no change in the Resident Council Guidelines reflects the new organizational structure. Because these committees are permanent components of the stockade council, the Special Master recommends that appropriate amendments reflecting this fact be made to the Stockade Resident Council Guidelines.

To the knowledge of the Special Master, only one effort was made between July, 1978 and December 1978 to amend the stockade council guidelines. The proposed amendment related to the structure and jurisdiction of the policy committee. Apparently, the proposal was rejected by the staff member serving as liaison person between the administration and the policy committee. Although that person discussed the proposal with the Superintendent, no

written explanation of disapproval was provided by the Superintendent as required by Paragraph 22 of the Court's order of July 20, 1978.

By memo of December 15, 1978, the Honor Dormitory Affairs Council informed the Superintendent of two proposed amendments to the Constitution of that organization which was adopted on August 9, 1976.[34] Article III(1)(b) was amended to read as follows:

> To be eligible for election to the Honor Dormitory Affairs Council, an inmate must have lived within the Honor Dormitory a minimum of sixty (60) days uninterrupted by parole or escape, i. e., a candidate must have lived within the Honor Dormitory those sixty (60) days prior to the election date and shall not have less than six (6) months to the parole board.

In addition, Article V(2) was amended to read as follows:

> There will be three (3) officers in the Honor Dormitory Affairs Council, these being the Chairman, Secretary, and Assistant Secretary. The Chairman and Secretary must be elected from the representatives block and the Assistant Secretary may be elected from the representatives block or from the alternates block.

There having been no indication of disapproval from the Superintendent, these amendments are now in effect.

The Special Master recommends that up-to-date copies of the stockade council guidelines and the honor dormitory constitution and by-laws be prepared for use by present and future members of the two councils. In the future, it would be useful to include these documents in the stockade and honor dormitory inmate manuals so that all inmates may be aware of the nature and structure of the organizations which serve them. The Special Master recommends that this be accomplished at the time of the

32. See *Taylor v. Perini*, 431 F.Supp. 566, 615 (N.D.Ohio 1977).

33. *Taylor v. Perini*, 446 F.Supp. 1184, 1203 (N.D.Ohio 1977).

34. *Taylor v. Perini*, 431 F.Supp. 566, 620 (N.D. Ohio 1977).

distribution of the revised manuals in June, 1979.

The administration as well as the councils themselves have provided the Special Master with all records of agendas, meetings, and proposals of the two councils between the summer of 1978 and December, 1978. These records reflect that all standing committees of the stockade council, the council itself, and the honor dormitory council have met on a regular and frequent basis. Although every standing committee has not met at two weeks' intervals, as the Superintendent hoped, no committee has been hampered by the inability to meet. In most cases, staff liaison members have met with the various committees on a regular basis. Meetings between the councils and the Superintendent have been rare and both councils have expressed concern about this matter to the Special Master.

Both councils are provided adequate office, meeting, and filing space. In addition, there have been no complaints concerning provision of office supplies.

With respect to meeting reasonable requests for information, at least one request by the stockade council has been refused consistently by the Superintendent over a period of a year. That organization has sought information about the current balance in the Industrial and Entertainment account which is maintained for the general inmate welfare. Contributions to this account originate, *inter alia,* from cash confiscated within the institution. Since this account is utilized to purchase recreation equipment as well as other items related to the activities of one or more standing committees, the Council has taken the position that this information would be useful to the committees in attempting to prepare feasible proposals. The Special Master agrees and has raised the matter several times with the Superintendent; at no time, however, has a reasonable explanation for refusal been offered.

Written responses from the Superintendent or his designee have been provided to some, but not all, council proposals. For example, on June 28, 1978, the medical committee of the stockade council recommended that dental floss be sold in the commissary and that it be permitted to enter the institution through visits and mail. Likewise, on November 29, 1978, the same committee recommended that antacid tablets be available in the housing units. On July 20, 1978, the food service committee proposed the holding of a Labor Day picnic, and the staff liaison member agreed to take this written recommendation to the Superintendent. As pointed out above, the policy committee, in an undated memorandum, proposed a change in the jurisdiction and structure of that committee. Finally, on October 24, 1978, the stockade council recommended that it be permitted to hold a general assembly for the entire stockade population. To the best of the Special Master's knowledge, no written response was provided to any of these proposals.

Council members are permitted to report their activities in block meetings, although some difficulty has been experienced in this regard from time to time with officers in the stockade. As best the Special Master can determine, the stockade council has access to "Points of Interest," the resident newsletter which is published in the stockade, although it has not utilized this vehicle on a regular basis.

No significant reports of harassment, intimidation or insult of council members relating to their service on one of these bodies have been received by the Special Master. The incident described in that portion of this report dealing with Paragraph 8 of the Court's order did involve a member of the honor dormitory council, and it is the opinion of the Special Master that the administration's exaggerated response was due, at least in part, to the inmate's position on the council.

The purposes which underlay the creation of the two resident councils were the development of more effective communication between the administration and the inmate body, the creation and adoption of new programs and policies which would benefit the inmate population without compromising the security of the institution, and, in

particular, the providing of yet another means for maintaining compliance with the requirements of the Court's final order in this case. From the point of view of the inmates, certainly, the value of these institutions is measured almost entirely by the extent of perceived accomplishments. Whatever the level of effectiveness of the two councils, M.C.I. will remain a prison, breeding a high level of discontent among its involuntary inhabitants. The fact and attendant restrictions of incarceration virtually guarantee this. Thus it is not surprising that the councils have fallen short of the goals which have been set for them by many inmates.

The task of the Special Master, however, is to attempt an evaluation of the effectiveness of these organizations from a somewhat more detached and objective point of view. Any attempt to measure the success of the councils requires subjective evaluation of what is a highly dynamic and fluid process. Allocation of responsibility for breakdowns and failures, when these have occurred, is even more difficult to make precisely.

That having been said, the Special Master believes that both councils have achieved significant accomplishments. First, and perhaps most important, the councils have become established as an ongoing element of the status quo within the prison. If staff members are less than enthusiastic, it is fair to say that their attitude is not one of unmitigated, unanimous opposition. Staff members serving liaison roles with the two councils and the various subcommittees of the stockade council, for what it is worth, expressed unanimous support for continuation of these organizations. All felt that increased constructive communication between staff and inmates had been accomplished. While it is certainly true that many of the problems to which these bodies have addressed themselves remain unsolved, the phenomenon of staff/inmate communication and discussion has taken hold. This in itself distinguishes Marion Correctional Institution from most prisons. While it is only natural that this accomplishment should lead to rising expectations

and thus to a certain amount of disappointment on the part of the inmates at the difficulty of reaching satisfactory resolutions in all instances, these difficulties should not be permitted to obscure the enormous importance of what in fact has occurred.

This is not to say that the inmates, or for that matter the Court, should be entirely satisfied by the level of concrete accomplishment that has been achieved. To the contrary, persistent problems relating to sanitation, physical disrepair, recurring mail and visiting incidents, and delays in medical treatment, for example, should be more amenable to resolution than has been the case. Part of the difficulty, no doubt, rests with the councils themselves. Organization and discussion could and should be more efficient, written proposals clearer, and follow up action more vigorous. It is equally certain, however, that staff responses should be more considered, articulate, and in at least some cases, positive. In any case, they should be more prompt.

In the imperfect environment in which the councils are functioning, however, it is fair to say that significant tangible accomplishments have been realized. In the honor dormitory, council recommendations resulted in the assignment of a full-time food service supervisor for that unit, the replacement and up-grading of the dishwashing machine in the kitchen, the installation of a toilet for the use of kitchen workers as well as a new visitors' restroom, the building of covered picnic tables for outside visiting, the upgrading of the plumbing system throughout the honor dormitory, the refurbishing of pool tables and the provision of some recreation equipment including a new movie projector, the availability of a paramedic for sick call on a more or less regular basis, the upgrading of medical equipment and supplies in the small honor dormitory infirmary, and the provision of new barber chairs and periodic replacement of barber equipment.

Since July, 1978, the chief concerns of many honor dormitory inmates have related

to visiting, telephone, and other restrictions which were imposed following a violent incident which led to the death of one inmate and serious injury to another on July 4, 1978. While the council has been able to discuss these restrictions with the Superintendent, it has not been successful in persuading him to relax any of the new procedures. These are difficult and important matters, both to the administration and to the inmate body, and the Special Master believes that the Court should be satisfied that the council has been able even to open up lines of communication on matters of this kind. Cooperation does not require the administration always to agree with the position put forward by the council. Willingness to listen, to respond positively when it is possible to do so, and to provide an articulate, reasoned basis for negative responses is the heart of the process.

In the stockade, a number of positive results have flowed from the activities of the various standing committees. A number of plumbing and sanitation problems have been alleviated through the efforts of the safety and sanitation committee, although others persist. Broken chairs in the visiting room were repaired and a weekly roach control program was initiated. A medical committee proposal for distribution of cold pills in the housing units was implemented, as was a suggestion that no inmate be allowed to obtain prescription medication in the infirmary without presenting his identification card. The recreation and commissary committee can take credit for the expansion of the range of cosmetic products available in the commissary, the installation of a new sound system for movies in the gymnasium, a $300 increase in the movie fund budget, the building of a new handball court, and the purchase of a new boxing ring and additional weight lifting equipment. As a result of a recommendation of the mail and visiting committee, a shield was constructed to maintain confidentiality of visiting lists from visitors at the visitors' desk. In addition, telephone reservations are permitted for weekend and holiday visitation, a new cash slip policy has been developed, and delivery of legal mail is made on Saturday in addition to Monday through Friday. In the area of food service there has been at least some improvement in grooming, sanitation, portion control, and enforcement of no smoking regulations in the kitchen and serving areas. The political action committee, a special project of the stockade council, has had excellent success in working with its staff liaison representative and has caused several letters to be mailed to friends and relatives of inmates urging them to participate in the November, 1978, election. The letters highlighted certain issues of interest to prisoners (e. g. State Issue # 2 relating to the removal of constitutional restrictions upon the use of prison labor) and were nonpartisan in their content. In addition, the political action committee has inaugurated a speakers' program which has brought to the prison representatives from the Ohio General Assembly and the executive branch of state government.

The two councils have enjoyed no success in attempting to bring about revision of several departmental policies, even to the extent of their application to M.C.I. For example, the reduction from four to two in the number of "friends" who can be placed on a visiting list has been a source of constant irritation. Until recently, it was not at all clear whether the regulation was imposed by the department or by the local institution and it is still not apparent (to the Special Master at least) why the regulation should apply to institutions whose visiting facilities are adequate to accommodate more visitors.

Likewise, the councils have been unsuccessful in obtaining fundamental change in institutional policies regarding visiting, the provision of playground equipment for children, or upgrading of medical care, and needed improvement in the areas of sanitation and quality relating to food service. Some of these issues relate to what are regarded as fundamental policies of the institution, and in many cases improvement will require substantial budgetary outlays. For these reasons, success is difficult to achieve.

Delays in implementation of agreed upon proposals still occur. A chief example is that of installation of telephones in the stockade. Efforts since May of 1977 have not yet brought this project to fruition. While in some instances delay is unavoidable and thus understandable, the phenomenon increases the level of general frustration on the part both of council members themselves and the inmates whom they represent.

Finally, it does appear that the Superintendent is using the two councils in a constructive manner to introduce new policies and procedures. In particular, at the time of the July 4 incident which resulted in substantial revision of honor dormitory privileges, the Superintendent met with the resident council in order to introduce and explain these changes and the reasons for them. By utilizing both councils in this manner, the Superintendent can avoid or at least minimize hostile reactions based upon inadequate information and surprise.

Before concluding this section of his report, the Special Master wishes to record his conviction that both resident organizations have been benefited by dedicated, able, and hard-working members. Leadership has been strong and willing to cope with frustration. Both groups have experienced discontent and disillusionment as they have attempted to fulfill their responsibilities, and the Special Master believes that their efforts have been largely unrecognized by many inmates and staff alike. Nonetheless, Marion Correctional Institution is a more livable place because of the work which these men have done, and staff, inmates,

and the Court should be grateful, as the Special Master is, for the willingness of these groups to persist in their efforts. In large measure the responsibility for maintaining these institutions in the future rests with the inmate population itself. While conceding that the councils have not accomplished miracles, as the Special Master predicted they would not,[35] one must acknowledge that the accomplishments of the councils are of significance and meaning to the lives of inmates in the institution. With time, perhaps even more can be achieved. In the meantime, inmates should do all in their power to preserve and protect these institutions by remaining interested, active, and supportive, as they constitute one of the most fundamental and far reaching accomplishments of this litigation. As the Special Master has pointed out on a number of occasions, the Court has ordered the defendants to permit these councils to exist and to provide tangible evidence of cooperation in a number of respects; on the other hand, it has not ordered the inmates to support these institutions. As a result the latter are free to abandon them if they choose. A decision to do so, however, will not improve conditions at M.C.I. and will destroy a vehicle for reform for which thousands of imprisoned men and women throughout the United States have struggled, sometimes at great cost.[36]

FINDINGS REGARDING COMPLIANCE

Subject to the specific matters commented upon below, it is the finding of the Special Master that the defendants have achieved a state of substantial compliance with the provisions of Paragraph 22 of the

35. "It is not the expectation of the Special Master that the new Inmate Council will accomplish miracles at the institution. Hopefully, however, both staff and inmates will act with patience and reason in order to begin to develop a constructive mechanism for the resolution of problems. In this way, litigation like *Taylor v. Perini* may be able to be avoided in the future." *Taylor v. Perini,* 421 F.Supp. 740, 744 (N.D.Ohio 1976).

36. The thirteenth of fifteen "practical proposals" made by inmate representatives at the time of the Attica riot in 1971 was the following: "Have an institutional delegation comprised of one inmate from each company authorized to speak to the institution administration concerning grievances (quarterly)." In his response, which came too late to avert the ultimate tragedy, Commissioner Oswald agreed to "establish an inmate grievance commission, comprised of one elected inmate from each company, which is authorized to speak to the administration concerning grievances and develop other procedures for inmate participation in the operation and decision-making processes of the institution." T. Wicker, *A Time to Die,* pp. 317, 321.

Court's order of July 20, 1978. The defendants should be required to take the steps recommended above regarding the up-dating and distribution of guidelines adopted by the two councils, and in the future the Superintendent should respond in writing to any proposal for amendment of the guidelines of which he disapproves. In addition, the defendants, particularly Superintendent Perini, should make every effort to continue and, to the extent possible, improve the effectiveness of the two resident councils by insisting upon increased cooperation on the part of staff liaison persons working with the two councils and the standing committees of the stockade organization. All reasonable requests for information by the councils should be met. To the extent that it is feasible, reasonable requests of the councils should be approved; in instances in which proposals are disapproved, however, care must be taken to provide coherent and reasonable written explanations of the reasons for the administration's position. In these areas in particular there is substantial room for improvement. In addition, both the administration and the councils themselves should be alert to the need to hold special elections when inmates resign from membership, and elections should be held promptly to fill vacancies. Finally, when council proposals relate to departmental rather than institutional policies, the Chief Inspector should make himself available for discussion and should assume responsibility for carrying such proposals to higher authority within the Department.

### PARAGRAPH 23

*Inspector of Institutional Services.* Mr. Jay Tripp continues to serve as Inspector of Institutional Services at M.C.I. Because of the large number of grievances that continue to be filed by inmates in the institution, the bulk of his time is spent dealing with these grievances; as a result, only a minor part of his activities relates to inspection of institutional services generally and to the monitoring of the application of institutional and departmental rules. On several occasions, in connection with a grievance investigation or at the direction of the Chief Inspector, the Inspector of Institutional Services has evaluated certain areas of the institution and their operation. Examples are the mail and kite system, the cafeteria, and the handling of incoming packages.

The Inspector of Institutional Services does participate in the staff orientation and in-service training programs required by Paragraphs 13 and 15 of the Court's order. In addition, he participates in the inmate orientation program required by Paragraph 16. Between July 20, 1978 and December 15, 1978, the Inspector of Institutional Services met only twice with each of the two resident councils. In the opinion of the Special Master, this does not constitute the "regular consultation" that is required by Paragraph 23 of the Court's order. Such meetings should be held at least monthly in order to establish an effective working relationship between the councils and the Inspector.

In spite of the large volume of grievances with which he has been required to deal, the Inspector of Institutional Services has provided written responses to all grievances, and these responses generally have provided the inmate with reasons for the Inspector's decision. In a number of cases, however, these explanations are less clear than they should be.

The Inspector of Institutional Services has not been given special assignments by the Chief Inspector that are unrelated to or inconsistent with the former's duties. The same appears to be true of the Superintendent as well. Following the outbreak of violence which occurred in the honor dormitory in July, 1978, the Inspector participated in the investigation of the incident, but the exceptional and serious nature of this occurrence warranted that involvement.

Except in one area, it appears that the Inspector of Institutional Services possesses sufficient authority to perform his duties in an effective manner. That area relates to sanctioning of correctional officers whose inappropriate behavior toward inmates has resulted in the filing of grievances. In one

instance, the Inspector recommended that a correctional officer who had been a source of numerous grievances be suspended without pay for three days and transferred to another shift. Based upon independent information which the Special Master has received both from inmates and staff members, he believes that the Inspector's recommendations clearly were warranted. Nonetheless, the recommendations were disapproved by the Superintendent. Although in his letter responding to the Inspector's recommendations, the Superintendent referred twice to the officer's "poor judgment" on previous occasions, he found that "his good points far overshadow his shortcomings."

On several occasions, the Inspector of Institutional Services has recommended that officers receive written reprimands for inappropriate behavior toward an inmate. In one instance, the affected officer had thrown a soft drink can at an inmate. When the Special Master reviewed the personnel file of this officer, there was no written reference to the incident, let alone written reprimand, to be found. According to the Personnel Officer at M.C.I., there has never been an occasion on which a written reprimand has been placed in an officer's personnel file as a result of a recommendation from the Inspector of Institutional Services.

The Inspector of Institutional Services is assisted by a full-time secretary whose skills require improvement if she is to fulfill the responsibilities of her position. In addition, because of the large number of grievances that arise at M.C.I., the Inspector, in the opinion of the Special Master, is in need of additional assistance in the investigation and resolution of grievances. Between July 1, 1978 and December 1, 1978, 402 grievances were filed at M.C.I. These constituted 35% of all grievances filed in eight adult correctional institutions in Ohio during that period. Under the present circumstances, it is not physically possible for the Inspector of Institutional Services at M.C.I. to investigate fully all of the grievances that are submitted to him as well as perform his duties of general inspection and monitoring of departmental and institutional rules and policies.

The Inspector of Institutional Services occupies the position of Administrative Assistant II and reports directly to the Superintendent. In addition, he submits regular reports on a monthly basis to the Chief Inspector. Monthly grievance logs as well as other documentation are submitted to the Chief Inspector on these occasions.

Mr. Tripp has served as Inspector of Institutional Services since the creation of that position in December, 1976. Prior to that time he served as Training Officer and Chairman of the Rules Infraction Board at M.C.I. During the two years he has served as Inspector of Institutional Services, he has acquired valuable experience that reflects itself in the improved operation of the system at Marion. The Inspector participated in a training program that was held primarily for members of the Outside Review Committee in January, 1978. In addition, he has participated in a number of meetings with the Chief Inspector that have contained a training component. Nonetheless, the Special Master believes that additional training should be provided to strengthen the Inspector's skills of dispute resolution and to improve his ability to articulate his decisions and the reasons therefor in a more thorough and effective manner.

## FINDINGS REGARDING COMPLIANCE

The Special Master finds that the defendants are in compliance with the provisions of Paragraph 23 of the Court's order of July 20, 1978, except to the extent that the volume of grievances in the institution does not permit the Inspector of Institutional Services to investigate thoroughly all grievances and to perform his duties of general inspection and monitoring of departmental and institutional rules and procedures; in addition the Inspector of Institutional Services apparently does not possess sufficient authority to effect disciplinary action against correctional officers who engage in inappropriate behavior toward inmates. The Inspector of Institutional Services re-

quires additional training in order to improve further certain skills that are related to the grievance resolution process. Finally, the Inspector of Institutional Services should engage in regularly scheduled meetings on at least a monthly basis with each of the two resident councils in the institution.

## PARAGRAPH 24

*The Chief Inspector.* The Department of Rehabilitation and Correction continues to employ a person who serves as Chief Inspector and whose duties relate almost exclusively to the grievance system mandated by Paragraph 25 of the Court's order of July 20, 1978. The duties and authority of the Chief Inspector are spelled out in Administrative Regulation 5120-9-30, which was amended on February 10, 1978. See Appendix A, p. 1335 *infra.*

In general, it appears that the Chief Inspector's activities conform to the substance of the Administrative Regulation that created the position. The principal exception relates to his mandated duty to investigate and monitor practices at Marion Correctional Institution to insure that all law as well as rules and regulations of the department and the institution are being followed and applied fairly. Likewise, it does not appear that the Chief Inspector has conducted periodic audits of all records and files at M.C.I. to insure proper documentation and utilization of the grievance system. Indeed, as the Special Master pointed out in that portion of this report dealing with Paragraph 17 of the Court's order, the audits that the Chief Inspector has conducted for the purpose of satisfying the requirements of that provision were insufficiently detailed to be more than minimally useful.

Although the Chief Inspector believes that he does not require the appointment of an Assistant Chief Inspector in order to perform the duties of his office, the inability of the Chief Inspector to fulfill the responsibilities referred to above would seem

to indicate the contrary. In addition, it is almost never possible for the Chief Inspector to conduct an on site investigation for the purpose of resolving a grievance appeal. Such investigations are necessary, particularly in those cases in which the Chief Inspector is called upon to resolve conflicting factual assertions.[37]

### FINDINGS REGARDING COMPLIANCE

The defendants have maintained the office of Chief Inspector and to that extent have remained in compliance with this provision of the Court's order of July 20, 1978. To the extent that the Chief Inspector has failed to engage in general investigation, monitoring, and auditing activities mandated by Administrative Regulation 5129-9-30 and to audit the operation of the grievance system at M.C.I., the purposes of Paragraph 25 of the Court's order are not being fully effectuated.

## PARAGRAPH 25

*The grievance system.* In spite of the fact that he was called upon to deal with 402 grievances between July 1, 1978 and December 1, 1978, the Inspector of Institutional Services has made what must be described as a herculean effort to effectuate the requirements of this paragraph of the Court's order. By and large, he has been successful in doing so. Few if any grievances have been excluded from consideration because they fall within the province of the Rules Infraction Board, the legislature, the Adult Parole Authority, the courts or another administrative agency. The Inspector has been successful in responding to all but a few grievances within the time constraints imposed by the Court's order, and he has provided the affected inmate with appropriate notice in virtually all cases in which delay was unavoidable. Copies of this notice, however, have not been sent to the Chief Inspector as required by the order. In only one case has the Inspector of Institutional Services requested a delay of

---

**37.** Paragraph 24 does not relate to the effectiveness of the Chief Inspector in resolving appeals. Discussion of that subject may be found in that portion of this report dealing with Paragraph 25 of the Court's order, pp. 1328–1329 *infra.*

more than 30 days, and in this instance the permission of the Chief Inspector was obtained.

The Inspector of Institutional Services has maintained the voluminous records required by the Court's order and has provided inmate/grievants with a written response and reasons therefor in all cases. The Inspector has deviated from the requirements of Paragraph 25, however, in that he has not provided inmate grievants with a copy of the completed grievance form submitted by the inmate.

In addition, the Inspector has been scrupulous in performing his duty of informing inmates of their right to appeal his resolution, in assisting the inmate to prepare that appeal if requested to do so, and in coordinating the meetings and activities of the Outside Review Committee. He has maintained a heavy schedule of inmate and staff interviews. In sum, he has made a dedicated effort to bring the defendants into compliance with this paragraph of the Court's order. Indeed, this effort to comply with the notice, reporting, and other procedural requirements of the system has made it impossible for the Inspector to make a full investigation of the substance of a number of grievances.

The key to understanding the provision of the Court's order requiring the defendants to maintain a grievance system is found in the word "effective." The first sentence of Paragraph 25 requires the defendants to "maintain an effective procedure for the resolution of inmate grievances at Marion Correctional Institution." Compliance with the myriad details of Paragraph 25 is not enough, for it is clear that the Court did not intend to create a system of form rather than substance. While it is true that in administering a system in keeping with the required details of the Court's order the Inspector has contributed to the development of an effective grievance system, that alone would not have been sufficient.

The measurement of the effectiveness of a grievance system, as defendants' counsel have pointed out to the Special Master on a number of occasions, is a subjective process of judgment. That is all the more true when the institutional setting for the system is a prison rather than a school, hospital, or factory. The fact of incarceration and many of its attendant restrictions are inherently grievance provoking. In addition, a substantial number of legitimate complaints simply cannot be resolved satisfactorily in the setting of a prison. Particularly, where the evidence that the Inspector must evaluate consists of conflicting factual allegations by staff and inmates, successful resolution will be rare.

All that having been said, the Special Master believes that the Inspector of Institutional Services at M.C.I. has been successful in maintaining an effective grievance procedure at the institutional level. Certainly it is less effective than many residents would have it be, and indeed in some respects it is less effective than it should be. The Special Master would hazard a guess, however, that there are few if any prison administrations that could not learn from it.

In attempting to evaluate the effectiveness of the grievance system at M.C.I., the Special Master reviewed all of the grievances that were submitted by inmates between July 20, and December 1, 1978. The improvement reflected in the Inspector's handling of complaints has been remarkable. A few examples of effective action on the part of the Inspector will make the point.

An officer who gave two incoming letters to one inmate to deliver to another inmate/addressee was reprimanded by the Inspector of Institutional Services, and as a result of his recommendation, by the Shift Commander. In another instance, an inmate whose earphones had been stolen was provided with a pair which had been properly confiscated by the administration from another inmate. This provided real relief rather than the illusion of redress offered by the Court of Claims system to which inmates are generally remitted in such instances. When an inmate was improperly denied a cell, the Inspector ordered that the person who had been mistakenly assigned to that cell be moved in order to make room

for the grievant. Another inmate who had been paid at a lower pay scale than that to which he was entitled was able to obtain the increase retroactively as a result of the Inspector's recommendation. In several cases involving inappropriate or disrespectful personal conduct on the part of correctional officers, the Inspector found the officer to be at fault and made that finding clear on the written grievance resolution that was sent to the inmate and the officer involved. When it was discovered that staff members were enforcing a policy that was not reflected in any written rule, the Inspector took steps to see to it that a written policy was developed and that notice was given to the resident population through the institutional newspaper. In a case in which an inmate was deprived of a visit with his wife, the Inspector arranged for the inmate to speak to his wife by long distance telephone call in spite of the fact that the institutional visiting officer was technically correct in refusing to permit the visit to occur. The Inspector recognized that the visitor had been put to great inconvenience and that the fact that the inmate's wife subsequently took up residence in another state made the circumstances unique.

In these and numerous other grievances, the Inspector accomplished a resolution that satisfied the needs of the inmate while preserving the essential interests of the institution. The Inspector has prodded staff members throughout the institution to improve the operation of their departments in order to resolve grievances and prevent recurrence. Where policies have been unwritten or unclear, he has attempted to develop articulate guidelines for future conduct and to make the resident population aware of the new policy.

This is not to say that all resolutions have been satisfactory. In connection with a grievance alleging that an officer had said, "Stop playing with niggers," the Inspector attempted unsuccessfully to contact the officer, stated that he would follow up the matter upon the officer's return to the institution from an interruption of his employment, but failed to do so. In response to an allegation that a staff member working in the food service department stated, "Fuck the order, I run this kitchen," the Inspector replied, "It is true that . . . does run the kitchen." Since the staff member was charged with violating an institutional policy which the Inspector acknowledged "cannot be applied to the letter," the response missed the point of the grievance. Another staff member was excused for swearing at an inmate because he did not do so "maliciously." In what was the most glaring example of the breakdown of the grievance system discovered by the Special Master, the Inspector failed to appreciate the seriousness of an established charge that one inmate performed surgery on another inmate by removing a tatoo in the infirmary while the "doctor was standing by." The Inspector's response dealt with everything but the substance of this extremely serious matter.

Several grievances alleging violations of the Court's order in *Taylor v. Perini* were brought to the attention of the Inspector of Institutional Services. These related to the mandated job assignment procedures, the provision of legal assistance by inmates other than inmate law clerks, the provision of credit for postage for outgoing legal mail, the bed assignment policy in dormitories, improper treatment of incoming legal mail, harassment of a member of the stockade resident council because of that person's membership on the council, failure to serve sugar or salt in the correctional cells, racial discrimination on the part of staff members toward inmates, use of racial epithet by a guard, improper confiscation of pictures of a "semi-nude" woman, and failure to provide adequate office supplies for the law library. In most of these instances, the Inspector made a sufficiently thorough investigation to conclude that no violation had in fact occurred or to provide a basis for instituting action to remedy the violation and prevent recurrence. In several, however, the Inspector should have gone further than he did, and he relied too heavily upon self-serving denials by affected staff members.

Thus it is clear that the level of effectiveness of the grievance system at the institutional level is less than perfect. At the same time, the Special Master believes that the Inspector of Institutional Services has made a sincere effort to make the system work as it should and that he has made substantial progress toward that goal. To the extent that he has fallen short, an explanation is provided by the tremendous demands of the system at M.C.I. upon the physical and mental resources of any one person. The operation of the grievance system within the institution, when compared to its optimal level of effectiveness, indeed falls short; when compared to the system which it replaced, however, it has come far.

On March 2, following the issuance of the draft report, the Special Master and counsel for the plaintiffs met with the two Resident Councils at M.C.I. This report should reflect that the inmate representatives who attended that meeting disagreed strongly with the conclusions reached by the Special Master concerning the adequacy of the Inspector's performance. Furthermore, some of the evidence presented at that meeting was not unpersuasive. For example, the Inspector of Institutional Services issued a conduct report against one grievant, charging him with lying. The alleged lie related to the inmate's assertion that he had not been permitted to use the telephone on a given evening. Thus, even if the inmate lied, the nature of the lie was not such as to permit sanctioning under Paragraph 25 of the Court's order which provides,

> False accusations and statements by inmates or staff may be the subject of disciplinary action when made in a knowing, deliberate, and malicious attempt to cause significant injury to another party and the potential for such injury is substantiated. The burden of proof in such cases shall always rest with the institution. Failure of an inmate to substantiate his grievance accusations shall not, by itself, be used as grounds to initiate disciplinary actions.

In fact, the inmate was found not guilty when he appeared before the Rules Infraction Board, and the basis for the acquittal was lack of evidence. The reaction of the members of the two Resident Councils should be a matter of genuine concern to the defendants and to the Inspector of Institutional Services, as it is to the Special Master, and the Inspector must realize that the confidence of the inmate population in the Inspector's objectivity, fairness, and effectiveness is a matter of crucial importance to the overall success of the grievance system.

The activities of the Inspector of Institutional Services constitute only the first level of the grievance system mandated by Paragraph 25 of the Court's order. The second step involves the Outside Review Committee, a panel of volunteer citizens who review grievances that are appealed to them by inmates who are dissatisfied by the results obtained at the level of the Inspector of Institutional Services. Between July 1, 1978 and mid-December of that year, the Outside Review Committee held 18 hearings and made findings and recommendations in those cases. Thus the process of outside review continues to be used by inmates, but not at a rate that threatens to swamp the reviewers with more cases than they reasonably can be expected to handle. All ten members of the original Outside Review Committee continue to serve, and several members have been added in order to reduce the number of occasions upon which any one member is required to hear a case. The outside review panels have been thorough in their treatment of the problems that have come before them and have recommended corrective action in a number of cases. In several instances, the Outside Review Committee confirmed the findings of the Inspector of Institutional Services. In spite of this, discussions between the Special Master and a number of inmates indicate that the Committee continues to enjoy a high level of credibility and respect from residents of the institution.

The Special Master has suggested to the Outside Review Committee, with whose members he met in December, 1978, that more care be taken to provide the inmate/grievant with an articulate explana-

tion of the Committee's findings and recommendations, and that any recommendation of corrective action be made clearly to the Chief Inspector. In all other respects, the Outside Review Committee has been operating at a high level of efficiency and with significant effectiveness. The presence of the component of outside review—and the dedicated efforts that these private citizens are making as volunteers—provide the entire system with a degree of credibility which would be altogether lacking in a totally in-house system, and the Special Master wishes to take this occasion to express his appreciation to the members for their important contribution to the overall effectiveness of the grievance system at M.C.I. While it is beyond the scope of this report, the Special Master hopes that the Director of the Department of Rehabilitation and Correction recognizes the success that has characterized the use of outside citizen reviewers at M.C.I. and that he will implement the system at institutions other than M.C.I. in the near future.

The final step in the grievance system incorporated into Paragraph 25 of the Court's order is that of review by the Chief Inspector. It is here, in the opinion of the Special Master, that the system has been least effective.

Between July 1, 1978 and mid-November of that year, 33 appeals were received by the Chief Inspector from inmates at Marion Correctional Institution. This number includes the 18 appeals which were referred to the Outside Review Committee that made recommendations to the Chief Inspector in these cases. In several instances, the Chief Inspector ignored the recommendation of the Outside Review Committee altogether. For example, in connection with one grievance, the Outside Review Committee recommended the development of a recreation schedule for inmates holding certain work assignments or participating in the institution's college program. The Chief Inspector's resolution made no mention of the Committee's recommendation. In another case, the Outside Review Committee correctly pointed to the precise statement in the Inmate Manual that notice of any new

rule should be given, save in exceptional circumstances, five days in advance of its implementation. Although the Chief Inspector found that "some of the (inmate's) argument . . . is not without merit," he took no steps to prevent recurrence of the problem that led to the grievance. In another instance, the Chief Inspector rejected the recommendation of the Outside Review Committee concerning the seniority system used in assigning cells without giving proper weight, at least in the text of his decision, to the recommendation of the Outside Review Committee. In one case involving an allegation of homosexual assault by an officer in the course of a shakedown, the Chief Inspector not only ignored the outside review recommendation that a second officer be present during a shakedown when this is possible, but went on to warn the inmate/grievant of the possibility of imposition of a disciplinary sanction for false allegations in a grievance. It should be noted that the written recommendation of the Outside Review Committee carefully refrained from any determination of the truthfulness of either the inmate's or the officer's testimony before the outside review panel.

In several cases, the Chief Inspector rendered a decision adverse to the inmate/grievant without making a proper investigation. For example, the Chief Inspector provided no relief to an inmate alleging that the food served on the "diet line" in fact is no different from that on the main line because the food service director at M.C.I. stated that the food is cooked differently. How, the Special Master wonders, does the Chief Inspector know? In another instance, a case involving an allegation of inadequate medical treatment of diabetic inmates, the Chief Inspector stated that he knew "for a fact" that "very rarely would an inmate ever have to wait 'weeks' to be seen by the doctor. Normally they are seen on the day they attend sick call." In the absence of an on site investigation or careful review of medical records maintained at M.C.I., the Special Master questions the reliability of the Chief Inspector's "factual" assertion.

In other cases, the Chief Inspector failed to perceive or to respond to an issue that was presented to him on appeal. For example, one inmate complained about the delay involved in implementing a service for taking photographs during visiting sessions. Rather than investigate the cause for the delay, the Chief Inspector informed the inmate that the service was one of grace rather than right; this apparently justified any delay in implementing a program that the administration at M.C.I. had sanctioned previously. In another instance, an inmate mentioned in the course of presenting his grievance that an officer had called him, "boy." No reference to the alleged incident was made in the Chief Inspector's response.

The most egregious failure of the Chief Inspector to provide adequate review of an inmate's grievance related to a complaint by an inmate that another inmate had performed surgery on him in the form of removal of a tatoo. According to the allegation, later substantiated by the Inspector of Institutional Services, the institution's physician was aware of the procedure and probably was present in the room at the time it was done. In his grievance the inmate indicated that the grievance would be solved to his satisfaction "if (the) surgical error was corrected by (a) licensed plastic surgeon." Although arrangements were made for the inmate to be seen by a physician, the Chief Inspector did not take any other action (such as reprimanding or recommending the dismissal of the physician) because (1) the inmate consented to the surgical procedure, (2) the inmate was aware of the fact that an inmate performed the surgery, (3) the physician was present during the entire process, (4) the inmate who performed the surgery "has had rather extensive experience in performing this procedure," (5) follow-up was provided by the physician, and (6) the follow-up indicated that the wound was well healed.

Subsequently an inmate who assisted the inmate whose tatoo was removed in filing his grievance himself filed a grievance alleging that the institutional physician told other inmates that they could thank the grieving inmate for the fact that various beneficial procedures and policies in the infirmary would have to be changed as a result of the grievance that was filed in connection with the removal of the tatoos. The Inspector of Institutional Services passed over the grievance with the comment, "We must take the good with the bad," and the Chief Inspector commented simply that he had talked with institutional authorities and that "action has been taken to assure that this problem does not again occur."

The Chief Inspector's responses to these grievances are all the more reprehensible because they represented a conscious effort to put the best possible face on conduct that was thought likely to lead to litigation. Rather than deal forthrightly with the problem that presented itself to him, the Chief Inspector, apparently with the advice and consent of in-house counsel at the Department of Rehabilitation and Correction, assumed a defensive posture. It is clear to the Special Master, from conversations with the Chief Inspector, that the latter perceived that the inmate's grievance raised an extremely serious problem at M.C.I. and that he deliberately refused to take any action, on record at least, to remedy the situation. Although the Special Master was informed that orders were given to prevent inmates from performing surgical procedures in the future, it is clear, from his own subsequent action leading to the second grievance, that the physician was not sufficiently impressed with the serious nature of his misconduct by any action that the Chief Inspector may have taken. The handling of the second grievance confirmed in the minds of several inmates their impression that the entire incident was taken rather lightly.

Between July 1, 1978 and December 1, 1978, the Chief Inspector received 71 grievance appeals from all of Ohio's prisons. In view of this relatively light caseload, and in view of the fact that few if any of these appeals caused the Chief Inspector to make on site inspections or investigations, the failure of the Chief Inspector to perform adequately his auditing and monitoring

roles at M.C.I., referred to earlier in this report, is all the more inexplicable. While he has been conscientious about the preparation of regular statistical reports on the volume of grievances being filed throughout the system and has performed a number of other ministerial functions over the past six months, the appellate level of the grievance procedure, as best the Special Master can determine, has all the appearance and little of the substance of an effective grievance mechanism.

In his fourth report on the defendants' state of compliance, the Special Master reported the creation of the Correctional Institution Inspection Committee, charged by the Ohio General Assembly with responsibility to conduct a review and to make a "separate evaluation of the inmate grievance procedure at each state correctional institution." *See* 446 F.Supp. 1193–94. That Committee submitted its first report, a progress report, on February 5, 1979. Although the Committee acknowledges in its report that it has been hampered by time limitations as well as by other matters in conducting as thorough a review as it would like to have made, it is obvious that this legislative group has made an effort to gain insight into the operation of the grievance procedure and that it is taking its charge from the legislature seriously. Thus the Court should be encouraged by the fact that the Correctional Institution Inspection Committee will continue to monitor the operation of the grievance mechanism after the Court has ended its own monitoring efforts.

It is clear that the Correctional Institution Inspection Committee understands the scope of its charge, and it is to be hoped that the Committee will have the resources during the current year to develop a monitoring system that will provide the information that the Committee acknowledges is necessary for a continuing review of the inmate grievance system. In particular, more emphasis upon qualitative evaluation is required. The Committee is to be complimented, however, on its initial efforts as well as on noting certain deficiencies in the present system as to which corrective action is recommended in the Committee's report. That report, in its entirety, is included as Appendix B at page 1337 of this report.

### FINDINGS REGARDING COMPLIANCE

It is the finding of the Special Master that the grievance system is operating effectively at the institutional level as well as at the level of the Outside Review Committee, and that to this extent the defendants are in compliance with Paragraph 25 of the Court's order of July 20, 1978. The Inspector of Institutional Services has not complied with the requirements of Paragraph 25 that copies of all notices of delay in grievance resolution beyond ten days be forwarded to the Chief Inspector and that inmates receive a copy of their completed grievance forms. Furthermore, a single Inspector of Institutional Services, unassisted by staff, cannot perform a sufficiently thorough investigation of all grievances that are filed at M.C.I.

On the other hand, the Special Master finds that the office of the Chief Inspector has not provided an effective appellate process to complement the institutional and outside review stages of the procedure.

### CONCLUSION

Following the issuance of a draft of this report, all counsel and the Special Master met on several occasions to discuss the deficiencies described above. These deficiencies fall into two categories, those relating to what the parties have described as "housekeeping" matters and those regarding the performance of the Chief Inspector. As to the former, discussions produced consensus as to the appropriate remedial steps to be taken. These steps, which the defendants have pledged to take and which have been agreed to by plaintiffs' counsel, are outlined in a letter from defendants' counsel to the Special Master, dated March 15, 1979. See Appendix C, p. 1386 *infra*.

Likewise, agreement has been reached among the parties concerning an appropriate course of action to deal with the deficiencies of the Chief Inspector's perform-

ance discussed in connection with Paragraphs 17, 24, and 25 *supra.* The Director of the Department of Rehabilitation and Correction has informed the Chief Inspector in writing of the former's displeasure and concern about the matters disclosed in those portions of this report. In addition, the Director has informed the Chief Inspector that a thorough review will be conducted of the latter's performance at the end of six months, by which time the Chief Inspector must submit another written audit of the state of compliance with all provisions of the Court's order in *Taylor v. Perini.* The Director's review will encompass all facets of the Chief Inspector's responsibilities including those of auditing, monitoring, and reviewing of grievances at the appellate level. The director has agreed to conduct this review of the Chief Inspector's performance under conditions that are agreeable both to plaintiffs' counsel and to the Special Master.

Given the steps that the defendants have agreed to take in order to bring about full compliance with the Court's order of July 20, 1978, and the agreement thereto by plaintiffs' counsel, the Special Master recommends that the Court, in adopting this report, enter a finding of continued substantial compliance on the part of the defendants. It is the further recommendation of the Special Master that he be dismissed at this time.

## APPENDIX A

### DEPARTMENT OF REHABILITATION AND CORRECTION

5120–9–30. *The office of the chief inspector.*

(A) The chief inspector shall be an individual appointed, pursuant to 5120.07 of the revised code, by the director of the department of rehabilitation and correction to serve in the unclassified service as division chief of special services at the pleasure of the director.

(B) Pursuant to § 5120.06 of the revised code, the director shall establish the division of special services and pre-scribe the powers and duties of said division. The chief inspector (working title) shall serve as division chief, equivalent in status to all other division chiefs within the department of rehabilitation and correction.

(C) The individual selected as chief inspector shall be a person who has had experience and special training in the type of work with which the division of special services is charged. The chief inspector shall be responsible and report directly to the director of the department of rehabilitation and correction.

(D) The chief inspector shall

(1) serve as chief administrator of the grievance procedure for inmates.

(2) be responsible for recommending to the director the resolution of inmate grievance appeals.

(3) investigate and monitor practices within the department of rehabilitation and correction to insure that all law as well as rules and regulations of the department and subordinate facilities are being followed and applied fairly throughout the system and report to the director any noncompliance with recommendations for corrective action.

(4) maintain for a period of three years complete files on each grievance appealed to his office.

(5) require monthly activity reports from each institution including all information relating to the grievance procedure.

(6) submit to the director an annual report on or before September 1 of each year (covering the preceding period of July 1 through June 30) including a statistical and narrative summary as to the number and nature of all grievances processed during the reporting period, their disposition, and the status of all pending grievances, by institution,

throughout the department of rehabilitation and correction. The annual report shall be made a part of the public record and shall be available to the public during reasonable hours. Copies of the annual report shall be distributed to the governor, the chief justice of the supreme court of Ohio, and the chairman of the senate and house judiciary committees.

(7) continuously monitor the utilization and operation of the grievance procedure established by administrative regulations 5120-9-29 and 5120-9-31.

(8) conduct meetings, at least quarterly, with all inspectors of institutional services.

(9) initiate and supervise continuous training for departmental staff to maintain an active awareness and understanding of the grievance procedure for inmates AND PREPARE A SYLLABUS FOR SUCH PURPOSE.

(10) conduct periodic audits of all records and files of each institution to insure proper documentation and utilization of the grievance procedure for inmates.

(11) SUPERVISE THE TRAINING CONDUCTED BY THE INSPECTORS OF INSTITUTIONAL SERVICES FOR STAFF AND MONITOR PERIODICAL REPORTS CONCERNING THE STATUS OF TRAINING AT EACH INSTITUTION RELATING TO THE GRIEVANCE PROCEDURE FOR INMATES.

(12) MONITOR THE ORIENTATION OF INMATES TO THE USE OF THE INMATE GRIEVANCE PROCEDURE.

(13) THE CHIEF INSPECTOR SHALL REVIEW ALL PROPOSED ADDITIONS TO OR REVISIONS OF THE ADMINISTRATIVE RULES OF THE DEPARTMENT AND INDICATE IN WRITING TO THE DIRECTOR WHETHER IN HIS OPINION THE PROPOSED RULE WOULD BE A POTENTIAL SOURCE OF GRIEVANCES; AND IF SO, SHALL PROPOSE SUCH AMENDMENTS AS ARE WARRANTED. THIS PROVISION SHALL NOT PRECLUDE THE ISSUANCE OF ADMINISTRATIVE RULES BY THE DIRECTOR CONTRARY TO THE OPINION OF THE CHIEF INSPECTOR.

(14) THE CHIEF INSPECTOR SHALL MAKE AT LEAST AN ANNUAL REVIEW OF THE PERFORMANCE OF THE INSPECTORS OF INSTITUTIONAL SERVICES IN ACCORDANCE WITH THE CIVIL SERVICE LAWS OF THIS STATE.

(15) perform other duties related to grievance procedures as appropriate and/or assigned by the director.

(E) The chief inspector shall have all necessary authority to perform the required duties and responsibilities of the division of special services. The chief inspector shall have full investigative powers and complete access at any time to all facilities, office, or installations under the jurisdiction of the department of rehabilitation and correction. All records, files, documentation, and any other information shall be available to the chief inspector upon request. Any employee or inmate of the department of rehabilitation and correction who is found to have knowingly, deliberately or maliciously obstructed the investigation of the chief inspector by falsifying information in any manner will be subject to disciplinary action upon the recommendation of the chief inspector.

(F) The chief inspector, with the support of sufficient staff, shall administer the

departmental grievance procedure for inmates. He shall have a centrally located staff, as necessary, with the following duties.

(1) Assistant chief inspectors. The individuals will assist the chief inspector in deciding grievance appeals, will provide continuous monitoring and auditing of the grievance procedure for inmates, and will be responsible for the compilation and publication of all data.

(2) Secretary. This individual will provide clerical support for the office of the chief inspector.

(G) The office of chief inspector shall not accept jurisdiction of a grievance until all administrative remedies have been exhausted at the local institution, with the exception of grievances to which the managing officer has been made a party. Such grievances naming the managing officer must show that the managing officer was personally involved in a violation of law or policy and approved it or did nothing to prevent it. Such grievances directed against a managing officer shall be referred immediately to the attention of the chief inspector for investigation and disposition.

(H) Upon receipt of a grievance against a managing officer, the chief inspector shall send notice to all affected parties setting forth the date the grievance was received by the chief inspector and specifying that the grievance will be investigated and reviewed within twenty working days. All affected parties shall be provided with a copy of the chief inspector's decision.

(I) The chief inspector may establish procedures for the resolution of emergency grievances on a priority basis. An emergency grievance is one which requires immediate resolution in order to avoid irreparable harm to the inmate or to the institution.

Effective Date ___February 20, 1978___

Former Rule Number ___5120–9–30___

Promulgated Under ___111.15___

Statutory Authority ___5120.___

Expires ___Indefinite___

## APPENDIX B

## PROGRESS REPORT OF THE CORRECTIONAL INSTITUTION INSPECTION COMMITTEE

### (February 5, 1979)
### INMATE GRIEVANCE PROCEDURE

#### INTRODUCTION

A formal written procedure to insure that inmates are afforded an effective, credible mechanism to provide an outlet for their complaints and dissatisfaction is a fundamental requirement in correctional institutions. The Committee is in full agreement with the observations of the National Advisory Commission on Criminal Justice Standards and Goals:

A formal procedure to insure that offenders' grievances are fairly resolved should alleviate much of the existing tension within institutions . . .

Peaceful avenues for redress of grievances are a prerequisite if violent means are to be avoided. Thus, all correctional agencies have not only a responsibility but an institutional interest in maintaining procedures that are, and appear to offenders to be, designed to resolve their complaints fairly.

The Committee has made an exhaustive examination and study of the existing Inmate Grievance Procedure in Ohio's correctional institutions and has reviewed numerous reports and materials pertaining to the design, operation and evaluation of grievance mechanisms in general. Senator Michael Schwarzwalder and Representative Walter McClaskey were appointed by the Chairman to head the subcommittee on the Inmate Grievance Procedure. Numerous discussions were had with officials and staff of the Department of Rehabilitation and Correction, superintendents, inmates, concerned citizens, and recognized experts in the area of inmate grievance mechanisms.

Most notable among these are Professor Vincent M. Nathan, Special Master to oversee compliance with the federal court order in *Taylor v. Perini,* involving Marion Correctional Institution, and Mr. William Thoroman, Chief Inspector, Ohio Department of Rehabilitation and Correction. Both of these gentlemen were most generous with their time and advice and were fully cooperative with the Committee and staff throughout the course of this study.

Despite the fact that the Committee as a whole, and the subcommittee in particular, has given much time and attention to the Committee's statutory charge of monitoring and evaluating the Inmate Grievance Procedure at each correctional institution, the Committee is keenly aware of the severe time limitations with respect to scheduling institutional visits and difficulties due to a change of staff, which have greatly hampered the Committee's effectiveness in fully monitoring the present grievance system. In addition, the process of making a fair, objective, and reasonable evaluation of the Inmate Grievance Procedure is one of far greater magnitude and complexity than originally envisioned when this Committee was first established. Nevertheless, the Committee is genuinely confident in making several recommendations and comments with respect to its initial evaluation of the Inmate Grievance Procedure. These recommendations and comments are set forth in Section VII of this report.

## SECTION I. CHARGE TO THE COMMITTEE:

The Committee has the express statutory charge, among others, to include in its Annual Report to the succeeding General Assembly "a separate evaluation of the inmate grievance procedure at each state correctional institution". (Ohio Revised Code Section 103.73(A)(3)) While such charge is simply stated, the task which it contemplates is by no means a simple one. Implicit in the statutory charge is a directive for the Committee to establish some sort of standards or criteria by which the Inmate Grievance Procedure can be fairly appraised and effectively monitored. The Committee

was, therefore, faced with two perplexing questions:

(1) How is one to determine that Ohio's Inmate Grievance Procedure is fairly and properly designed?; and

(2) How is one to determine that Ohio's inmate grievance mechanism is functioning properly and operating efficiently, and, therefore, serving its intended purpose?

Both of these questions can only be answered after the Committee has had sufficient time to monitor and audit the present grievance system.

For a proper understanding of the Committee's charge, it is essential that a clear distinction be made between grievance monitoring and grievance review. The Committee views its function in this regard as that of an outside grievance monitor. ("Outside" in the sense that the Committee is wholly separate and independent from the Department of Rehabilitation and Correction.) Such a function necessarily requires a process whereby what is happening in the various correctional institutions can somehow be reduced to paper, objectively analyzed to identify problem areas in the design or operation of the mechanism and properly interpreted with respect to making recommendations for improving the overall design or a particular facet of operation.

Grievance review, on the other hand, requires an active participatory role in the redress of grievances and in the resolution of a particular grievance. Grievance review is not contemplated in the statutory charge to the Committee; therefore, the Committee has not included such a function as a part of its evaluative process.

## SECTION II. METHODS OF EVALUATION

The Committee and staff have made diligent and exhaustive efforts to collect essential data and records from officials and staff at the Department of Rehabilitation and Correction and at the eight State correctional institutions. Departmental officials and superintendents have been most cooperative in supplying the Committee staff with requested statistical information

and records pertaining to inmate grievances. Numerous discussions were had with the Chief Inspector, Superintendents, several Inspectors of Institutional Services, guards and inmates to learn their respective views of the present grievance structure. The Committee as a whole conducted a formal hearing and received testimony from Professor Vincent Nathan, Special Master appointed to oversee the compliance with the Federal Court Order at Marion Correctional Institution. The Sub-Committee and staff also met with Professor Nathan and William Thoroman, Chief Inspector, for a more in-depth discussion. Copies of the transcripts from the Committee hearing and the Sub-Committee meeting may be obtained from the Committee staff.

Numerous research materials, reports, and studies were also reviewed by the Committee in developing its methods for making a quantitative and qualitative analysis of the data collection. The Committee accepts the following characteristics, as offered by the Center for Community Justice in Washington, D. C., which seem reasonably important in the establishment of an effective grievance mechanism:

1. Whether the mechanism has few steps,
2. Whether it is easily understood by inmates,
3. Whether written responses are given,
4. Whether reasons are given,
5. Whether all complaints are answered,
6. How fast the answers are returned,
7. Existence of reasonable time limits,
8. Whether inmate representatives are involved in designing the mechanism,
9. Whether representatives of the line staff, as opposed to administrative staff were involved in designing the mechanism,
10. Whether outside review is included in the mechanism,
11. The degree of commitment on the part of the departmental administration to the program,
12. The degree of commitment on the part of the superintendents to the program,
13. Whether inmates are involved in the mechanism's operations,
14. Whether staff members are involved in the mechanism's operations, and
15. Whether there was thorough training in conflict resolution skills of the key personnel involved in the mechanism.

All of the above characteristics were carefully considered by the Committee with particular concern and importance as to how each feature enhances the credibility of the grievance system.

The establishment of credibility is paramount to all other features of a grievance system for the simple reason that even the best designed grievance procedure is of no value if inmates do not believe their complaints will be fairly resolved by such usage.

The incidence of *usage* by inmates is one of the two fundamental criteria which the Committee has accepted in determining whether the grievance mechanism is operating effectively. The second criterion is the *responsiveness* on the part of the Departmental and institutional officials to complaints submitted to the mechanism which identified a problem with policy and as reflected by a clarification and/or change of Departmental or institutional policies. *Usage* was studied to determine whether the system was meeting its intended objective of providing all inmates the opportunity to voice grievances and receive an official response, thereby reducing inmate frustration, reducing the level of violence in the institutions, reducing the amount of litigation, and promoting rehabilitation. *Responsiveness* was studied to determine if the system was meeting its intended objective of assisting management by identifying institutional problems and implementing changes in Departmental or institutional policies.

The efforts of the Committee and staff have thus far been directed primarily to data collection and collation. Although a

 wealth of information is gathered by the Department of Rehabilitation and Correction, the Committee has encountered some difficulties in making fair comparative analyses due to the fact that data received from various correctional institutions are sometimes reported in different formats or are defined in different ways. The two most notable examples are:

(1) the inconsistency among institutions as to when a particular inmate complaint becomes a formal grievance; and

(2) the ambiguity in the list of categories of grievances as developed by the Department of Rehabilitation and Correction.

The Committee has learned from the Chief Inspector, William Thoroman, that the Department is currently in the process of revising its list of grievance categories to eliminate any overlap or ambiguity. It is the hope of the Department and this Committee that such revision will provide categories whereby every Inspector of Institutional Services will recognize where a particular grievance belongs. This would enhance greatly the value of the grievance procedure in terms of uniformity of reported information and thereby, assist the Committee and Departmental officials in determining whether certain problems seem to be arising disproportionately in one institution as opposed to another.

## SECTION III. OHIO'S INMATE GRIEVANCE PROCEDURE

The Department of Rehabilitation and Correction instituted a new inmate grievance system on December 26, 1976. As developed in Administrative Regulations 5120–9–29, 5120–9–30, and 5120–9–31, the grievance procedure is a multi-level system wherein an inmate must first attempt to resolve his grievance by contacting, in person or in writing, the appropriate institutional department or staff member whose area of responsibility is related to the grievance.

If the grievance is not resolved to the satisfaction of the inmate, he may, in writing or in person, notify the Inspector of Institutional Services of his grievance. The Inspector of Institutional Services is appointed by the Superintendent of each institution and serves as a member of his or her staff. Such individual has the responsibility of investigating and processing inmate grievances and taking appropriate actions within the steps of his or her authority or making recommendations to the Superintendent to effect grievance resolutions. Such individual is also charged with monitoring the application and enforcement of institutional and Departmental rules and regulations.

After an inmate has exhausted all other administrative remedies at the local institution(s), he then can appeal to the Office of the Chief Inspector. The Chief Inspector is appointed by the Director of the Department of Rehabilitation and Correction and serves as the Chief Administrator of the grievance procedure for inmates and is responsible for investigating and reviewing all grievance appeals within twenty working days after receipt.

## SECTION IV. THE INMATE GRIEVANCE PROCEDURE AT MARION CORRECTIONAL INSTITUTION

The Federal Courts are playing an increasingly significant and costly role in the area of prison reform in general and the redress of inmate grievances in particular. The present inmate grievance procedure evolved as a result of the Federal Court order in the case of *Taylor v. Perini*, case number C69–275 Northern District of Ohio. The *Taylor* case was filed as a class action suit on November 7, 1969 and a Special Master was later appointed to oversee compliance with the court's order of September 12, 1972. The first two paragraphs of that order prohibit the defendants from "engaging in acts or practices that are discriminatory in purpose or effect, and from engaging in any form of racial harassment, intimidation or insult against members of the plaintiff class." The Court found that the defendants (Superintendent Perini and the Department of Rehabilitation and Correction) would not be in full compliance with the Court's order until a more effective and

independent grievance system had been developed and implemented. On December 26, 1976, the Department of Rehabilitation and Correction issued Administrative Regulations 5120-9-29, 5120-9-30, and 5120-9-31 which superseded the old inmate grievance system.

Soon after the implementation of the new grievance procedure, the Director of the Department of Rehabilitation and Correction appointed a Special Committee to monitor the Inmate Grievance System. That Committee was charged with evaluating the revised inmate grievance system throughout the State and recommending any modifications which would promote the objectives of effectiveness, independence and feasibility. The Special Committee issued its report in June 1977, (FOURTH REPORT OF THE SPECIAL MASTER, APPENDIX A) in which a number of unanimous recommendations were made purportedly to increase the credibility and effectiveness of the system. Most notable among these were: (1) There should be a permanent external monitoring committee; and (2) Independent reviewers should be appointed to assist in the settlement of grievances.

In the third of his five reports, the Special Master concluded that the newly adopted departmental grievance procedure is designed to deal with complaints of racial discrimination, harassment, intimidation and insult, as well as other grievances which inmates may have. Of continued critical importance to the C.I.I. Committee is the following statement of the Special Master as found in his Third Report and which was strongly reiterated during his testimony before this Committee on September 12, 1978:

. . . It is the conviction of the Special Master that some form of permanent external monitoring is an essential ingredient in an effective grievance system. This was the position of the Special Committee which studied the former system and recommended extensive change including the adoption of permanent external monitoring. The precise form of the external monitoring mechanism is not a matter of great importance so long as the review is conducted primarily by persons outside the correctional structure and independent of the Department of Rehabilitation and Correction. A chief effect of external monitoring will be to promote the system's credibility in the eyes of inmates and thus to encourage them to utilize the grievance procedure. In addition, reliable external monitoring will be of substantial assistance to the Director in conducting the continuous assessment of the system which is necessary in order to maintain an effective grievance mechanism.

The Special Master has admonished this Committee on several occasions that if the C.I.I. Committee does not perform this external monitoring function, the Federal Court will insist that the Special Master and the Department develop some other monitoring system in order to avert further litigation of Taylor. The Special Master also strongly urged this Committee to employ the services of the Center for Community Justice to conduct an initial audit of the grievance procedure and to develop a monitoring mechanism for the Committee's use in subsequent years.

By agreement between the Special Master and the Department of Rehabilitation and Correction, an experimental program was initiated utilizing members of the Marion Correctional Institution's Citizens Advisory Committee to serve as outside reviewers. The inclusion of this element of outside review in the operational design of MCI's grievance procedure significantly distinguishes that grievance system from those at the other seven correctional institutions. This outside review process permits any inmate who is dissatisfied with the decision rendered by the Inspector of Institutional Services to seek review from the Citizens Advisory Committee. A single member or panel of said Committee is assigned to cases on a rotating basis. An outside reviewer is permitted to reach his decision on the basis of the written record, to order an investigation and a written report of its results, or to

hold an evidentiary hearing within the institution. A written *advisory* opinion of the outside reviewer along with the inmate's record of appeal is then sent to the Chief Inspector for his determination. The recommendation of the outside reviewer as well as the advisory opinion of the outside reviewer is then forwarded to the Director for a final determination.

There is a considerable difference of opinion between the Special Master and the Chief Inspector as to whether the element of outside review is essential to the development of an effective, fair, and credible grievance procedure. Both agree, however, that outside review has been working very well at Marion.

At the request of the Special Master, the Center for Community Justice, in Washington, D. C., conducted a review of the grievance procedure at MCI. In its final report the Center found that MCI's grievance procedure was generally effective and recommended that the process of outside review by use of the respective Citizens Advisory Committees be extended to all the other correctional institutions in Ohio. The immediate implementation of a system of statewide outside review is objected to by the Special Master and by the Chief Inspector for the primary reason that there has not yet been a complete and effective assessment or monitoring of the present grievance procedure. Both gentlemen have cautioned this Committee from making any major alterations to the present grievance system until sufficient time has elapsed for conducting a thorough audit, study and evaluation of how the system has been and is now operating.

*SECTION V. MAJOR OBJECTIONS VOICED IN OPPOSITION TO OHIO'S INMATE GRIEVANCE PROCEDURE*

The following objections were voiced in opposition to the established grievance procedure during the various inspections of institutions and from numerous discussions with concerned citizen groups:

1. With the exception of Marion Correctional Institution, the mechanism does not include any form of independent review, i. e., review by persons from outside the Department of Rehabilitation and Correction. Many inmates were extremely pessimistic about the chances of their grievances receiving proper attention. Inmates stated that oftentimes they are required to submit a grievance to the person whom they feel is responsible for the denial of their rights or privileges. Essentially, most inmates do not believe that their grievances will receive a fair and impartial hearing solely within the structure of the Department of Rehabilitation and Correction.

2. Grievances are not acted upon in a timely manner. Many inmates complain that by the time a response is given to their complaint the problem no longer exists or has become worse. Inmates also object to failure on the part of some institutional inspectors and, occasionally, the Chief Inspector to adhere to the time limits for responding to a grievance as provided in the Department's Administrative Regulations.

3. The written or oral responses from the appropriate staff member or administrator oftentimes lack sufficient clarity or completeness for a full and proper understanding of the decision by the inmate. Inmates expressed no confidence in the accuracy of oral responses to their grievances and many complained that written responses were not descriptive in explaining the disposition of the grievance.

4. Many of the Inspectors of Institutional Services do not have sufficient training in conflict resolution skills in order to effectively resolve allegations of harassment and racial discrimination. Many inmates also feel that because the Inspector of Institutional Services is appointed by the Superintendent, the Inspector is constrained from fairly resolving any allegations involving inappropriate supervision and harassment on the part

of correctional officers by way of writing disciplinary conduct reports.

## SECTION VI. COMMITTEE'S FINDINGS, DATA ANALYSIS, AND COMMENTS

### THE NUMBER OF GRIEVANCES FILED

The "Fiscal Year Report—July 1, 1977 to June 30, 1978" on Inmate Grievances, by the Chief Inspector of the Department of Rehabilitation and Correction, provides one source of information on the operation of the Inmate Grievance Procedure in Ohio correctional institutions. The number of grievances filed at the institutions in FY 1978 totals 2,064, with a range of 32 at the London Correctional Institution to 918 at the Marion Correctional Institution. Table 27 provides a breakdown of the number of grievances filed at each institution in the fiscal year.*

It should be noted that different methods of implementing the Inmate Grievance Procedure may be a significant factor contributing to the disparity between the number filed at Marion, London, and the other correctional institutions. In the case of the Marion Correctional Institution for example, *Taylor v. Perini* has had an impact on the manner in which grievances are handled. Section (E) of Administrative Regulation 5120–9–31, "Inmate Grievance Procedure", stipulates the following:

> An inmate should first attempt to resolve his grievance by contacting in person or in writing the appropriate institutional department or staff member whose area of responsibility is related to the grievance. If the grievance is not resolved to the satisfaction of the inmate, he may, in writing or in person, notify the Inspector of Institutional Services of his grievance.

According to the Chief Inspector, the Inspector of Institutional Services at the Marion Correctional Institution does not require inmates to attempt to resolve problems before grievances are filed. Reportedly, Section (E) of the Administrative Regulation is excluded in practice at the Marion Correctional Institution in order to eliminate accusations regarding the refusal or rejection of grievances by the Inspector. All complaints, problems and difficulties are referred to the Inspector, and recorded as grievances.

In contrast, according to the Superintendent and staff of the London Correctional Institution and the Chief Inspector, much time and effort are devoted to resolving problems before they become grievances. That is, the Superintendent and the Deputy Superintendent personally interview thousands of inmates annually in response to kites sent to the Superintendent from inmates. Follow-up action is then taken to resolve legitimate problems or difficulties through contacting the appropriate staff member or department. In accord with Section (E) of the Administrative Regulation, only grievances "not resolved to the satisfaction of the inmate" are then filed with the Inspector of Institutional Services.

If the above references to the actual implementation of the Inmate Grievance Procedure are correct, then the London Correctional Institution actually receives more complaints than the Marion Correctional Institution. However, most of the complaints are resolved without the need for intervention of the Inspector of Institutional Services at the London Correctional Institution. Consequently, no record of grievances handled by institutional staff exists in the Inspector's files, but they can be documented if records of kites and follow-up interviews are maintained by the Superintendent and his Deputies.

Correspondence and interviews with inmates seem to indicate that inmates at other institutions also send kites to the superintendents and/or appropriate staff members in an attempt to resolve problems. Kites are a general means of communication within the institution in which simple questions and requests, as well as minor and major problems are called to the attention of a staff member. The kite system, which existed long before the establishment of the

* See Appendix 1.

present Inmate Grievance Procedure, is an integral part of the problem-solving process. For example, from February through May of 1978 the position of Inspector of Institutional Services at the Ohio Reformatory for Women was vacant. Although no grievances were filed during the four-month period, grievances existed, and were handled through kites and verbal communication, according to the Chief Inspector.

Of the approximate 13,221 inmates in FY 1978, one inmate out of every six inmates filed a grievance. Table 28 provides a breakdown of the number of grievances filed by Black inmates, White inmates, and all inmates at each institution during the fiscal year. The ratio of grievances filed by Black inmates is slightly higher than that of White inmates, indicating that White inmates tended to file more grievances than Black inmates. However, there is no significant difference. Of the Black population, one out of every 6.4 inmates filed a grievance, and a grievance was filed by one out of every 5.9 White inmates.

However, there is a notable racial difference in the number of grievances filed at three institutions. At the London Correctional Institution, in which 46 percent of their population are Black, 37 percent of the grievances were filed by Black inmates. One Black inmate of every 47 filed a grievance. The White inmate population, which accounts for 54 percent of the inmates, filed 63 percent of the grievances. A grievance was filed by one out of every 32 White inmates. Similarly, the number of grievances filed by inmates at the Southern Ohio Correctional Facility consisted of one grievance for every eleven Black inmates, and one for every eight White inmates.

The Ohio State Reformatory's statistics indicate that one out of seven Black inmates filed a grievance, compared to one out of 13 White inmates. Although the Lebanon Correctional Institution and Ohio Reformatory for Women ratios do not significantly differ in terms of the number of grievances filed by race, Black inmates tended to file more grievances than White inmates. Except for the Ohio State Reformatory, Ohio Reformatory for Women, and the Lebanon Correctional Institution, more White inmates tended to file grievances than Black inmates at all other institutions.

In view of the apparent differences in implementation, recordkeeping and referral processes, as well as in the definition of roles related to the Inmate Grievance Procedure, the number of grievances filed at the institutions during a fiscal year has limited meaning. Caution must be taken in any statistical comparison of one institution to another. There is reason to believe that the varying application of the Inmate Grievance Procedure at each institution is a significant factor which prohibits the use of the statistics in the formation of conclusions as to positive or negative aspects of the Inmate Grievance Procedure at a particular institution. More information in this area must be gathered, and a uniform recordkeeping system established before the number of grievances filed can be used as a reliable evaluative indicator.

The Committee is not convinced that the Department is making full use of the grievance mechanism as an effective management information system. The Department's information system merely consists of (1) logs of each formal grievance filed indicating its subject area, type, disposition, and dates filed and decided through appeal, and (2) annual reports from all of the institutions showing the number of each type of grievance and the disposition of all types of grievances by institution. The Committee has not found that this raw data is collated and carefully analyzed to identify specific problems in the design of the mechanism or in a particular facet of operation. Additional data needs to be gathered so that management can systematically measure and analyze the mechanism's responsiveness, timeliness, and credibility among inmates. More importantly, an effective management information system would provide information as to the mechanisms impact on reducing litigation and clarification and/or change of departmental and institutional policies, rules and regulations.

At present, there is no adequate information feedback to administrators or to inmates which would demonstrate the responsiveness or effectiveness of the grievance procedure in bringing about departmental or institutional changes.

*ORIGIN AND SUBJECT OF GRIEVANCES*

The recordkeeping system on grievances includes information on the "Origin of Grievances," that is, whether an inmate, staff member, or non-staff member filed a particular grievance. In addition, referrals from the Central Office or the Chief Inspector, and self-initiated investigations by the Inspectors of Institutional Services are recorded. Table 29 provides a breakdown of the number of grievances initiated by each group, and the number of grievances pertaining to a policy or procedure, staff member, inmate, or non-staff person.

The largest number of grievances filed in FY 1978 were initiated by inmates regarding a policy or procedure, accounting for 53.0 percent of all grievances filed. This category comprised from 75.1 percent of the grievances at the Marion Correctional Institution, to only 13.0 percent at the Lebanon Correctional Institution. A majority of the grievances originated from inmates and pertained to policies or procedures at the Chillicothe Correctional Institute and the London Correctional Institution accounting for 55.6 percent and 65.6 percent of their grievances respectively.

The second largest number of grievances were initiated by inmates and pertained to staff members. This group comprised 40.1 percent of the grievances filed in FY 1978, ranging from 21.1 percent of the grievances at the Marion Correctional Institution, to 81.4 percent of the grievances filed at the Lebanon Correctional Institution. The majority of the grievances at the Columbus Correctional Facility, Southern Ohio Correctional Facility and Ohio Reformatory for Women were initiated by inmates in regard to staff members, with 57.2 percent, 62.0 percent and 75.8 percent respectively.

Grievances filed by inmates regarding other inmates account for only 2.9 percent of all grievances in FY 1978, but the group is the third largest of all "Origin of Grievances" categories. It is interesting to note that the Southern Ohio Correctional Facility and London Correctional Institution have no grievances filed by inmates against other inmates. However, at the Ohio State Reformatory and Columbus Correctional Facility, these grievances comprise 7.4 percent and 7.2 percent of their grievances respectively. Grievances filed by inmates regarding other inmates account for 4.2 percent of the grievances at the Ohio Reformatory for Women and the Lebanon Correctional Institution.

In all, 96.0 percent of all grievances are filed by inmates regarding policy or procedure, staff members, or other inmates. This group comprises from 89.8 percent of the grievances at the Columbus Correctional Facility, to 98.6 percent at both the Southern Ohio Correctional Facility and Lebanon Correctional Institution.

The fourth largest number of grievances in FY 1978 were filed by staff members regarding inmates, comprising 1.6 percent of all grievances. Only three institutions reported grievances in this category: the Ohio Reformatory for Women, Chillicothe Correctional Institute, and Marion Correctional Institution. Grievances from staff members regarding inmates comprise from 1.1 percent of the grievances at the Ohio Reformatory for Women, to 5.2 percent of the grievances at the Chillicothe Correctional Institute.

Referrals from the Central Office of the Department of Rehabilitation and Correction or from the Chief Inspector accounted for 1.2 percent of the grievance caseload in FY 1978. No referrals were received by Inspectors at the Marion Correctional Institution or the Southern Ohio Correctional Facility. The number of referrals received at the other institutions range from one each at the Lebanon and London Correctional Institutions to nine at the Ohio State Reformatory. More information is needed regarding the nature of and reason for these referrals. If the referrals were made because inmates wrote the Chief Inspector

or Departmental Administrators instead of contacting their Inspector, then it may mean that they did not completely understand how to use the Inmate Grievance Procedure or for some reason chose not to call their problem to the attention of their institutional Inspector.

Only 15 grievances were reported by non-staff members or non-inmates regarding inmates. The largest number was reported from the Columbus Correctional Facility, accounting for 5.8 percent of their grievances. The Lebanon Correctional Institution, Ohio Reformatory for Women and London Correctional Institution have no grievances in the category.

Inspectors of Institutional Services conducted "Self-initiated investigations" at only two institutions, with three investigations at the Marion Correctional Institution and one at the Ohio State Reformatory. The category comprises only .2 percent of the grievance caseload in FY 1978. The same two institutions are the only institutions which had grievances filed by staff members regarding other staff members. There were two such grievances at the Marion Correctional Institution and one at the Ohio State Reformatory.

Four of the institutions had grievances filed by non-staff members or non-inmates regarding staff members or policies. One complaint regarding a staff member was made at the Marion Correctional Institution and two complaints were made at the Lebanon Correctional Institution. One complaint regarding a policy was made at both the Columbus Correctional Facility and the London Correctional Institution.

The Ohio State Reformatory is the only institution that received a complaint from a staff person about a non-staff person, with only one such complaint. No complaints were made by staff members regarding policies or procedures at any of the institutions.

## AREAS OF CONCERN

The reporting forms used by the Inspector of Institutional Services, provide 22 broad areas of concern, including an "Other" category, which are used to record the subject of each complaint. Table 30 lists each area of concern, the number of grievances filed in each category, the percent distribution and average number of grievances filed per month in each category. Since the categories overlap and inter-relate in some cases, individual Inspectors must determine which category best represents a particular grievance. Consequently, it is possible for similar grievances to be placed in different categories depending on the individual Inspector of Institutional Services who is categorizing the grievance. For example, a staff member may be involved as part of a grievance in many of the areas of concern, such as Inappropriate Supervision, Harassment, or Racial grievances. One Inspector may categorize the grievance as pertaining to staff, while another may place the grievance in one of the other categories. This problem of overlapping is presently being addressed by the Chief Inspector through the revision, addition or deletion of particular categories. Through these efforts and the provision of clear and concise definitions for the categories as needed, the present difficulties in recording and analyzing the areas of concern will be eliminated.

Of the 22 areas of concern specified in FY 1978, 50.1 percent pertain to four subject areas: Property, Medical Care, Inappropriate Supervision, and Harassment. These areas represent 1,082 grievances in the fiscal year, or 90 per month. The largest number of complaints relate to Property, accounting for nearly 19 percent of all grievances, while Medical Care is the area of concern in approximately 12 percent of the cases.

The fourth largest number of grievances relate to Harassment, with approximately 8.6 percent of the grievances filed. Mail and Placement account for 6.9 and 6.6 percent of the total respectively. Grievances pertaining to the Rules Infraction Board and Institutional Policy each comprise 5.5 percent of the grievances in FY 1978. A total of 74.6 percent of all grievances pertain to one of the eight groups referenced above, ranging from 118 grievances about

Institutional Policy, to 407 regarding Property.

All other areas of concern comprise 25.5 percent of the grievances, ranging from four complaints each regarding Use of Force without Reports, Protection, and Extortion, to 96 grievances pertaining to Inmate Accounts. Visits, staff, conditions, and legal problems range from 72 to 87 grievances in the fiscal year.

## GRIEVANCES PERTAINING TO PROPERTY

A total of 407 grievances in FY 1978 are related to Property, and comprise 18.9 percent of all grievances. Table 31 provides a breakdown of the number of Property-related grievances from each institution. Of the grievances filed at each institution, property-related grievances comprise 38.4 percent of the grievances at the Columbus Correctional Facility and 31.3 percent of the London Correctional Institution's grievances. Of the grievances at the Lebanon and Marion Correctional Institutions, 22.8 percent and 20.6 percent pertain to property, respectively. Property grievances at other institutions range from 7.4 percent at the Ohio Reformatory for Women, to approximately 15.0 percent at the Ohio State Reformatory and Southern Ohio Correctional Facility. Nearly ten percent of the grievances of the Chillicothe Correctional Institute are property-related.

It should be noted that due to the large number of property-related grievances filed at each institution, the Committee is conducting an in-depth study of Court of Claims statistics and relevant data in order to fully assess the problem. Departmental officials, Superintendents and the Clerk of the Court of Claims have been most cooperative in assisting the Committee staff in this effort. Our preliminary findings, as reported by the Department's Assistant Liaison Officer, show that in 1977 there were 250 claims filed by inmates and 235 claims filed as of November 21, 1978. The overwhelming majority (some 92 percent) are cases in which there was an alleged loss of personal property for which the inmate seeks to hold the State liable. The other eight percent include mostly personal injury cases with an occasional medical negligence case.

## MEDICAL–RELATED GRIEVANCES

Grievances pertaining to Medical Care comprise the second largest group of grievances filed in FY 1978, with 11.8 percent of all grievances. Table 32 lists the total number, percentage and the number of grievances per month related to medical care at each institution. Of the grievances at each institution, medical-related grievances range from 4.2 percent of the grievances at the Lebanon Correctional Institution, to 22.3 percent of the grievances at the Southern Ohio Correctional Facility. Medical-related grievances comprise 17.9 percent and 14.3 percent of the grievances filed at the Ohio Reformatory for Women and the Ohio State Reformatory, respectively. The grievances pertaining to medical care at the Columbus, Chillicothe, and Marion Correctional Institutions comprise 12.3 percent, 11.5 percent, and 10.1 percent of the grievances at each institution respectively. The London Correctional Institution has the second smallest percentage of medical-related grievances, comprising 6.3 percent of the grievances at the facility.

## GRIEVANCES RELATED TO INAPPROPRIATE SUPERVISION

There were 234 grievances filed in FY 1978 regarding Inappropriate Supervision, comprising 10.8 percent of all grievances. Table 33 provides a breakdown of information pertaining to grievances in the category at each institution. The Marion Correctional Institution has the largest percentage of grievances in the category, with 18.2 percent of their grievances related to Inappropriate Supervision. The Ohio State Reformatory has the second largest percentage of grievances in the category, with 10.3 percent of their grievances pertaining to Inappropriate Supervision. The percentage of grievances in the category at other institutions, ranges from 1.0 percent at the Southern Ohio Correctional Facility, to 6.5 percent at the Columbus Correctional Facility. At the Ohio Reformatory for Women and the London Correctional Institution,

grievances pertaining to Inappropriate Supervision account for 6.3 percent of the grievances at their institutions.

### GRIEVANCES RELATED TO HARASSMENT

A total of 186 grievances filed in FY 1978 are related to Harassment, accounting for 8.6 percent of all grievances. Table 34 contains the number, percent distribution, and the average number of filings per month regarding harassment-related grievances at each institution. The Ohio State Reformatory has the largest percentage of grievances in the category with 19.0 percent of all grievances filed at the institution in FY 1978. The category comprises 7.9 percent, 7.8 percent, 7.4 percent and 7.0 percent of the grievances at the Southern Ohio Correctional Facility, Marion Correctional Institution, Lebanon Correctional Institution, and Chillicothe Correctional Institute, respectively. Only 2.1 percent of the grievances at the Ohio Reformatory for Women are related to Harassment. Only one grievance filed at the London Correctional Institution during the fiscal year is in the category.

### MAIL–RELATED GRIEVANCES

There are from two to 77 mail-related grievances in the FY 1978 report, with a total of 149 grievances, or 6.9 percent of all grievances filed. Table 35 provides the number of grievances in the category and the percent distribution for each institution. Mail-related grievances at the London and Columbus Correctional Institutions comprise 12.5 percent and 11.6 percent of their grievances respectively. Mail is the area of concern in 9.4 percent and 8.4 percent of the grievances filed at the Chillicothe and Marion Correctional Institutions respectively. Grievances in the category account for approximately two percent of the grievances at the Lebanon Correctional Institution and Ohio Reformatory for Women, the smallest percentage of mail-related grievances of all institutions.

### GRIEVANCES RELATED TO PLACEMENT

In FY 1978, 142 grievances were filed in regard to Placement, comprising 6.6 percent of all grievances. Table 36 provides information on the number of grievances filed in the category and related statistics. Note that the Columbus Correctional Facility and London Correctional Institution have no grievances in the category. Placement-related grievances comprise 10.5 percent of the grievances filed at the Chillicothe Correctional Institute, and 9.5 percent of the grievances at the Ohio State Reformatory. Grievances in the category account for 8.3 percent of the grievances filed at the Marion Correctional Institution. Only a very small number of such grievances were filed at the Lebanon, Southern Ohio, and Marysville facilities.

### GRIEVANCES RELATED TO THE RULES INFRACTION BOARD

In FY 1978, 5.5 percent of the grievances concerned the Rules Infraction Board. It should be noted that Section (C) of Administrative Regulation 5120–9–31, "Inmate Grievance Procedure", stipulates the following:

> The grievance procedure is not designed to act as an additional or substitute appeal process in connection with rules infraction board or institutional hearing officer proceedings. A complaint relating to a specific disciplinary decision will not be considered.

Thus, it should be taken into consideration that the grievances in the category pertain to matters other than disciplinary decisions of the Rules Infraction Board. Table 37 provides information on the number of grievances filed at each institution in the category. Note that the Ohio Reformatory for Women and Columbus Correctional Facility have no grievances pertaining to the Rules Infraction Board. The Rules Infraction Board was an area of concern in 27.0 percent of the grievances filed at the Lebanon Correctional Institution, and 12.5 percent of the grievances at the London Correctional Institution. In three of the institutions, 3.4 percent to 5.4 percent of the grievances are related to the Rules Infraction Board, specifically the Marion, Chillicothe and Southern Ohio Correctional Institutions. Less than one percent of the grievances at the Ohio State Reformatory relate to the Rules Infraction Board.

## GRIEVANCES CONCERNING INSTITUTIONAL POLICY

In Fy 1978, 5.5 percent of all grievances pertained to Institutional Policies at the correctional institutions, with a total of 118 grievances. Table 38 presents information on the number of grievances filed in the category at each institution and related statistics. Grievances pertaining to Institutional Policy range from one at the Columbus Correctional Facility, to 26 at the Ohio State Reformatory and Marion Correctional Institution. Grievances in the category account for 11.9 percent of all grievances at the Southern Ohio Correctional Facility and 10.5 percent of the grievances at the Ohio Reformatory for Women. Institutional Policy is the area of concern in 9.5 percent of the grievances filed at the Ohio State Reformatory. The grievances in the category comprise 6.3 percent, 6.0 percent, and 5.6 percent of all grievances filed at the London, Lebanon and Chillicothe Correctional Institutions, respectively.

## GRIEVANCES PERTAINING TO INMATE ACCOUNTS

A total of 96 grievances filed in FY 1978 are related to Inmate Accounts, comprising 4.4 percent of all grievances. Table 39 lists the number of grievances filed in the category and the percent distribution for each institution. As many as 15.6 percent and 12.3 percent of the grievances at the London Correctional Institution and Columbus Correctional Facility, pertain to Inmate Accounts, respectively. The next highest percentage of grievances in the category are at the Southern Ohio Correctional Facility, in which 7.9 percent of the grievances concern Inmate Accounts. Grievances in the category account for approximately four percent of the grievances at both the Chillicothe Correctional Institute and Marion Correctional Institution. Only two grievances pertaining to Inmate Accounts were filed at the Lebanon Correctional Institution, Ohio Reformatory for Women and the Ohio State Reformatory.

## GRIEVANCES RELATED TO LEGAL MATTERS

A total of 87 grievances in FY 1978 concern legal matters, comprising 4.0 percent of all grievances. In Section (C) of Administrative Regulation 5120–9–31, "Inmate Grievance Procedure", the following reference relates to legal areas of concern:

> In addition, complaints unrelated to institutional life such as legislative action, policies and decisions of the Adult Parole Authority, judicial proceedings and sentencing are not grievances within the scope of this Administrative Regulation. No claim involving subject matter exclusively within the jurisdiction of the courts or other agencies will be considered.

Grievances related to legal areas comprise 6.4 percent of the grievances filed at both the Marion Correctional Institution and the Southern Ohio Correctional Facility. The Chillicothe Correctional Institute has the next largest percentage of grievances in the category, with 2.8 percent. No grievances pertaining to legal matters were filed at the London Correctional Institution or Ohio Reformatory for Women. From one to four legal-related grievances were filed at the three remaining institutions, representing from .5 percent to 1.5 percent of their grievances. (See Table 40)

## GRIEVANCES PERTAINING TO CONDITIONS

A total of 81 grievances related to Conditions at Ohio correctional institutions were filed in Fy 1978, comprising 3.8 percent of all grievances. Table 41 provides a breakdown of the number of grievances filed in the category from each institution. No grievances were filed in regard to Conditions at the Southern Ohio Correctional Facility, Ohio Reformatory for Women, or London Correctional Institution. Only two such grievances were filed at the Lebanon Correctional Institution, comprising less than one percent of their grievances. However, the Chillicothe Correctional Institute has the largest number of grievances in the category, with 32 grievances regarding Conditions, or 11.2 percent of their grievances. Conditions are an area of concern in 5.1 percent of the grievances filed at the Ohio State Reformatory. The category comprises 4.3 percent and 2.9 percent of the griev-

ances at the Columbus Correctional Facility and Marion Correctional Institution respectively.

## GRIEVANCES REGARDING STAFF

In FY 1978, 80 grievances were filed against staff members, comprising 3.7 percent of all grievances. Table 42 provides a statistical breakdown of the number of grievances filed in the category. The Ohio Reformatory for Women has the largest number of staff-related grievances, with a total of 39, or 41.1 percent of all grievances filed at the Reformatory. Grievances pertaining to staff account for 10.2 percent of the grievances filed at the Lebanon Correctional Institution, and 5.0 percent of the grievances at the Southern Ohio Correctional Facility. No grievances pertaining to staff members were filed at the London Correctional Institution or Ohio State Reformatory. While 2.1 percent of the grievances filed at the Chillicothe Correctional Institute pertain to staff, the group comprises less than one percent of their grievances.

## GRIEVANCES RELATED TO VISITATION

In FY 1978, 72 grievances were filed regarding Visiting at correctional institutions, accounting for 3.3 percent of all grievances. Table 43 provides information on the number of grievances in the category at each institution. Grievances pertaining to visiting comprise 5.6 and 5.4 percent of the grievances at the Chillicothe Correctional Institute and Southern Ohio Correctional Facility respectively. From 3.1 to 3.7 percent of the grievances filed at the London, Columbus and Lebanon Correctional Institutions pertain to Visitation. Visiting grievances account for 2.9 percent of the grievances at the Marion Correctional Institution, and 1.5 percent of the areas of concern at the Ohio State Reformatory. The Ohio Reformatory for Women is the only institution that has no grievances related to visiting.

## "OTHER" GRIEVANCES

A total of 34 grievances in FY 1978 are categorized as "Other" grievances, consisting of only 1.6 percent of all grievances filed. Table 44 provides information on the number of grievances included in the category from each institution. At the Lebanon Correctional Institution, "Other" grievances account for 4.2 percent of the grievances filed at the institution. The category comprises approximately three percent of the grievances at the Southern Ohio Correctional Facility, Ohio Reformatory for Women, and London Correctional Institution. While 2.8 percent of the Chillicothe Correctional Institute's grievances are categorized as "Other" areas of concern, the Columbus and Marion Institutions have less than one percent of their grievances in the category. The Ohio State Reformatory is the only institution that has no "Other" grievances in the FY 1978 report.

## GRIEVANCES REGARDING PROGRAMS

Approximately 1.2 percent of the grievances filed in FY 1978 are related to Programs at the correctional institutions. Table 45 provides a breakdown of information on Program-related grievances. Grievances in the category comprise 2.1 and 1.9 percent of the grievances filed at the Chillicothe and Lebanon Correctional Institutions, respectively. Grievances related to Programs comprise from .7 percent to 1.5 percent of the grievances at the four other institutions. The Columbus Correctional Facility and London Correctional Institution have no Program-related grievances.

## PAROLE-RELATED GRIEVANCES

A total of 19 grievances concerning Parole were filed in FY 1978, ranging from one to ten such grievances at four institutions. Table 46 provides a breakdown of the number of grievances filed in the category. Of the four institutions in which Parole-related grievances were filed, the group comprises from .5 to 2.1 percent of the grievances. No grievances in the category were filed at the Columbus, Lebanon, or London Correctional Institutions, or at the Ohio Reformatory for Women. The 19 Parole-related grievances comprise less than one percent of all grievances.

## GRIEVANCES PERTAINING TO DEPARTMENTAL POLICY

A total of 17 grievances in FY 1978 relate to Departmental Policy, ranging from two

at the Southern Ohio Correctional Facility, to five at the Chillicothe Correctional Institute. Three of the institutions have no grievances in the category: the Columbus, London and Marion Correctional Institutions. Table 47 provides specific information on the number of grievances concerning Departmental Policy. Grievances in the category account for 3.2 percent of the grievances at the Ohio Reformatory for Women, and from one to two percent of the grievances at the other institutions.

## GRIEVANCES RELATED TO THREATS

A total of 16 grievances in the FY 1978 report concern threats. Table 48 provides information on the number of grievances in the category at each institution. Four of the institutions have no grievances regarding threats: The Chillicothe Correctional Institute, London Correctional Institution, Ohio Reformatory for Women, and Southern Ohio Correctional Facility. The Ohio State Reformatory has the largest number of grievances concerning threats, with a total of ten, and comprising 3.7 percent of their grievances. Threat-related grievances at the three remaining institutions range from one at the Lebanon Correctional Institution to three at the Marion Correctional Institution.

## RACIAL GRIEVANCES

Only ten grievances were filed in FY 1978 which concerned racial matters. As noted on Table 49, only three institutions have grievances in the category. Four racial grievances were filed at the Chillicothe Correctional Institute, and three were filed at both the Marion Correctional Institution and Ohio State Reformatory. The group comprises only .5 percent of all grievances filed in the Fiscal Year.

## GRIEVANCES RELATED TO EXTORTION

Only four grievances in the FY 1978 report pertain to Extortion, consisting of only .2 percent of all grievances. As indicated on Table 50, only three institutions have grievances in the category. Two Extortion-related grievances were filed at the Chillicothe Correctional Institute, and one grievance was filed at both the Columbus Correctional Facility and Ohio State Reformatory.

## GRIEVANCES RELATED TO PROTECTION

Only four grievances in FY 1978 pertain to Protection. As noted on Table 51 five of the eight institutions have no grievances in the category. The four grievances related to Protection comprise .2 percent of all grievances filed in the Fiscal Year. There are two Protection-related grievances from the Ohio State Reformatory, and one each from the Marion Correctional Institution and Ohio Reformatory for Women.

## GRIEVANCES REGARDING THE USE OF FORCE WITHOUT REPORTS

Only two institutions had grievances pertaining to the Use of Force without Reports in FY 1978. As Table 52 indicates, three of the four grievances were filed at the Ohio State Reformatory, and one grievance was filed at the Lebanon Correctional Institution. Grievances concerning the Use of Force without Reports, comprise .2 percent of all grievances in the Fiscal Year.

## FREQUENT COMPLAINTS AT EACH INSTITUTION

Table 53 * provides the number, type and percent of inmate grievances filed in FY 1978 at each institution. Statistics are arranged according to the total number of grievances at each institution, from the largest number at Marion to the smallest number at the London Correctional Institution. As Table 53 * indicates, more property-related grievances were filed than any other type of grievance at the Columbus Correctional Facility, London Correctional Institution, and Marion Correctional Institution, accounting for 38.4 percent, 31.3 percent, and 20.6 percent of their grievances respectively.

Medical care is the largest area of concern at two of the institutions, comprising 22.3 percent of the grievances at the Southern Ohio Correctional Facility, and 11.5 percent of the grievances at the Chillicothe Correctional Institute.

* Also see Tables 54 and 55.

Other areas of concern which rank as the largest at an institution are staff, the Rules Infraction Board, and harassment. The largest number of grievances at the Ohio Reformatory for Women, 41.1 percent of their grievances, are related to staff members. The Rules Infraction Board is the most frequent subject of grievances at the Lebanon Correctional Institution, comprising 27.0 percent of their grievances. The most frequent concern at the Ohio State Reformatory is harassment, which accounts for 19.0 percent of the Reformatory's grievances.

Areas of concern which rank as the second most frequent complaint filed at one or more of the institutions, include Property, Inmate Accounts, Medical Care, Inappropriate Supervision and Conditions. Property is the second most frequent complaint at the Lebanon Correctional Institution, Ohio State Reformatory and Southern Ohio Correctional Facility, consisting of 22.8 percent, 15.0 percent, and 14.9 percent of the grievances filed at the institutions respectively. At the London Correctional Institution and Columbus Correctional Facility, the second largest number of grievances pertained to Inmate Accounts, comprising 15.6 percent and 12.3 percent of their grievances respectively. Of the grievances filed at the Marion Correctional Institution, 18.2 percent are related to Inappropriate Supervision, their second largest area of concern. Medical care is the second largest area of concern in the Ohio Reformatory for Women, comprising 17.9 percent of their grievances. At the Chillicothe Correctional Institute, Conditions rank as the second most frequent grievance subject, consisting of 11.2 percent of the grievances at the institution.

Medical care is the third most frequent complaint in three institutions. Medical care is the area of concern in 14.3 percent of the grievances filed at the Ohio State Reformatory, 12.3 percent of those filed at the Columbus Correctional Facility, and 10.1 percent of the Marion Correctional Institution's grievances. Grievances regarding Institutional Policy rank as the third largest area of concern at the Southern Ohio Cor-

rectional Facility and Ohio Reformatory for Women, consisting of 11.9 percent and 10.5 percent of their grievances respectively.

The third largest complaint at the London Correctional Institution is related to Mail, comprising 12.5 percent of their grievances. Grievances regarding Placement at the Chillicothe Correctional Institute rank third, with 10.5 percent of their grievances in the category. Staff-related grievances comprise 10.2 percent of the grievances filed at the Lebanon Correctional Institution, third in frequency at the facility.

Harassment, Mail or Property rank fourth in the number filed at six institutions. Inappropriate Supervision is the area of concern in 10.3 percent of the grievances filed at the Ohio State Reformatory, ranking as the fourth largest number of grievances at the Reformatory. At the London Correctional Institution, the Rules Infraction Board is the area of concern in 12.5 percent of the grievances filed.

## GRIEVANCE RESOLUTIONS

The FY 1978 report on Inmate Grievances provides information on the type of action taken to resolve grievances. Table 56 provides a statistical summary of the number of full and partial resolutions, invalid complaints, appeals, withdrawals, and referrals resulting from grievances filed in FY 1978.

As noted in the Table, grievances were fully resolved in 52.9 percent of the cases, ranging from 35.7 percent and 36.7 percent of the grievances at the Ohio State Reformatory and Chillicothe Correctional Institute, to 79.2 percent of the grievances at the Southern Ohio Correctional Facility. Grievances were also resolved in full for a large percentage of the cases filed at the Columbus Correctional Facility and Ohio Reformatory for Women, accounting for 72.5 percent and 75.3 percent of their grievances respectively. Full resolutions of grievances at the Marion and Lebanon Correctional Institution occurred in 51.0 percent and 58.8 percent of their cases respectively.

Approximately 22 percent of the grievances filed in FY 1978 were partially resolved, ranging from 3.0 percent of the grievances filed at the Southern Ohio Correctional Facility to 37.9 percent of the grievances filed at the Ohio State Reformatory. No partial resolutions were reported in regard to grievances filed at the London Correctional Institution. Partial resolutions were made in 32.1 percent of the cases at the Marion Correctional Institution. At the Ohio Reformatory for Women and the Chillicothe Correctional Institute, 5.2 percent of their grievances were partially resolved.

In all, 4.7 percent of the grievances filed in FY 1978 were not resolved in full or part. While the Ohio State Reformatory, Columbus Correctional Facility, and London Correctional Institution have grievances in this category, 14.0 percent of the grievances filed at the Chillicothe Correctional Institute were not resolved. There were no resolutions in 5.4 percent of the cases at the Marion Correctional Institution, and 4.0 percent of the cases at the Southern Ohio Correctional Facility.

Grievances which were resolved in full or in part, comprise 74.5 percent of all grievances filed in FY 1978. At four of the institutions, from 80.5 percent to 87.0 percent of the grievances had full or partial resolutions. These institutions include the Ohio Reformatory for Women, Southern Ohio Correctional Facility, Marion Correctional Institution, and the Columbus Correctional Facility. Full or partial resolutions were made in 73.6 percent of the Ohio State Reformatory's grievances and 69.4 percent of the grievances filed at the Lebanon Correctional Institution. At the London and Chillicothe Correctional Institutions, only 42.4 percent and 41.9 percent of their cases respectively, were resolved in full or in part.

The FY 1978 report on Inmate Grievances includes the number of grievances classified as Invalid, comprising 11.7 percent of the grievances filed. There are three types of invalid grievances according to the report. The largest group of invalid grievances are those labeled "Inappropriate Method by Administrative Regulation or State Statute". There are 124 grievances in the category, representing 5.7 percent of all grievances filed. Invalid grievances due to an inappropriate method account for 25.5 percent of the grievances filed at the Lebanon Correctional Institution, 15.5 percent of those at the London Correctional Institution and 10.5 percent of the grievances filed at the Chillicothe Correctional Institute. Only three such grievances were filed at the Marion and Columbus Correctional Institutions, and only two at the Southern Ohio Correctional Facility.

Grievances classified as invalid due to false claims, comprise 4.3 percent of the grievances filed at Ohio correctional institutions. No false claims are reported at the Southern Ohio Correctional Facility or Columbus Correctional Facility. The largest number of invalid grievances in this category are from the Chillicothe Correctional Institute which totals 41 and comprises 14.3 percent of their grievances. However, the 12 false claims reported at the London Correctional Institute comprise 36.4 percent of their grievances.

Other grievances classified as invalid are those which are "not within the scope of inspection". The group comprises 1.7 percent of all grievances filed in FY 1978, ranging from .7 percent of the grievances at the Marion Correctional Institution, to 6.3 percent of the grievances at the Ohio State Reformatory. The Southern Ohio Correctional Facility, Ohio Reformatory for Women and the London Correctional Institution have no grievances classified as "not within the scope of inspection".

Grievances classified as "invalid", comprise from 1.0 percent of the grievances at the Southern Ohio Correctional Facility, to 51.6 percent of the London Correctional Institution's grievances. Invalid grievances comprise 27.9 percent and 26.9 percent of the grievances at the Chillicothe and Leba-

non Correctional Institutions, respectively. In all, grievances categorized as "invalid" total 255.

More information is needed regarding the three types of invalid grievances. Those declared invalid because filing a grievance is an "inappropriate method" to deal with the problem, or because the problem is "not within the scope" of the Inmate Grievance Procedure, apparently relate to restrictions specified in the Administrative Regulation, but the distinction between the two is not clear. In addition, the procedure used to identify "false claims" from legitimate grievances is not known. It may be possible that one inspector may group false claims with grievances which are classified as "not resolved", while another inspector may label the same type of grievances as "false claims". More information regarding the types of grievances classified as invalid may indicate a need to either expand the jurisdiction of Inspectors to include more aspects of institutional life, or to improve the other problem-solving processes used to deal with complaints "outside the scope" of the Inspectors.

Referrals to the Managing Officers were made at only three of the institutions. Of the eight referrals at the Columbus Correctional Facility, in six of the cases, recommendations were followed in full, and two were followed in part. Of the four referrals at the Ohio Reformatory for Women, recommendations were followed in full in each case. The Chillicothe Correctional Institute's Managing Officer received one referral and the recommendation was followed in full.

Two of the institutions had grievances in FY 1978 in which referrals were made to outside agencies. The Inspector of the Columbus Correctional Facility made four such referrals, and one referral was made by the Inspector at the Marion Correctional Institution.

The FY 1978 report provides information on the resolutions of grievances filed by Black inmates and those filed by White inmates. Table 57 provides a breakdown of the number of grievances filed by Black and White inmates at each institution and the types of resolutions reported. Overall, 75.5 percent of the grievances filed by Black inmates were resolved in full or in part, compared to 74.8 percent of the grievances filed by White inmates. Thus, there is no significant difference when the total of all institutions are considered. However, on an institutional basis, percentage differences are more notable. At four of the institutions a larger percentage of grievances filed by White inmates were resolved in full or in part compared to those filed by Black inmates. At the Ohio State Reformatory, 74.2 percent of the grievances filed by White inmates were resolved, while 63.9 percent of the grievances filed by Black inmates were resolved, a difference of 10.3 percent. Resolutions of the Lebanon Correctional Institution and Columbus Correctional Facility indicate a difference of 5.7 and 4.1 percent respectively. Grievances filed by Black inmates at the London Correctional Institution were resolved in 41.2 percent of the cases, compared to 44.8 percent of the grievances filed by White inmates, a difference of 3.6 percent.

A larger percentage of the grievances filed by Black inmates were resolved in full or in part at the other four institutions. At the Southern Ohio Correctional Facility, 91.1 percent of the grievances filed by Black inmates were resolved, compared to 74.2 percent of those filed by White inmates, a difference of 16.9 percent. At the Chillicothe Correctional Institute and Ohio Reformatory for Women, there is a difference of 5.2 percent and 3.5 percent in the number of resolutions of grievances filed by Black inmates and White inmates. At the Marion Correctional Institution, grievances filed by Black inmates were resolved in 84.3 percent of the cases, while 84.0 percent of the grievances filed by White inmates were resolved. Thus, the Marion statistics show no significant difference regarding the race of an inmate filing a grievance, and its resolution.

Grievances which were not resolved in full or in part, those in which the Managing Officer did not follow the recommendation of the Inspector, invalid grievances, and withdrawals, comprise 20.6 percent of the grievances filed by Black inmates and 22.3 percent of the grievances filed by White inmates. On an institutional basis the most notable difference in percentages is at the Southern Ohio Correctional Facility, in which only 2.7 percent of the grievances filed by Black inmates were not resolved, etc., compared to 13.5 percent of those filed by White inmates.

### APPEALS TO THE CHIEF INSPECTOR

According to the FY 1978 report, 4.3 percent of the decisions made by the Inspectors of Institutional Services, were appealed by inmates. As Table 58 indicates, of the 93 appeals filed in the fiscal year, 59 were filed by inmates at the Marion Correctional Institution. Of the 59 appeals from Marion, 32 received outside review by the Citizens Advisory Committee. Inmates of the Southern Ohio Correctional Facility filed the second largest number of appeals, a total of 25. Six appeals were filed from the Chillicothe Correctional Institute, two from the Ohio Reformatory for Women, and one from the London Correctional Institution. No appeals were filed by inmates at the Columbus Correctional Facility, Lebanon Correctional Institution and Ohio State Reformatory.

As noted on Table 59 in FY 1978, the Chief Inspector affirmed the decisions made by the Inspectors in 77 of the 93 cases, comprising 82.8 percent of the appeals. An "affirmation" means that the Chief Inspector agrees with the decision of the Inspector of Institutional Services, including any corrective action, which may or may not have been taken at the institutional level. The Chief Inspector modified the decisions in 13 of the cases, and reversed three decisions. As a result of the affirmations, modifications and reversals by the Chief Inspector, corrective action was ordered in seven cases, and Departmental policies were changed as a result of two grievances. No institutional policies were changed as a result of actions taken on appeals in FY 1978.

### MONTHLY STATISTICS

Superintendents of Ohio correctional institutions were asked to submit to the Committee, the number and type of inmate grievances filed during the most recent three-month period. All superintendents provided the information to the Committee, except for the Superintendent of the Columbus Correctional Facility. Superintendent McKeen referred the Committee to H. Morris, the Chief of the Division of Institutions. Mr. Morris stated that information on grievances from all institutions from the beginning of FY 1979 to the present would be sent to the Committee. However, the information has not been received.

Tables 60 through 66 present the information received from the Superintendents of seven of the institutions including the number of inmate grievances from the Chillicothe Correctional Institute from February through April; grievances from the Ohio State Reformatory, Southern Ohio Correctional Facility and London Correctional Institution from April through June 1978; grievances from the Marion Correctional Institution and Lebanon Correctional Institution from May through July 1978; and the Ohio Reformatory for Women inmate grievances for June and July 1978. The Tables are presented in alphabetical order by institution.

### SECTION VII. RECOMMENDATIONS

1. The Departmental Regulations should be amended to include a specific provision to the effect that no part of any grievance shall be placed in the complaining inmates central file. It should be specified that no such information shall be made available to the Rules Infraction Boards; to any hearing officer, review officer, member of the Adult Parole Board, or any employees of the Adult Parole Authority; to the Furlough Screening Committee, Classification Committees,

Transfer Committees, Honor Placement Committees, or to any similar committees.

2. The Departmental Regulations should be amended to provide for the direct appointment by the Chief Inspector of all Inspectors of Institutional Services. Said provision should also specify that the Inspector of Institutional Services shall report directly to the Chief Inspector and shall not serve as a member of the Managing Officer's staff.

3. The Departmental Regulations should be amended to include some provision for a timelier resolution of emergency grievances.

PROGRESS REPORT OF THE CORRECTIONAL INSTITUTION INSPECTION COMMITTEE

Table 27. The Number of Grievances Filed at Ohio Correctional Institutions, FY 1978

| CORRECTIONAL INSTITUTION | GRIEVANCES FILED | | | REFERRALS TO MANAGING OFFICER | | APPEALS | | GRIEVANCES UNDER INVESTIGATION | |
|---|---|---|---|---|---|---|---|---|---|
| | NUMBER | PERCENT | AVERAGE PER MONTH | NUMBER | PERCENT | NUMBER | PERCENT | NUMBER | PERCENT |
| Marion Correctional Institution | 918 | 44.5% | 77 | | | 59 | 6.4% | 26 | 2.8% |
| Chillicothe Correctional Institution | 286 | 13.9 | 24 | | | 6 | 2.1 | | |
| Ohio State Reformatory | 273 | 13.2 | 23 | 1 | .4% | | | 4 | 1.5 |
| Lebanon Correctional Institution | 215 | 10.4 | 18 | | | | | | |
| Southern Ohio Correctional Institution | 202 | 9.8 | 17 | | | 25 | 12.4 | | |
| Columbus Correctional Facility | 138 | 6.7 | 12 | 3 | 2.2 | | | | |
| London Correctional Institution | 32 | 1.6 | 3 | | | 1 | 3.1 | | |
| TOTAL | 2,064 | 100.0% | 172 | 4 | .2% | 91 | 4.4% | 30 | 1.5% |
| | 95 | 4.4% | 12 | 1 | 1.1 | 2 | 2.1 | | |

NOTE: Since the Ohio Reformatory for Women has no statistics available from February through May, 1978, the facility was excluded from the cumulative table. The ORW statistics for the available months in FY 1978 are provided below in the appropriate columns:

SOURCE: Office of the Chief Inspector.

Table 28. The Number of Grievances Filed by Race in FY 1978 at Ohio Correctional Institutions with Population Breakdown by Race and Ratio of Grievances to Inmate Population, By Institution

| Racial Breakdown of Population and Grievances Filed | Marion | | Chillicothe | | ORW | | OSR | | Lebanon | | SOCF | | CCF | | London | | Total | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | # | % | # | % | # | % | # | % | # | % | # | % | # | % | # | % | # | % |
| Black Population | 789 | 57% | 856 | 49% | 374 | 61% | 1,268 | 52% | 867 | 45% | 1,245 | 64% | 706 | 49% | 801 | 46% | 6,906 | 52% |
| Grievances Filed by Black Inmates | 428 | 47 | 131 | 46 | 59 | 63 | 180 | 66 | 97 | 49 | 112 | 56 | 61 | 45 | 17 | 37 | 1,085 | 51 |
| Ratio of Grievances Filed to Black Population | 1:1.8 | | 1:6.5 | | 1:6.3 | | 1:7.0 | | 1:8.9 | | 1:11.1 | | 1:11.6 | | 1:47.1 | | 1:6.4 | |
| White Population | 595 | 43 | 889 | 51 | 238 | 39 | 1,175 | 48 | 1,045 | 55 | 701 | 36 | 748 | 51 | 924 | 54 | 6,315 | 48 |
| Grievances Filed by White Inmates | 486 | 53 | 155 | 54 | 35 | 37 | 93 | 34 | 103 | 51 | 89 | 44 | 74 | 55 | 29 | 63 | 1,064 | 50 |
| Ratio of Grievances Filed to White Population | 1:1.2 | | 1:5.7 | | 1:6.8 | | 1:12.6 | | 1:10.1 | | 1:7.9 | | 1:10.1 | | 1:31.9 | | 1:5.9 | |
| Total Population | 1,384 | 100% | 1,745 | 100% | 612 | 100% | 2,443 | 100% | 1,912 | 100% | 1,946 | 100% | 1,454 | 100% | 1,725 | 100% | 13,221 | 100% |
| Total Grievances Filed | 914 | 100% | 286 | 100% | 94 | 100% | 273 | 100% | 200 | 100% | 201 | 100% | 135 | 100% | 46 | 100% | 2,149 | 100% |
| Ratio of Grievances Filed to Population | 1:1.5 | | 1:6.1 | | 1:6.5 | | 1:8.9 | | 1:9.6 | | 1:9.7 | | 1:10.8 | | 1:37.5 | | 1:6.2 | |

NOTE: The number of grievances filed on the above table differs from the total indicated on other tables, although both totals were taken from the FY 1978 Annual Report. The following institutions have conflicting totals in other sections of the report: Marion, Lebanon, Southern Ohio Correctional Facility, Columbus, and London. It is not known whether the inmate population figures represent the average daily inmate population for FY 1978 or whether the figures represent the population on a particular date.

SOURCE: Office of the Chief Inspector

Table 29. Origin of Grievances in Ohio Correctional Institutions in FY 1978, by Institution

| Origin of Grievance | Marion # | % | Chillicothe # | % | OSR # | % | Lebanon # | % | SOCF # | % | CCF # | % | ORW # | % | London # | % | Total # | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Inmate re: Policy or Procedure | 694 | 75.1% | 159 | 55.6% | 119 | 44.2% | 28 | 13.0% | 75 | 36.6% | 35 | 25.4% | 15 | 15.8% | 21 | 65.6% | 1,146 | 53.0% |
| Inmate re: Staff | 195 | 21.1 | 94 | 32.9 | 117 | 43.5 | 175 | 81.4 | 127 | 62.0 | 79 | 57.2 | 72 | 75.8 | 9 | 28.1 | 868 | 40.1 |
| Inmate re: Inmate | 9 | 1.0 | 10 | 3.5 | 20 | 7.4 | 9 | 4.2 | | | 10 | 7.2 | 4 | 4.2 | | | 62 | 2.9 |
| Staff re: Inmate | 18 | 1.9 | 15 | 5.2 | | | | | | | | | 1 | 1.1 | | | 34 | 1.6 |
| Referred from Central Office or Chief Inspector | | | 7 | 2.4 | 9 | 3.3 | 1 | .5 | | | 5 | 3.6 | 3 | 3.2 | 1 | 3.1 | 26 | 1.2 |
| Non-Staff or Non-Inmate re: Inmate | 2 | .2 | 1 | .3 | 1 | .4 | | | 3 | 1.5 | 8 | 5.8 | | | | | 15 | .7 |
| Self-Initiated Investigation | 3 | .3 | | | 1 | .4 | | | | | | | | | | | 4 | .2 |
| Staff re: Staff | 2 | .2 | | | 1 | .4 | | | | | | | | | | | 3 | .1 |
| Non-Staff or Non-Inmate re: Staff | 1 | .1 | | | | | 2 | .9 | | | | | | | | | 3 | .1 |
| Non-Staff or Non-Inmate re: Policy | | | | | | | | | | | 1 | .7 | | | 1 | 3.1 | 2 | .1 |
| Staff re: Non-staff | | | | | 1 | .4 | | | | | | | | | | | 1 | .0 |
| Staff re: Policy or Procedure | | | | | | | | | | | | | | | | | | |
| TOTAL | 924* | 100.0% | 286 | 100.0% | 269* | 100.0% | 215 | 100.0% | 205* | 100.0% | 138 | 100.0% | 95* | 100.0% | 32 | 100.0% | 2,164 | 100.0% |

* The following inmate grievance totals are in the FY 1978 report: Marion 918, Ohio State Reformatory 273, Southern Ohio Correctional Facility 202. Statistics from the Ohio Reformatory for Women are not available from February through May, 1978.

SOURCE: Office of the Chief Inspector

Table 30. The Number of Grievances Filed at Ohio Correctional Institutions, FY 1978, by Area of Concern

| AREA OF CONCERN | NUMBER | PERCENT | AVERAGE PER MONTH |
|---|---|---|---|
| Property | 407 | 18.9% | 34 |
| Medical | 255 | 11.8 | 21 |
| Inappropriate Supervision | 234 | 10.8 | 20 |
| Harassment | 186 | 8.6 | 16 |
| Mail | 149 | 6.9 | 12 |
| Placement | 142 | 6.6 | 12 |
| Rules Infraction Board | 119 | 5.5 | 10 |
| Institutional Policy | 118 | 5.5 | 10 |
| Inmate Accounts | 96 | 4.4 | 8 |
| Legal | 87 | 4.0 | 7 |
| Conditions | 81 | 3.8 | 7 |
| Staff | 80 | 3.7 | 7 |
| Visits | 72 | 3.3 | 6 |
| Other | 34 | 1.6 | 3 |
| Program | 25 | 1.2 | 2 |
| Parole | 19 | .9 | 2 |
| Departmental Policy | 17 | .8 | 1 |
| Threats | 16 | .7 | 1 |
| Racial | 10 | .5 | 1 |
| Extortion | 4 | .2 | |
| Protection | 4 | .2 | |
| Use of Force without Report | 4 | .2 | |
| TOTAL | 2,159 | 100.0% | 180 |

NOTE: Statistics from the Ohio Reformatory for Women, February through May, 1978 are excluded from the above table.

SOURCE: Office of the Chief Inspector.

Table. 31. The Number of Grievances Filed Pertaining to Property in FY 1978, by Institution.

| CORRECTIONAL INSTITUTION | PROPERTY GRIEVANCES NUMBER | PERCENT | AVERAGE PER MONTH | PERCENT OF PROPERTY GRIEVANCES AT EACH INSTITUTION |
|---|---|---|---|---|
| Marion Correctional Institution | 189 | 46.4% | 16 | 20.6 |
| Columbus Correctional Facility | 53 | 13.0 | 4 | 38.4 |
| Lebanon Correctional Institution | 49 | 12.0 | 4 | 22.8 |
| Ohio State Reformatory | 41 | 10.1 | 3 | 15.0 |
| Southern Ohio Correctional Facility | 30 | 7.4 | 3 | 14.9 |
| Chillicothe Correctional Institution | 28 | 6.9 | 2 | 9.8 |
| London Correctional Institution | 10 | 2.5 | 1 | 31.3 |
| Ohio Reformatory for Women | 7 | 1.7 | 1 | 7.4 |
| TOTAL | 407 | 100.0% | 34 | |
| Percent of all grievances | | | | 18.9% |

NOTE: This report does not include the Ohio Reformatory for Women from February through May, 1978.

¥¥¥¥¥¥¥¥¥¥¥¥¥¥¥¥¥¥¥¥¥¥¥¥¥¥¥¥¥¥¥¥¥¥¥¥¥¥¥¥¥¥¥¥¥¥¥¥¥¥¥¥¥¥¥¥¥¥¥¥¥¥¥¥¥¥¥¥¥¥¥¥¥¥¥¥¥¥¥¥¥¥¥¥¥¥¥¥¥¥¥¥¥

Table 32 . The Number of Medical Grievances Filed in FY 1978, by Institution.

| CORRECTIONAL INSTITUTION | MEDICAL GRIEVANCES NUMBER | PERCENT | AVERAGE PER MONTH | PERCENT OF MEDICAL GRIEVANCES AT EACH INSTITUTION |
|---|---|---|---|---|
| Marion Correctional Institution | 93 | 36.5% | 8 | 10.1% |
| Southern Ohio Correctional Facility | 45 | 17.6 | 4 | 22.3 |
| Ohio State Reformatory | 39 | 15.3 | 3 | 14.3 |
| Chillicothe Correctional Institute | 33 | 12.9 | 3 | 11.5 |
| Columbus Correctional Facility | 17 | 6.7 | 1 | 12.3 |
| Ohio Reformatory for Women | 17 | 6.7 | 2 | 17.9 |
| Lebanon Correctional Institution | 9 | 3.5 | 1 | 4.2 |
| London Correctional Institution | 2 | .8 | | 6.3 |
| TOTAL | 255 | 100.0% | 21 | |
| Percent of all grievances | | | | 11.8% |

NOTE: This report does not include the Ohio Reformatory for Women from February through May, 1978.

Table 33 . The Number of Grievances Filed Pertaining to Inappropriate Supervision in FY 1978, by Institution.

| CORRECTIONAL INSTITUTION | INAPPROPRIATE SUPERVISION | | AVERAGE PER MONTH | PERCENT OF INAPPROPRI- ATE SUPERVISION FILED AT EACH INSTITUTION |
|---|---|---|---|---|
| | NUMBER | PERCENT | | |
| Marion Correctional Institution | 167 | 71.4% | 14 | 18.2 |
| Ohio State Reformatory | 28 | 12.0 | 2 | 10.3 |
| Chillicothe Correctional Institution | 13 | 5.6 | 1 | 4.5 |
| Columbus Correctional Facility | 9 | 3.8 | 1 | 6.5 |
| Lebanon Correctional Institution | 7 | 3.0 | 1 | 3.3 |
| Ohio Reformatory for Women | 6 | 2.6 | 1 | 6.3 |
| London Correctional Institution | 2 | .9 | | 6.3 |
| Southern Ohio Correctional Facility | 2 | .9 | | 1.0 |
| TOTAL | 234 | 100.0% | 20 | 10.8% |
| Percent of all grievances | | | | 10.8% |

NOTE: This report does not include the Ohio Reformatory for Women for the months of February through May, 1978.

SOURCE: Office of the Chief Inspector.

*****************************************************************************************************

Table 34 . The Number of Grievances Filed Pertaining to Harassment in FY 1978, by Institution.

| CORRECTIONAL INSTITUTION | HARASSMENT GRIEVANCES | | AVERAGE PER MONTH | PERCENT OF HARASSMENT GRIEVANCES AT EACH INSTITUTION |
|---|---|---|---|---|
| | NUMBER | PERCENT | | |
| Marion Correctional Institution | 72 | 38.7% | 6 | 7.8 |
| Ohio State Reformatory | 52 | 28.0 | 4 | 19.0 |
| Chillicothe Correctional Institution | 20 | 10.8 | 2 | 7.0 |
| Lebanon Correctional Institution | 16 | 8.6 | 1 | 7.4 |
| Southern Ohio Correctional Facility | 16 | 8.6 | 1 | 7.9 |
| Columbus Correctional Facility | 7 | 3.8 | 1 | 5.1 |
| Ohio Reformatory for Women | 2 | 1.1 | | 2.1 |
| London Correctional Institution | 1 | .5 | | 3.1 |
| TOTAL | 186 | 100.0% | 16 | 8.6% |
| Percent of all grievances | | | | 8.6% |

NOTE: This report excludes the Ohio Reformatory for Women from February through May, 1978.

SOURCE: Office of the Chief Inspector.

Table 35. The Number of Grievances Filed Pertaining to Mail in FY 1978, by Institution

| CORRECTIONAL INSTITUTION | MAIL GRIEVANCES NUMBER | PERCENT | AVERAGE PER MONTH | PERCENT OF MAIL GRIEVANCES AT EACH INSTITUTION |
|---|---|---|---|---|
| Marion Correctional Institution | 77 | 51.7% | 6 | 8.4 |
| Chillicothe Correctional Institution | 27 | 18.1 | 2 | 9.4 |
| Columbus Correctional Facility | 16 | 10.7 | 1 | 11.6 |
| Ohio State Reformatory | 9 | 6.0 | 1 | 3.3 |
| Southern Ohio Correctional Facility | 9 | 6.0 | 1 | 4.5 |
| Lebanon Correctional Institution | 5 | 3.4 | | 2.3 |
| London Correctional Institution | 4 | 2.7 | | 12.5 |
| Ohio Reformatory for Women | 2 | 1.3 | | 2.1 |
| TOTAL | 149 | 100.0% | 12 | |
| Percent of all grievances | | | | 6.9 |

NOTE: This report excludes statistics of the Ohio Reformatory for Women frcm February through May, 1978.

SOURCE: Office of the Chief Inspector.

*******************************************************************************************

Table 36. The Number of Grievances Filed Pertaining to Placement in FY 1978, by Institution.

| CORRECTIONAL INSTITUTION | PLACEMENT GRIEVANCES NUMBER | PERCENT | AVERAGE PER MONTH | PERCENT OF PLACEMENT GRIEVANCES AT EACH INSTITUTION |
|---|---|---|---|---|
| Marion Correctional Institution | 76 | 53.5% | 6 | 8.3 |
| Chillicothe Correctional Institution | 30 | 21.1 | 3 | 10.5 |
| Ohio State Reformatory | 26 | 18.3 | 2 | 9.5 |
| Lebanon Correctional Institution | 5 | 3.5 | | 2.3 |
| Southern Ohio Correctional Facility | 3 | 2.1 | | 3.8 |
| Ohio Reformatory for Women | 2 | 1.4 | | 2.1 |
| Columbus Correctional Facility | 0 | .0 | | .0 |
| London Correctional Institution | 0 | .0 | | .0 |
| TOTAL | 142 | 100.0% | 12 | |
| Percent of all grievances | | | | 6.6% |

NOTE: This report excludes statistics of the Ohio Reformatory for Women from February through May, 1978.

Table 37 . The ·Number of Grievances Filed Pertaining to the Rules Infraction Board in
FY 1978, by Institution

| CORRECTIONAL INSTITUTION | R I B GRIEVANCES NUMBER | PERCENT | AVERAGE PER MONTH | PERCENT OF RIB GRIEVANCES AT EACH INSTITUTION |
|---|---|---|---|---|
| Lebanon Correctional Institution | 58 | 48.7% | 5 | 27.0 |
| Marion Correctional Institution | 31 | 26.1 | 3 | 3.4 |
| Chillicothe Correctional Institute | 14 | 11.8 | 1 | 4.9 |
| Southern Ohio Correctional Facility | 11 | 9.2 | 1 | 5.4 |
| London Correctional Institution | 4 | 3.4 | | 12.5 |
| Ohio State Reformatory | 1 | .8 | | .4 |
| Columbus Correctional Facility | 0 | .0 | | .0 |
| Ohio Reformatory for Women | 0 | .0 | | .0 |
| TOTAL | 119 | 100.0% | 10 | |
| Percent of all grievances | | | | 5.5% |

NOTE: This report excludes statistics of the Ohio Reformatory for Women from
February through May, 1978.

SOURCE: Office of the Chief Inspector

Table 38 . The Number of Grievances Filed Pertaining to Institutional Policy in FY 1978,
by Institution.

| CORRECTIONAL INSTITUTION | INST. POLICY GRIEVANCES NUMBER | PERCENT | AVERAGE PER MONTH | PERCENT OF INST. POLICY GRIEVANCES AT EACH INST. |
|---|---|---|---|---|
| Marion Correctional Institution | 26 | 22.0% | 2 | 2.8 |
| Ohio State Reformatory | 26 | 22.0 | 2 | 9.5 |
| Southern Ohio Correctional Facility | 24 | 20.3 | 2 | 11.9 |
| Chillicothe Correctional Institute | 16 | 13.6 | 1 | 5.6 |
| Lebanon Correctional Institution | 13 | 11.0 | 1 | 6.0 |
| Ohio Reformatory for Women | 10 | 8.5 | 1 | 10.5 |
| London Correctional Institution | 2 | 1.7 | | 6.3 |
| Columbus Correctional Facility | 1 | .8 | | .7 |
| TOTAL | 118 | 100.0% | 10 | |
| Percent of all grievances | | | | 5.5% |

NOTE: This report excludes statistics from the Ohio Reformatory for Women from
February through May, 1978.

SOURCE: Office of the Chief Inspector.

Table 39. The Number of Grievances Filed Pertaining to Inmate Accounts in FY 1978, by Institution

| CORRECTIONAL INSTITUTION | INMATE ACCOUNT GRIEVANCES | | AVERAGE PER MONTH | PERCENT OF INMATE ACCOUNT GRIEVANCES BY INSTITUTION |
|---|---|---|---|---|
| | NUMBER | PERCENT | | |
| Marion Correctional Institution | 40 | 41.7% | 3 | 4.4 |
| Columbus Correctional Facility | 17 | 17.7 | 1 | 12.3 |
| Southern Ohio Correctional Facility | 16 | 16.7 | 1 | 7.9 |
| Chillicothe Correctional Institution | 12 | 12.5 | 1 | 4.2 |
| London Correctional Institution | 5 | 5.2 | | 15.6 |
| Lebanon Correctional Institution | 2 | 2.1 | | .9 |
| Ohio Reformatory for Women | 2 | 2.1 | | 2.1 |
| Ohio State Reformatory | 2 | 2.1 | | .7 |
| TOTAL | 96 | 100.0% | 8 | |
| Percent of all grievances | | | | 4.4% |

NOTE: Statistics for the Ohio Reformatory for Women are excluded from February through May, 1978.

SOURCE: Office of the Chief Inspector

*******************************************************************************************

Table 40. The Number of Legal Grievances Filed in FY 1978, by Institution.

| CORRECTIONAL INSTITUTION | LEGAL GRIEVANCES | | AVERAGE PER MONTH | PERCENT OF LEGAL GRIEVANCES AT EACH INSTITUTION |
|---|---|---|---|---|
| | NUMBER | PERCENT | | |
| Marion Correctional Institution | 59 | 67.8% | 5 | 6.4 |
| Southern Ohio Correctional Facility | 13 | 14.9 | 1 | 6.4 |
| Chillicothe Correctional Institution | 8 | 9.2 | 1 | 2.8 |
| Ohio State Reformatory | 4 | 4.6 | | 1.5 |
| Columbus Correctional Facility | 2 | 2.3 | | 1.4 |
| Lebanon Correctional Institution | 1 | 1.1 | | .5 |
| London Correctional Institution | 0 | .0 | | .0 |
| Ohio Reformatory for Women | 0 | .0 | | .0 |
| TOTAL | 87 | 100.0% | 7 | |
| Percent of all grievances | | | | 4.0% |

NOTE: Statistics for the Ohio Reformatory for Women are excluded from February through May, 1978.

SOURCE: Office of the Chief Inspector

Table 41. The Number of Grievances Filed Pertaining to Conditions in FY 1978, by Institution.

| CORRECTIONAL INSTITUTION | CONDITIONS GRIEVANCES NUMBER | CONDITIONS GRIEVANCES PERCENT | AVERAGE PER MONTH | PERCENT OF CONDITIONS GRIEVANCES BY INSTITUTION |
|---|---|---|---|---|
| Chillicothe Correctional Institution | 32 | 39.5% | 3 | 11.2% |
| Marion Correctional Institution | 27 | 33.3 | 2 | 2.9 |
| Ohio State Reformatory | 14 | 17.3 | 1 | 5.1 |
| Columbus Correctional Facility | 6 | 7.4 | 1 | 4.3 |
| Lebanon Correctional Institution | 2 | 2.5 | | .9 |
| London Correctional Institution | 0 | .0 | | .0 |
| Ohio Reformatory for Women | 0 | .0 | | .0 |
| Southern Ohio Correctional Facility | 0 | .0 | | .0 |
| TOTAL | 81 | 100.0% | 7 · | |
| Percent of all grievances | | | | 3.8% |

NOTE: Statistics for the Ohio Reformatory for Women are not available from February through May, 1978.

SOURCE: Office of the Chief Inspector

xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

Table 42. The Number of Grievances Filed Pertaining to Staff in FY 1978, by Institution.

| CORRECTIONAL INSTITUTION | STAFF GRIEVANCES NUMBER | STAFF GRIEVANCES PERCENT | AVERAGE PER MONTH | PERCENT OF STAFF GRIEVANCES AT EACH INSTITUTION |
|---|---|---|---|---|
| Ohio Reformatory for Women | 39 | 48.8% | 5 | 41.1% |
| Lebanon Correctional Institution | 22 | 27.5 | 2 | 10.2 |
| Southern Ohio Correctional Facility | 10 | 12.5 | 1 | 5.0 |
| Chillicothe Correctional Institution | 6 | 7.5 | 1 | 2.1 |
| Marion Correctional Institution | 2 | 2.5 | | .2 |
| Columbus Correctional Facility | 1 | 1.3 | | .7 |
| London Correctional Institution | 0 | .0 | | .0 |
| Ohio State Reformatory | 0 | .0 | | .0 |
| TOTAL | 80 | 100.0% | 7 | |
| Percent of all grievances | | | | 3.7% |

NOTE: Statistics for the Ohio Reformatory for Women are not available from February through May, 1978.

SOURCE: Office of the Chief Inspector

Table 43. The Number of Grievances Filed Pertaining to Visiting in FY 1978, by Institution.

| CORRECTIONAL INSTITUTION | VISIT GRIEVANCES NUMBER | VISIT GRIEVANCES PERCENT | AVERAGE PER MONTH | PERCENT OF VISIT GRIEVANCES AT EACH INSTITUTION |
|---|---|---|---|---|
| Marion Correctional Institution | 27 | 37.5% | 2 | 2.9% |
| Chillicothe Correctional Institution | 16 | 22.2 | 8 | 5.6 |
| Southern Ohio Correctional Facility | 11 | 15.3 | 1 | 5.4 |
| Lebanon Correctional Institution | 8 | 11.1 | 1 | 3.7 |
| Columbus Correctional Facility | 5 | 6.9 | | 3.6 |
| Ohio State Reformatory | 4 | 5.6 | | 1.5 |
| London Correctional Institution | 1 | 1.4 | | 3.1 |
| Ohio Reformatory for Women | 0 | .0 | | .0 |
| TOTAL | 72 | 100.0% | 6 | |
| Percent of all grievances | | | | 3.3% |

NOTE: Statistics for the Ohio Reformatory for Women are not available from February through May, 1978.

SOURCE: Office of the Chief Inspector

*******************************************************************************************

Table 44. The Number of Grievances Filed in FY 1978 which are Classified as "Other", by Institution.

| CORRECTIONAL INSTITUTION | OTHER GRIEVANCES NUMBER | OTHER GRIEVANCES PERCENT | AVERAGE PER MONTH | PERCENT OF OTHER GRIEVANCES AT EACH INSTITUTION |
|---|---|---|---|---|
| Lebanon Correctional Institution | 9 | 26.5% | 1 | 4.2% |
| Chillicothe Correctional Institution | 8 | 23.5 | 1 | 2.8 |
| Marion Correctional Institution | 6 | 17.6 | 1 | .7 |
| Southern Ohio Correctional Facility | 6 | 17.6 | 1 | 3.0 |
| Ohio Reformatory for Women | 3 | 8.8 | | 3.2 |
| Columbus Correctional Facility | 1 | 2.9 | | .7 |
| London Correctional Institution | 1 | 2.9 | | 3.1 |
| Ohio State Reformatory | 0 | .0 | | .0 |
| TOTAL | 34 | 100.0% | 3 | |
| Percent of all grievances | | | | 1.6% |

NOTE: Statistics for the Ohio Reformatory for Women are not available from February through May, 1978.

SOURCE: Office of the Chief Inspector

Table 45. The Number of Grievances Filed Pertaining to Programs in FY 1978, by Institution.

| CORRECTIONAL INSTITUTION | PROGRAM GRIEVANCES NUMBER | PROGRAM GRIEVANCES PERCENT | AVERAGE PER MONTH | PERCENT OF PROGRAM GRIEVANCES AT EACH INSTITUTION |
|---|---|---|---|---|
| Marion Correctional Institution | 9 | 36.0% | 1 | 1.0% |
| Chillicothe Correctional Institution | 6 | 24.0 | 1 | 2.1 |
| Lebanon Correctional Institution | 4 | 16.0 | | 1.9 |
| Southern Ohio Correctional Facility | 3 | 12.0 | | 1.5 |
| Ohio State Reformatory | 2 | 8.0 | | .7 |
| Ohio Reformatory for Women | 1 | 4.0 | | 1.1 |
| Columbus Correctional Facility | 0 | .0 | | .0 |
| London Correctional Institution | 0 | .0 | | .0 |
| TOTAL | 25 | 100.0% | 2 | |
| Percent of all grievances | | | | 1.2% |

NOTE: Statistics from the Ohio Reformatory for Women are excluded from February through May, 1978.

SOURCE: Office of the Chief Inspector

*****************************************************************************************

Table 46. The Number of Grievances Filed Pertaining to Parole in FY 1978, by Institution.

| CORRECTIONAL INSTITUTION | PAROLE GRIEVANCES NUMBER | PAROLE GRIEVANCES PERCENT | AVERAGE PER MONTH | PERCENT OF PAROLE GRIEVANCES AT EACH INSTITUTION |
|---|---|---|---|---|
| Marion Correctional Institution | 10 | 52.6% | 1 | 1.1% |
| Chillicothe Correctional Institution | 6 | 31.6 | 1 | 2.1 |
| Ohio State Reformatory | 2 | 10.5 | | .7 |
| Southern Ohio Correctional Facility | 1 | 5.3 | | .5 |
| Columbus Correctional Facility | 0 | .0 | | .0 |
| Lebanon Correctional Institution | 0 | .0 | | .0 |
| London Correctional Institution | 0 | .0 | | .0 |
| Ohio Reformatory for Women | 0 | .0 | | .0 |
| TOTAL | 19 | 100.0% | 2 | |
| Percent of all grievances | | | | .9% |

NOTE: Statistics from the Ohio Reformatory for Women are not available from February through May, 1978.

SOURCE: Office of the Chief Inspector

Table 47. The Number of Grievances Filed Pertaining to Departmental Policy in FY 1978, by Institution.

| CORRECTIONAL INSTITUTION | DEPT. POLICY GRIEVANCES NUMBER | DEPT. POLICY GRIEVANCES PERCENT | AVERAGE PER MONTH | PERCENT OF DEPT. POLICY GRIEVANCES AT EACH INST. |
|---|---|---|---|---|
| Chillicothe Correctional Institute | 5 | 29.4% | | 1.7% |
| Ohio State Reformatory | 4 | 23.5 | | 1.5 |
| Lebanon Correctional Institution | 3 | 17.6 | | 1.4 |
| Ohio Reformatory for Women | 3 | 17.6 | | 3.2 |
| Southern Ohio Correctional Facility | 2 | 11.8 | | 1.0 |
| Columbus Correctional Facility | 0 | .0 | | |
| London Correctional Institution | 0 | .0 | | |
| Marion Correctional Institution | 0 | .0 | | |
| TOTAL | 17 | 100.0% | 1 | |
| Percent of all grievances | | | | .8% |

NOTE: Statistics for the Ohio Reformatory for Women are not available from February through May, 1978.

SOURCE: Office of the Chief Inspector.

*******************************************************************************************

Table 48. The Number of Grievances Filed Pertaining to Threats in FY 1978, by Institution.

| CORRECTIONAL INSTITUTION | THREAT GRIEVANCES NUMBER | THREAT GRIEVANCES PERCENT | AVERAGE PER MONTH | PERCENT OF THREAT GRIEVANCES AT EACH INSTITUTION |
|---|---|---|---|---|
| Ohio State Reformatory | 10 | 62.5% | 1 | 3.7% |
| Marion Correctional Institution | 3 | 18.8 | | .3 |
| Columbus Correctional Facility | 2 | 12.5 | | 1.4 |
| Lebanon Correctional Institution | 1 | 6.3 | | .5 |
| Chillicothe Correctional Institution | 0 | .0 | | .0 |
| London Correctional Institution | 0 | .0 | | .0 |
| Ohio Reformatory for Women | 0 | .0 | | .0 |
| Southern Ohio Correctional Facility | 0 | .0 | | .0 |
| TOTAL | 16 | 100.0% | 1 | |
| Percent of all grievances | | | | .7% |

NOTE: Statistics for the Ohio Reformatory for Women are not available from February through May, 1978.

Table 49. The Number of Racial Grievances Filed in FY 1978, by Institution.

| CORRECTIONAL INSTITUTION | RACIAL GRIEVANCES NUMBER | PERCENT | AVERAGE PER MONTH | PERCENT OF RACIAL GRIEVANCES AT EACH INSTITUTION |
|---|---|---|---|---|
| Chillicothe Correctional Institution | 4 | 40.0% | | 1.4% |
| Marion Correctional Institution | 3 | 30.0 | | .3 |
| Ohio State Reformatory | 3 | 30.0 | | 1.1 |
| Columbus Correctional Facility | 0 | .0 | | .0 |
| Lebanon Correctional Institution | 0 | .0 | | .0 |
| London Correctional Institution | 0 | .0 | | .0 |
| Ohio Reformatory for Women | 0 | .0 | | .0 |
| Southern Ohio Correctional Facility | 0 | .0 | | .0 |
| TOTAL | 10 | 100.0% | 1 | |
| Percent of all grievances | | | | .5% |

NOTE: Statistics for the Ohio Reformatory for Women are not available from February through May, 1978.

SOURCE: Office of the Chief Inspector

*******************************************************************************

Table 50. The Number of Grievances Filed Pertaining to Extortion in FY 1978, by Institution.

| CORRECTIONAL INSTITUTION | EXTORTION GRIEVANCES NUMBER | PERCENT | AVERAGE PER MONTH | PERCENT OF EXTORTION GRIEVANCES AT EACH INSTITUTION |
|---|---|---|---|---|
| Chillicothe Correctional Institution | 2 | 50.0% | | .7 |
| Columbus Correctional Facility | 1 | 25.0 | | .7 |
| Ohio State Reformatory | 1 | 25.0 | | .4 |
| Lebanon Correctional Institution | 0 | .0 | | .0 |
| London Correctional Institution | 0 | .0 | | .0 |
| Marion Correctional Institution | 0 | .0 | | .0 |
| Ohio Reformatory for Women | 0 | .0 | | .0 |
| Southern Ohio Correctional Facility | 0 | .0 | | .0 |
| TOTAL | 4 | 100.0% | * | |
| Percent of all grievances | | | | .2% |

NOTE: Statistics for the Ohio Reformatory for Women are not available from February through May, 1978.

* Less than one per month.

SOURCE: Office of the Chief Inspector

Table 51. The Number of Grievances Filed Pertaining to Protection in FY 1978, by Institution.

| CORRECTIONAL INSTITUTION | PROTECTION GRIEVANCES NUMBER | PROTECTION GRIEVANCES PERCENT | AVERAGE PER MONTH | PERCENT OF PROTECTION GRIE-VANCES AT EACH INSTITUTION |
|---|---|---|---|---|
| Ohio State Reformatory | 2 | 50.0% | | .7% |
| Marion Correctional Institution | 1 | 25.0 | | .1 |
| Ohio Reformatory for Women | 1 | 25.0 | | 1.1 |
| Chillicothe Correctional Institution | 0 | .0 | | .0 |
| Columbus Correctional Facility | 0 | .0 | | .0 |
| Lebanon Correctional Institution | 0 | .0 | | .0 |
| London Correctional Institution | 0 | .0 | | .0 |
| Southern Ohio Correctional Facility | 0 | .0 | | .0 |
| TOTAL | 4 | 100.0% | * | |
| Percent of all grievances | | | | .2% |

NOTE: Statistics for the Ohio Reformatory for Women are excluded from February through May, 1978.

*Less than one per month.

SOURCE: Office of the Chief Inspector

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Table 52. The Number of Grievances Filed Pertaining to the Use of Force Without Reports in FY 1978, by Institution.

| CORRECTIONAL INSTITUTION | USE OF FORCE GRIEVANCES NUMBER | USE OF FORCE GRIEVANCES PERCENT | AVERAGE PER MONTH | PERCENT OF USE OF FORCE GRIEVANCES BY INSTITUTION |
|---|---|---|---|---|
| Ohio State Reformatory | 3 | 75.0% | | 1.1% |
| Lebanon Correctional Institution | 1 | 25.0 | | .5 |
| Chillicothe Correctional Institution | 0 | .0 | | .0 |
| Columbus Correctional Facility | 0 | .0 | | .0 |
| London Correctional Institution | 0 | .0 | | .0 |
| Lebanon Correctional Institution | 0 | .0 | | .0 |
| Marion Correctional Institution | 0 | .0 | | .0 |
| Ohio Reformatory for Women | 0 | .0 | | .0 |
| TOTAL | 4 | 100.0% | * | |
| Percent of all grievances | | | | .2% |

NOTE: Statistics for the Ohio Reformatory for Women are not available from February through May, 1978.

*Less than one per month.

Table 51 The Number, Type and Percent of Inmate Grievances Filed in FY 1978, by Institution.

| MARION CORRECTIONAL INSTITUTION GRIEVANCES | | | CHILLICOTHE CORRECTIONAL INSTITUTION GRIEVANCES | | | OHIO STATE REFORMATORY GRIEVANCES | | |
|---|---|---|---|---|---|---|---|---|
| Area of Concern | Number | Percent | Area of Concern | Number | Percent | Area of Concern | Number | Percent |
| Property | 189 | 20.6% | Medical | 33 | 11.5% | Harassment | 52 | 19.0% |
| Inappropriate Supervision | 167 | 18.2 | Conditions | 32 | 11.2 | Property | 41 | 15.0 |
| Medical | 93 | 10.1 | Placement | 30 | 10.5 | Medical | 39 | 14.3 |
| Mail | 77 | 8.4 | Property | 28 | 9.8 | Inappropriate Supervision | 28 | 10.3 |
| Placement | 76 | 8.3 | Mail | 27 | 9.4 | Placement | 26 | 9.5 |
| Harassment | 72 | 7.8 | Harassment | 20 | 7.0 | Institutional Policy | 26 | 9.5 |
| Legal | 59 | 6.4 | Institutional Policy | 16 | 5.6 | Conditions | 14 | 5.1 |
| Inmate Accounts | 40 | 4.4 | Visits | 16 | 5.6 | Threats | 10 | 3.7 |
| Rules Infraction Board | 31 | 3.4 | Rules Infraction Board | 14 | 5.0 | Mail | 9 | 3.3 |
| Conditions | 27 | 2.9 | Inappropriate Supervision | 13 | 4.5 | Legal | 4 | 1.5 |
| Visits | 27 | 2.9 | Inmate Accounts | 12 | 4.2 | Departmental Policy | 4 | 1.5 |
| Institutional Policy | 26 | 2.8 | Legal | 8 | 2.8 | Visits | 4 | 1.5 |
| Parole | 10 | 1.1 | Other | 8 | 2.8 | Racial | 3 | 1.1 |
| Programs | 9 | 1.0 | Programs | 6 | 2.1 | Use of Force Without Report | 3 | 1.1 |
| Other | 6 | .7 | Parole | 6 | 2.1 | Inmate Accounts | 2 | .7 |
| Racial | 3 | .3 | Staff | 6 | 2.1 | Parole | 2 | .7 |
| Threats | 3 | .3 | Departmental Policy | 5 | 1.7 | Programs | 2 | .7 |
| Staff | 2 | .2 | Racial | 4 | 1.4 | Protection | 1 | .4 |
| Protection | 1 | .1 | Extortion | 2 | .7 | Rules Infraction Board | 1 | .4 |
| Extortion | | | Protection | | | Staff | | |
| Departmental Policy | | | Threats | | | Other | | |
| Use of Force Without Report | | | Use of Force Without Report | | | | | |
| TOTAL | 918 | 100.0% | TOTAL | 286. | 100.0% | TOTAL | 273 | 100.0% |

SOURCE: Office of the Chief Inspector

Table 54. The Number, Type and Percent of Inmate Grievances Filed in FY 1978, by Institution.

**LEBANON CORRECTIONAL INSTITUTION GRIEVANCES**

| Area of Concern | Number | Percent |
|---|---|---|
| Rules Infraction Board | 58 | 27.0% |
| Property | 49 | 22.8 |
| Staff | 22 | 10.2 |
| Harassment | 16 | 7.4 |
| Institutional Policy | 13 | 6.0 |
| Medical | 9 | 4.2 |
| Other | 9 | 4.2 |
| Visits | 8 | 3.7 |
| Inappropriate Supervision | 7 | 3.3 |
| Mail | 5 | 2.3 |
| Placement | 5 | 2.3 |
| Programs | 4 | 1.9 |
| Departmental Policy | 3 | 1.4 |
| Conditions | 2 | .9 |
| Inmate Accounts | 2 | .9 |
| Legal | 1 | .5 |
| Threats | 1 | .5 |
| Use of Force Without Report | 1 | .5 |
| Extortion | 1 | .5 |
| Parole | | |
| Protection | | |
| Racial | | |
| **TOTAL** | **215** | **100.0%** |

**SOUTHERN OHIO CORRECTIONAL INSTITUTION GRIEVANCES**

| Area of Concern | Number | Percent |
|---|---|---|
| Medical | 45 | 22.3% |
| Property | 30 | 14.9 |
| Institutional Policy | 24 | 11.9 |
| Harassment | 16 | 7.9 |
| Inmate Accounts | 16 | 7.9 |
| Legal | 13 | 6.4 |
| Rules Infraction Board | 11 | 5.4 |
| Visits | 11 | 5.4 |
| Staff | 10 | 5.0 |
| Mail | 9 | 4.5 |
| Other | 6 | 3.0 |
| Placement | 3 | 1.5 |
| Programs | 3 | 1.5 |
| Inappropriate Supervision | 2 | 1.0 |
| Departmental Policy | 2 | 1.0 |
| Parole | 1 | .5 |
| Conditions | | |
| Extortion | | |
| Protection | | |
| Racial | | |
| Threats | | |
| Use of Force Without Report | | |
| **TOTAL** | **202** | **100.0%** |

**COLUMBUS CORRECTIONAL FACILITY GRIEVANCES**

| Area of Concern | Number | Percent |
|---|---|---|
| Property | 53 | 38.4% |
| Inmate Accounts | 17 | 12.3 |
| Medical | 17 | 12.3 |
| Mail | 16 | 11.6 |
| Inappropriate Supervision | 9 | 6.5 |
| Harassment | 7 | 5.1 |
| Conditions | 6 | 4.3 |
| Visits | 5 | 3.6 |
| Legal | 2 | 1.4 |
| Threats | 2 | 1.4 |
| Extortion | 1 | .7 |
| Institutional Policy | 1 | .7 |
| Staff | 1 | .7 |
| Other | 1 | .7 |
| Parole | | |
| Placement | | |
| Departmental Policy | | |
| Programs | | |
| Protection | | |
| Racial | | |
| Rules Infraction Board | | |
| Use of Force Without Report | | |
| **TOTAL** | **138** | **100.0%** |

SOURCE: Office of the Chief Inspector

1373

Table 55. The Number, Type and Percent of Inmate Grievances Filed in FY 1978, by Institution.

OHIO REFORMATORY FOR WOMEN GRIEVANCES

| Area of Concern | Number | Percent |
|---|---|---|
| Staff | 39 | 41.1% |
| Medical | 17 | 17.9 |
| Institutional Policy | 10 | 10.5 |
| Property | 7 | 7.4 |
| Inappropriate Supervision | 6 | 6.3 |
| Departmental Policy | 3 | 3.2 |
| Other | 3 | 3.2 |
| Extortion | 2 | 2.1 |
| Inmate Accounts | 2 | 2.1 |
| Mail | 2 | 2.1 |
| Placement | 2 | 2.1 |
| Programs | 1 | 1.1 |
| Protection | 1 | 1.1 |
| Conditions | | |
| Extortion | | |
| Legal | | |
| Parole | | |
| Racial | | |
| Rules Infraction Board | | |
| Threats | | |
| Visits | | |
| Use of Force Without Report | | |
| TOTAL | 95 | 100.0% |

LONDON CORRECTIONAL INSTITUTION GRIEVANCES

| Area of Concern | Number | Percent |
|---|---|---|
| Property | 10 | 31.3% |
| Inmate Accounts | 5 | 15.6 |
| Mail | 4 | 12.5 |
| Rules Infraction Board | 4 | 12.5 |
| Inappropriate Supervision | 2 | 6.3 |
| Medical | 2 | 6.3 |
| Institutional Policy | 2 | 6.3 |
| Harassment | 1 | 3.1 |
| Visits | 1 | 3.1 |
| Other | 1 | 3.1 |
| Conditions | | |
| Extortion | | |
| Legal | | |
| Parole | | |
| Placement | | |
| Departmental Policy | | |
| Program | | |
| Protection | | |
| Racial | | |
| Staff | | |
| Threats | | |
| Use of Force Without Report | | |
| TOTAL | 32 | 100.0% |

NOTE: The Ohio Reformatory for Women has no statistics available from February through May, 1978.

SOURCE: Office of the Chief Inspector

Table 56. Resolutions of Inmate Grievances Filed in FY 1978, by Institution.

| RESOLUTIONS | Marion # | Marion % | Chillicothe # | Chillicothe % | Ohio State R # | Ohio State R % | Lebanon # | Lebanon % | Southern Ohio # | Southern Ohio % | Columbus # | Columbus % | ORW # | ORW % | London # | London % | TOTAL # | TOTAL % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Full | 477 | 51.0% | 105 | 36.7% | 96 | 35.7% | 127 | 58.8% | 160 | 79.2% | 100 | 72.5% | 73 | 75.3% | 14 | 42.4% | 1152 | 52.9 |
| Partial | 300 | 32.1 | 15 | 5.2 | 102 | 37.9 | 23 | 10.6 | 6 | 3.0 | 20 | 14.5 | 5 | 5.2 | 5 | 15.2 | 471 | 21.6 |
| Invalid: Inappropriate Method by Admin. Reg. or State Statute | 3 | .3 | 30 | 10.5 | 20 | 7.4 | 55 | 25.5 | 2 | 1.0 | 3 | 2.2 | 6 | 6.2 | | | 124 | 5.7 |
| None | 51 | 5.4 | 40 | 14.0 | | | 2 | .9 | 8 | 4.0 | | | 2 | 2.1 | | | 103 | 4.7 |
| Invalid: False Claim | 27 | 2.9 | 41 | 14.3 | 9 | 3.3 | 1 | .5 | | | | | 4 | 4.1 | 12 | 36.4 | 94 | 4.3 |
| Appealed | 59 | 6.3 | 6 | 2.1 | | | | | 25 | 12.4 | | | 2 | 2.1 | 1 | 3.0 | 93 | 4.3 |
| Withdrawn | 11 | 1.2 | 39 | 13.6 | 25 | 9.3 | 6 | 2.8 | 1 | .5 | | | 1 | 1.0 | 1 | 3.0 | 84 | 3.9 |
| Invalid: Not within Scope of Inspection | 7 | .7 | 9 | 3.1 | 17 | 6.3 | 2 | .9 | | | 3 | 2.2 | | | | | 37 | 1.7 |
| Referred to M.O. with Recommendations and Followed in Full | | | 1 | .3 | | | | | | | 6 | 4.3 | 4 | 4.1 | | | 11 | .5 |
| Referred to Outside Agency | 1 | .1 | | | | | | | | | 4 | 2.9 | | | | | 5 | .2 |
| Referred to M.O. with Recommendations and Followed in Part | | | | | | | | | | | 2 | 1.4 | | | | | 2 | .1 |
| TOTAL RESOLUTIONS / Total "Origins of Complaints" / Total Inmate Grievances | 936 924 918 | 100.0% | 286 286 286 | 100.0% | 269 269 273 | 100.0% | 216 215 215 | 100.0% | 202 205 202 | 100.0% | 138 138 138 | 100.0% | 97 95 95 | 100.0% | 33 32 32 | 100.0% | 2176 2164 2159 | 100% |

NOTE: Statistics for the Ohio Reformatory for Women are not available from February through May, 1978.
SOURCE: Office of the Chief Inspector.

Table 57. Resolution of Inmate Grievances in FY 1978 with Breakdowns by Race and Institution

| Resolution of Grievances | Marion | | Chillicothe | | OSR | | SOCF | | Lebanon | | CCF | | ORW | | London | | Total | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | # | % | # | % | # | % | # | % | # | % | # | % | # | % | # | % | # | % |
| **Black Inmates:** | | | | | | | | | | | | | | | | | | |
| Full, partial, referred to Managing Officer with recommendations followed in full or in part | 361 | 84.3% | 60 | 45.8% | 115 | 63.9% | 102 | 91.1% | 67 | 69.1% | 56 | 91.8% | 51 | 86.4% | 7 | 41.2% | 819 | 75.5% |
| None, withdrawn, not valid, referred to Managing Officer with recommendations not followed | 47 | 11.0% | 71 | 54.2% | 49 | 27.2% | 3 | 2.7% | 30 | 30.9% | 5 | 8.2% | 8 | 13.6% | 10 | 58.8% | 223 | 20.6% |
| Other | 20 | 4.7 | 0 | | 16 | 8.9 | 7 | 6.3 | 0 | | 0 | | 0 | | 0 | | 43 | 4.0% |
| Total Grievances filed | 428 | 46.8% | 131 | 45.8% | 180 | 65.9% | 112 | 55.7% | 97 | 48.5% | 61 | 45.2% | 59 | 62.8% | 17 | 37.0% | 1,085 | 50.5% |
| **White Inmates:** | | | | | | | | | | | | | | | | | | |
| Full, partial, referred to M.O. with recommendations followed in full or in part | 408 | 84.0% | 63 | 40.6% | 69 | 74.2% | 66 | 74.2% | 77 | 74.8% | 71 | 95.9% | 29 | 82.9% | 13 | 44.8% | 796 | 74.8% |
| None, withdrawn, not valid, referred to M.O. with recommendations not followed | 61 | 12.6% | 92 | 59.4% | 22 | 23.7% | 12 | 13.5% | 26 | 25.2% | 3 | 4.1% | 5 | 14.3% | 16 | 55.2% | 237 | 22.3% |
| Other | 17 | 3.5 | 0 | | 2 | 2.2 | 11 | 12.4 | 0 | | 0 | | 1 | 2.9 | 0 | | 31 | 2.9 |
| Total Grievances filed | 486 | 53.2% | 155 | 54.2% | 93 | 34.1% | 89 | 44.3% | 103 | 51.5% | 74 | 54.8% | 35 | 37.2% | 29 | 63.0% | 1,064 | 49.5% |

(CONTINUED ON NEXT PAGE)

Table 57. Resolution of Inmate Grievances in FY 1978 with Breakdowns by Race and Institution

| Resolution of Grievances | Marion | | Chillicothe | | OSR | | SOCF | | Lebanon | | CCF | | ORW | | London | | Total | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | # | % | # | % | # | % | # | % | # | % | # | % | # | % | # | % | # | % |
| Total Inmates: Full, partial, referred to M.O. with recommendations followed in full or in part | 769 | 84.1% | 123 | 43.0% | 184 | 67.4% | 168 | 83.6% | 144 | 72.0% | 127 | 94.1% | 80 | 85.1% | 20 | 43.5% | 1,615 | 75.2% |
| None, withdrawn, not valid, referred to M.O. with recommendations not followed | 108 | 11.8% | 163 | 57.0% | 71 | 26.0% | 15 | 7.5% | 56 | 28.0% | 8 | 5.9% | 13 | 13.8% | 26 | 56.5% | 460 | 21.4% |
| Other | 37 | 4.0 | 0 | | 18 | 6.6 | 18 | 9.0 | 0 | | 0 | | 1 | 1.1 | 0 | | 74 | 3.4 |
| Total Grievances filed | 914 | 100.0% | 286 | 100.0% | 273 | 100.0% | 201 | 100.0% | 200 | 100.0% | 135 | 100.0% | 94 | 100.0% | 46 | 100.0% | 2,149 | 100.0% |

NOTE: The total grievances for each institution do not coincide with total grievances in other sections of the FY 1978 report. The following institutions have conflicting totals: CCF, Lebanon, London, Marion, ORW, and SOCF.

SOURCE: Office of the Chief Inspector

Table 58. The Number of Appeals to the Chief Inspector in FY 1978 in Ohio Correctional Institutions, with Monthly Breakdown by Institution

| Month | Marion C I | S. Ohio C F | Chillicothe C I | Ohio Ref. for Women | London C I | Columbus C F | Lebanon C I | Ohio State Reformatory | Total Appeals |
|---|---|---|---|---|---|---|---|---|---|
| July | 4 | | | | | | | | 4 |
| August | 2 | | | | | | | | 2 |
| September | 3 | 1 | | | | | | | 4 |
| October | 4 | 1 | 1 | | | | | | 6 |
| November | 1 | 2 | 2 | 2 | | | | | 7 |
| December | 1 | 1 | 1 | | | | | | 3 |
| January | 2 | 1 | 1 | | | | | | 4 |
| February | 9 | 1 | | | | | | | 10 |
| March | 8 | 2 | | | | | | | 10 |
| April | 7 | 1 | 1 | | | | | | 9 |
| May | 14 | 11 | 1 | | 1 | | | | 26 |
| June | 4 | 4 | | | | | | | 8 |
| Total Appeals | 59 | 25 | 6 | 2 | 1 | 0 | 0 | 0 | 93 |
| Total Grievances Filed* | 914 | 201 | 286 | 94 | 46 | 135 | 200 | 273 | 2,149 |
| Percent Appealed | 6.5% | 18.9% | 2.1% | 2.1% | 2.2% | .0% | .0% | .0% | 4.3% |
| Total Origin of Complaints** | 924 | 205 | 286 | 95 | 32 | 138 | 215 | 269 | 2,164 |
| Percent Appealed | 6.4% | 12.2% | 2.1% | 2.1% | 3.1% | .0% | .0% | .0% | 4.3% |
| Total Resolutions*** | 936 | 202 | 286 | 97 | 33 | 138 | 216 | 269 | 2,176 |
| Percent Appealed | 6.3% | 12.4% | 2.1% | 2.1% | 3.0% | .0% | .0% | .0% | 4.3% |

*Figures are taken from the "Grievances Filed" as indicated in the section titled "Racial Breakdown of Grievance vs. Resolution" of the FY 1978 Annual Report.

**Figures are taken from the "Origin of Complaint" section of the FY 1978 Annual Report

***Figures are taken from the "Resolutions" section of the FY 1978 Annual Report

NOTE: Thirty-two of the 59 grievance resolutions from Marion C I which were appealed to the Chief Inspector, received outside review. This represents 54.2 percent of the grievance resolutions.

SOURCE: Office of the Chief Inspector

Table 59. Actions taken on Appeals to the Chief Inspector in Ohio Correctional Institutions
for FY 1978

| Actions by the Chief Inspector | Number | Percent of Appeals |
|---|---|---|
| Affirmed* | 77 | 82.8% |
| Modified | 13 | 14.0 |
| Reversed | 3 | 3.2 |
| Total Appeals/Actions | 93 | 100.0% |
| Other types of actions included above: | | |
| Corrective Action Ordered | 7 | 7.5% |
| Departmental Policy Changed | 2 | 2.2 |
| Institutional Policy Changed | 0 | .0 |
| TOTAL | 9 | 9.7% |

*According to the Chief Inspector, an affirmed resolution may have already included
corrective action at the institutional level. Therefore, it is incorrect to assume
that no resolution occurred in those cases.

SOURCE: Office of the Chief Inspector

**1380**

Table 60. Inmate Grievances at the Chillicothe Correctional Institution from February through April, 1978.

| INMATE GRIEVANCE INFORMATION | FEBRUARY | MARCH | APRIL | TOTAL NUMBER | TOTAL PERCENT | AVERAGE PER MONTH |
|---|---|---|---|---|---|---|
| **Type:** | | | | | | |
| Referred* | 31 | 15 | 20 | 66 | 48.2% | 22 |
| Informal | 9 | 12 | 35 | 56 | 40.9 | 19 |
| Formal | 7 | 5 | 3 | 15 | 10.9 | 5 |
| Subtotal | 16 | 17 | 38 | 71 | 51.8% | 24 |
| TOTAL | 47 | 32 | 58 | 137 | 100.0% | 46 |
| **Areas of Concern:** | | | | | | |
| Medical | | | | 13 | 18.6% | 4 |
| Property | | | | 11 | 15.7 | 4 |
| Mail | | | | 8 | 11.4 | 3 |
| Visits | | | | 6 | 8.6 | 2 |
| Inmate Accounts | | | | 5 | 7.1 | 2 |
| Conditions | | | | 4 | 5.7 | 1 |
| Harassment | | | | 4 | 5.7 | 1 |
| Rules Infraction Board | | | | 4 | 5.7 | 1 |
| Staff | | | | 3 | 4.3 | 1 |
| Inappropriate Supervision | | | | 2 | 2.9 | 1 |
| Parole | | | | 2 | 2.9 | 1 |
| Racial | | | | 2 | 2.9 | 1 |
| Departmental Policy | | | | 1 | 1.4 | |
| Extortion | | | | 1 | 1.4 | |
| Institutional Policy | | | | 1 | 1.4 | |
| Legal | | | | 1 | 1.4 | |
| Other | | | | 1 | 1.4 | |
| Placement | | | | 1 | 1.4 | |
| TOTAL | | | | 70 | 100.0% | 23 |
| TOTAL COMPLAINTS | | | | 71 | | 24 |

*Referrals to other departments for resolution of inmate problems or complaints.

SOURCE: Superintendent's Office and Office of the Inspector of Institutional Services

Table 61. Inmate Grievances at the Lebanon Correctional Institution from May through July, 1978, by Area of Concern

| AREA OF CONCERN | MAY | JUNE | JULY | TOTAL NUMBER | TOTAL PERCENT | AVERAGE PER MONTH |
|---|---|---|---|---|---|---|
| Staff | 4 | 10 | 0 | 14 | 18.2% | 5 |
| Institutional Policy | 2 | 4 | 5 | 11 | 14.3 | 4 |
| Property | 3 | 2 | 5 | 10 | 13.0 | 3 |
| Harassment | 0 | 0 | 8 | 8 | 10.4 | 3 |
| Inappropriate Supervision | 1 | 0 | 6 | 7 | 9.1 | 2 |
| Rules Infraction Board | 2 | 0 | 5 | 7 | 9.1 | 2 |
| Use of Force | 1 | 0 | 6 | 7 | 9.1 | 2 |
| Medical | 0 | 0 | 4 | 4 | 5.2 | 1 |
| Conditions | 0 | 1 | 1 | 2 | 2.6 | 1 |
| Placement | 0 | 1 | 1 | 2 | 2.6 | 1 |
| Departmental Policy | 0 | 2 | 0 | 2 | 2.6 | 1 |
| Inmate Threats | 0 | 1 | 1 | 2 | 2.6 | 1 |
| Other (Cellmate) | 0 | 0 | 1 | 1 | 1.3 | |
| TOTAL | 13 | 21 | 43 | 77 | 100.0% | 26 |

SOURCE: Superintendent's Office

Table 62. Inmate Grievances at the London Correctional Institution from April through June, 1978.

| INMATE GRIEVANCE INFORMATION | APRIL | MAY | JUNE | TOTAL NUMBER | TOTAL PERCENT | AVERAGE PER MONTH |
|---|---|---|---|---|---|---|
| **Racial Distribution:** | | | | | | |
| Grievances filed by White inmates | 1 | 1 | 2 | 4 | 80.0% | 1 |
| Grievances filed by Black inmates | 0 | 0 | 1 | 1 | 20.0% | |
| TOTAL | 1 | 1 | 3 | 5 | 100.0% | 1.7 |
| **Origin of Complaint:** | | | | | | |
| Inmate re: policy or procedure | 1 | 1 | 1 | 3 | 60.0% | 1 |
| Inmate re: staff | 0 | 0 | 2 | 2 | 40.0% | 1 |
| TOTAL | 1 | 1 | 3 | 5 | 100.0% | 2 |
| **Area of Concern:** | | | | | | |
| Rules Infraction Board | 0 | 1 | 1 | 2 | 40.0% | 1 |
| Inappropriate Supervision | 0 | 0 | 2 | 2 | 40.0% | 1 |
| Inmate Accounts | 1 | 0 | 0 | 1 | 20.0% | |
| TOTAL | 1 | 1 | 3 | 5 | 100.0% | 2 |
| **Resolution:** | | | | | | |
| Inappropriate method by Admin. Reg. or State Statute | | 1 | 1 | 2 | 40.0% | 1 |
| Full | | | 2 | 2 | 40.0% | 1 |
| False Claim | 1 | | | 1 | 20.0% | |
| TOTAL | 1 | 1 | 3 | 5 | 100.0% | 2 |
| **Resolved by Inspector of Institutional Services** | 1 | 1 | 3 | 5 | 100.0% | 2 |

SOURCE: Superintendent's Office and Office of the Inspector of Institutional Services

Table 63. Inmate Grievances at the Marion Correctional Institution from May through July, 1978

| INMATE GRIEVANCE INFORMATION | MAY | JUNE | JULY | TOTAL NUMBER | PERCENT | AVERAGE PER MONTH |
|---|---|---|---|---|---|---|
| **Areas of Concern:** | | | | | | |
| Inappropriate Supervision | 13 | 46 | 10 | 69 | 29.9% | 23 |
| Property | 7 | 16 | 10 | 33 | 14.3 | 11 |
| Medical | 11 | 11 | 10 | 32 | 13.9 | 11 |
| Mail | 11 | 7 | 10 | 28 | 12.1 | 9 |
| Placement | 10 | 0 | 2 | 12 | 5.2 | 4 |
| Inmate Accounts | 5 | 3 | 2 | 10 | 4.3 | 3 |
| Living Conditions | 0 | 3 | 6 | 9 | 3.9 | 3 |
| Legal/Recordkeeping | 4 | 1 | 4 | 9 | 3.9 | 3 |
| Harassment | 2 | 4 | 2 | 8 | 3.5 | 3 |
| Rules Infraction Board Process | 1 | 1 | 3 | 5 | 2.2 | 2 |
| Programs | 2 | 0 | 1 | 3 | 1.3 | 1 |
| Racial Discrimination | 1 | 1 | 1 | 3 | 1.3 | 1 |
| Institutional Policy | 0 | 0 | 2 | 2 | .9 | 1 |
| Parole/Furlough | 0 | 1 | 0 | 1 | .4 | |
| Threats | 0 | 1 | 0 | 1 | .4 | |
| Other | 1 | 0 | 0 | 1 | .4 | |
| TOTAL | 70 | 98 | 63 | 231 | 100.0% | 77 |
| **Resolution:** | | | | | | |
| Under Investigation | 4 | 26 | 13 | 43 | 18.3% | 14 |
| Appealed | 19 | 5 | 5 | 29 | 12.3 | 10 |
| Referred to Managing Officer | 0 | 0 | 27* | 27 | 11.5 | 9 |
| TOTAL | 23 | 31 | 45 | 99 | 42.1% | 33 |
| Actual number of grievances | 74 | 98 | 63 | 235 | 100.0% | 78 |

* "These figures represent what could have been considered a 'Class Action' grievance. It was filed by 25 residents on a specific incident which they felt was inappropriate supervision. This accounts for the inflated figures in that area of concern, also for the number referred to the Managing Officer in that period."

SOURCE: Superintendent's Office

Table 64. Inmate Grievances at the Ohio Reformatory for Women for June and July, 1978.

| INMATE GRIEVANCE INFORMATION | JUNE | JULY | TOTAL | | AVERAGE PER MONTH |
|---|---|---|---|---|---|
| | | | NUMBER | PERCENT | |
| **Racial Distribution:** | | | | | |
| Grievances filed by Black Inmates | 3 | 17 | 20 | 60.6% | 10 |
| Grievances filed by White Inmates | 6 | 7 | 13 | 39.4 | 7 |
| TOTAL | 9 | 24 | 33 | 100.0% | 17 |
| **Origin of Complaints:** | | | | | |
| Inmate re: staff | 3 | 14 | 17 | 51.5% | 9 |
| Inmate re: policy or procedure | 5 | 9 | 14 | 42.4 | 7 |
| Staff re: inmate | 1 | 0 | 1 | 3.0 | 1 |
| Referred from Central Office or Chief Inspector | 0 | 1 | 1 | 3.0 | 1 |
| TOTAL | 9 | 24 | 33 | 100.0% | 17 |
| **Areas of Concern:** | | | | | |
| Inappropriate Supervision | 1 | 10 | 11 | 33.3% | 6 |
| Property | 1 | 6 | 7 | 21.2 | 4 |
| Harassment | 2 | 3 | 5 | 15.2 | 3 |
| Medical | 3 | 1 | 4 | 12.1 | 2 |
| Institutional Policy | 2 | 1 | 3 | 9.1 | 2 |
| Staff | 0 | 2 | 2 | 6.1 | 1 |
| Mail | 0 | 1 | 1 | 3.0 | 1 |
| TOTAL | 9 | 24 | 33 | 100.0% | 17 |
| **Resolutions:** | | | | | |
| Full | 2 | 14 | 16 | 48.5% | 8 |
| None | 2 | 5 | 7 | 21.2 | 4 |
| Partial | 3 | 2 | 5 | 15.2 | 3 |
| False Claim | 1 | 1 | 2 | 6.1 | 1 |
| Subtotal | 8 | 22 | 30 | 90.9% | 15 |
| Referred to Managing Officer | 1 | 1 | 2 | 6.1% | 1 |
| Time Extension | 0 | 1 | 1 | 3.0 | 1 |
| TOTAL | 9 | 24 | 33 | 100.0% | 17 |
| Appealed | 0 | 1 | 1 | 3.0% | 1 |

NOTE: The Inspector of Institutional Services position was vacant during May, and there is no formal log for the month.

SOURCE: Superintendent's Office

Table 65. Inmate Grievances at the Ohio State Reformatory from April through June, 1978

| INMATE GRIEVANCE INFORMATION | APRIL | MAY | JUNE | TOTAL NUMBER | PERCENT | AVERAGE PER MONTH |
|---|---|---|---|---|---|---|
| **Areas of Concern:** | | | | | | |
| Mail | 10 | 0 | 2 | 12 | 13.8% | 4 |
| Harassment | 3 | 5 | 4 | 12 | 13.8 | 4 |
| Inappropriate Supervision | 5 | 2 | 3 | 10 | 11.5 | 3 |
| Property | 2 | 3 | 5 | 10 | 11.5 | 3 |
| Medical | 4 | 3 | 3 | 10 | 11.5 | 3 |
| Placement | 3 | 3 | 3 | 9 | 10.3 | 3 |
| Conditions | 1 | 1 | 4 | 6 | 6.9 | 2 |
| Threats | 3 | 0 | 0 | 3 | 3.4 | 1 |
| Racial | 0 | 0 | 3 | 3 | 3.4 | 1 |
| Visits | 0 | 2 | 1 | 3 | 3.4 | 1 |
| Institutional Policy | 1 | 2 | 0 | 3 | 3.4 | 1 |
| Departmental Policy | 0 | 1 | 1 | 2 | 2.3 | 1 |
| Programs | 0 | 1 | 0 | 1 | 1.1 | |
| Protection | 0 | 1 | 0 | 1 | 1.1 | |
| Use of Force without Reports | 0 | 1 | 0 | 1 | 1.1 | |
| Extortion | 0 | 0 | 1 | 1 | 1.1 | |
| **TOTAL** | 32 | 25 | 30 | 87 | 100.0% | 29 |
| **Resolutions:** | | | | | | |
| Disposed of | 31 | 15 | 23 | 69 | 79.3% | 23 |
| Pending from previous month | 1 | 10 | 1 | 12 | 13.8 | 4 |
| Withdrawn | | | 3 | 3 | 3.4 | 1 |
| Invalid | | | 3 | 3 | 3.4 | 1 |
| **TOTAL** | 32 | 25 | 30 | 87 | 100.0% | 29 |

SOURCE: Office of the Inspector of Institutional Services

Table 66. Inmate Grievances at the Southern Ohio Correctional Facility from April through June, 1978

| AREA OF CONCERN | NUMBER | PERCENT | AVERAGE PER MONTH |
|---|---|---|---|
| Institutional Policy | 11 | 20.4% | 3.7 |
| Medical | 9 | 16.7 | 3.0 |
| Staff | 6 | 11.1 | 2.0 |
| Harassment | 5 | 9.3 | 1.7 |
| Inmate Accounts | 5 | 9.3 | 1.7 |
| Mail | 5 | 9.3 | 1.7 |
| Property | 4 | 7.4 | 1.3 |
| Inappropriate Supervision | 2 | 3.7 | .7 |
| Legal | 1 | 1.9 | .3 |
| Placement | 1 | 1.9 | .3 |
| Programs | 1 | 1.9 | .3 |
| Rules Infraction Board | 1 | 1.9 | .3 |
| Visits | 1 | 1.9 | .3 |
| Parole Board Review | 1 | 1.9 | .3 |
| Use of Force without Reports | 1 | 1.9 | .3 |
| TOTAL | 54 | 100.0% | 18.0 |

*********************************************************************************************

Table 67. Grievances Filed with the Chief Inspector from the Southern Ohio Correctional Facility, April through June, 1978

| AREA OF CONCERN | STAFF MEMBER INVOLVED |
|---|---|
| Refusal to visit inmates or answer kites | Inspector of Institutional Services |
| Administrative Isolation Status | Superintendent |
| Visiting hours in J-Block | Superintendent |
| Windows in J-1 in need of paint | Superintendent |
| Furnishings in Administrative Isolation Cell | Superintendent |
| Decision of Publication Screening Committee | Director of Department of Rehabilitation and Correction |
| Statements about an inmate | Director of Department of Rehabilitation and Correction |
| Release of an inmate from Administrative Isolation | Two staff persons |

SOURCE: Superintendent's Office

**1386**

## APPENDIX C

900 Adams Street
Toledo, Ohio 43624
(419) 241-1200

Jacqueline M. Boney
Cary Rodman Cooper
Bruce A Cramer
John Czarnecki
John F. Hayward
Vaughn A. Hoblet
T Scott Johnston
H Buswell Roberts, Jr.
John L Straub
Richard S. Walinski

Franklin F. Hayward (1907-1973)

**Hayward, Cooper, Straub, Walinski & Cramer**
A Legal Professional Association

March 15, 1979

Vincent M. Nathan, Esq.
College of Law
University of Toledo
2801 W. Bancroft Street
Toledo, Ohio 43606

Re: J. B. Taylor, et al. v.
 E. P. Perini, etc., et al;
 United States District
 Court No. C69-275

Dear Vince:

After our discussion with you at the University of Toledo on
March 1, 1979, Dick Walinski and I met first with Director Denton
and then with Superintendent Perini to discuss the draft of your
sixth and final report. We have agreed to the following action
with regard to the "housekeeping" deficiencies you observed.

1. Law Books: Director Denton has been advised by
 the central office staff and Superintendent Perini
 has confirmed his understanding that all law books
 have been ordered and will be placed in the li-
 brary. Jim Mayers will follow the matter and see
 to its completion.

2. Legal Kits: MCI will provide legal kits on
 credit to those inmates who do not have sufficient
 funds at the time of purchase. The procedure will
 be such that an inmate seeking a kit on credit
 will kite the Inspector of Institutional Services
 who will first determine if the inmate is eligible
 to receive the kit on credit. If the inmate's
 account indeed has insufficient funds, the request
 will be approved. This procedure will be announced
 in the inmate manual.

3. <u>Amendment of Garary Record</u>: On March 13, 1979 the following entry was placed in Garary's file: "Re action of 4-17-78, 8-22-78, 1-10-79; '4-17-78 -- reassigned to roofing crew from paint shop -- non-disciplinary transfer.'"

4. <u>Reclassification of Inmate Law Clerks in Honor Dorm</u>: Attached is a memorandum dated March 6, 1979 directed to Superintendent Perini from M. D. Marsino to the effect that inmate law clerks in the honor dorm have always had a job description, a copy of which is also attached.

5. <u>Responses of Superintendent to Proposals of Inmate Councils</u>: The Superintendent will respond in writing to written proposals approved and submitted by the Executive Committee of each Council. The Superintendent will advise the Councils of the necessity to have the Councils communicate in writing through their respective Executive Committees.

6. <u>Revision of Inmate Manuals</u>: The revisions suggested at pages 19 and 20 of the Sixth Report will be accomplished by July 1, 1979. J. Tripp, assisted by others, will follow the matter and see to its completion.

7. <u>Guidelines for Inmate Councils</u>: The revisions suggested at pages 71-73 of the Sixth Report will be accomplished by July 1, 1979. William Whealon will follow the matter and see to its completion.

8. <u>Special Elections for Inmate Councils</u>: Special elections will be conducted as needed.

9. <u>Revision of Job Assignment System</u>: With one exception, the recommendation to add a new subparagraph (h) to paragraph 10, appearing at pages 40-41 of the Sixth Report, is agreed to and will be implemented, provided, however, that a subparagraph (h)(5) be added to the recommended amendment which subparagraph (h)(5) should read as follows:

> (5) The Superintendent may make a non-disciplinary transfer when he determines that an inmate must be transferred to protect the safety and security of the inmate, of other inmates, or of the staff. In such instances, the Superintendent shall forthwith inform the Reclassification Committee and the transferred inmate in writing of the transfer and of the reason. In such instances the inmate's record regarding the transfer shall only reflect that the transfer was made; e.g., "(date) -- reassigned to (new job) from (existing job)". In such instances, the transferred inmate shall be eligible to bid for other available jobs in accordance with the job bidding procedure and if he does bid for another job other bidding inmates shall not be given a preference over the transferred inmate because the inmate has been on the new job less than ninety days.

The amendment suggested at pages 42-43 of the Sixth Report regarding "skilled" positions is agreeable and will be implemented.

10. <u>Assistance for Job Counselor and for Institutional Inspector</u>: One full-time secretary will serve both the Institutional Inspector and the Job Counselor. Superintendent Perini will create a new position the purpose of which will be to serve as an assistant to both the Job Counselor and the Institutional Inspector. The person hired will be required to go "inside" the institution in order to assist the Job Counselor and the Institutional Inspector. Presently, it is anticipated that the pay range for the position will be approximately Twelve Thousand Dollars ($12,000.00) and that the requisites will include at least an Associates Degree in Corrections, or four to five years experience in corrections.

11. <u>Inmate Bed Assignments</u>: The current practice of generating weekly reports on bed assignments will be continued, and the reports will be given monthly to the inmate Councils for their review.

12. <u>Written Waiver of Hearing before Publications Review Committee</u>: The written waiver discussed at page 16 of the Sixth Report has been obtained in most instances where appropriate. In the future, however, inmates who wish to waive their rights to a hearing before the Publications Screening Committee will be asked to sign a waiver. A copy of the form to be used is attached.

13. <u>Correctional Officer Assigned to Correctional Cell Area</u>: Superintendent Perini has reiterated his order to all Shift Captains and personnel to the effect that the correctional officer assigned to the correctional cell area is to remain in the correctional cell area except for brief, temporary absences or during emergencies. He has further reinterated that each occupied correctional cell is to be visually inspected at least every thirty (30) minutes. Correctional officers assigned to the correctional cell area will not be assigned other duties.

14. <u>Dispensing of Prescription Medication to Correctional Cell Inmates</u>: Superintendent Perini has reiterated his orders as outlined at pages 32-33 of the Sixth Report, and intends to enforce the orders.

15. <u>Meetings between Institutional Inspector and Inmate Councils</u>: Superintendent Perini has instructed the Institutional Inspector to meet monthly with the executive committees of both Councils, and intends to enforce the instructions.

The foregoing responds to each of the housekeeping matters we discussed with you. I understand that the suggested solutions

are consistent with our discussions and agreeable to you.

Sincerely yours,

Cary Rodman Cooper

CRC/jeh
Encls.

cc: George Denton, Director
 Department of Rehabilitation
 and Correction
 Suite 403
 1050 Freeway Drive, N.
 Columbus, Ohio 43229

 E. P. Perini, Superintendent
 Marion Correctional Institution
 P.O. Box 57
 Marion, Ohio

 Niki Z. Schwartz, Esq.
 Gold, Rotatori, Messerman
 & Schwartz Co., L.P.A.
 1100 Ohio Savings Plaza
 1801 East 9th Street
 Cleveland, Ohio 44114

STATE OF OHIO

## DEPARTMENT OF REHABILITATION & CORRECTION

## MARION CORRECTIONAL INSTITUTION

**BOX 57**

**MARION, OHIO 43302**

JAMES A. RHODES - GOVERNOR

GEORGE F. DENTON - DIRECTOR

E. PETER PERINI - SUPERINTENDENT

March 6, 1979

TO: E. P. Perini, Superintendent

FROM: M. D. Marsino, Administrative Assistant to the Superintendent
 and Acting Job Counselor

RE: JOB DESCRIPTION FOR HONOR DORM LAW CLERKS

Dear Mr. Perini:

Pursuant to your instructions, we have investigated the matter of the Law Clerks use at the Honor Dormitory. We find that there is a job description in the Job Description Book, (page number 0041 in the front part) and it seems to be an adequate description.

It would appear that perhaps someone overlooked this page in the Job Description Book when the discussion was had last week with the Special Master.

THE MARION CORRECTIONAL INSTITUTION

M. D. Marsino, Administrative Assistant
 to the Superintendent
Job Counselor (Acting)

:vm
cc

HONOR DORM

**SHOP:** Honor Dormitory Help

**JOB:** Law Clerks

**NUMBER OF EMPLOYEES:** 2

**DUTIES:**

 **Primary:** Maintain law library in proper order and
 appearance.
 Maintain and repair books.
 Maintain office supplies.
 Assist residents in preparation of complaints,
 appeals, post-conviction petitions, etc.
 Prepare and submit inventories of books to
 appropriate office when required.
 Maintain filing system of all records of the
 law library – correspondence, records of
 resident's court actions, etc.

 **Occasional:** Assist librarian when needed.

**QUALIFICATIONS:** Must have at least an eighth grade level in
 reading, writing and math.
 A high school diploma or G.E.D. is desired.
 Must be able to type accurately at least 20
 words a minute.
 Must have a working knowledge of law.
 Must be able to work without supervision.

"CLASSIFICATION V
$24.00/MONTH"

**1392**

### WAIVER OF RIGHTS FOR PUBLICATION SCREENING

NAME:_____MCI#_____CASE #_____

PUBLICATION:_____

I have been informed that the above named publication has been refered to the Publication Screening Committee on the basis that:

( ) it may meet the criteria of obscenity.

( ) it may meet the criteria of presenting a clear and present danger to the safety and security of the institution.

I understand that I am entitled to have this material brought before the Publication Screening Committee and reviewed according to standard criteria.

I understand that I am entitled to appear before this committee and make any statements and present any evidence.

I understand that I am entitled to a written decision from the committee.

I understand that I may appeal any adverse decision of this committee and will be supplied with necessary forms to make such appeal.

I chose to waive the above rights and request that the material not be presented to the committee. Such waiver is knowlingly done.

I request that the material be disposed of as follows:

( ) mailed at my expense to:_____

_____

( ) destroyed by the Chairman of the committee

( ) sent out on visit to be picked up by_____

I have read the above and fully understand all of my rights and chose to waive them for the above described material.

_____ Number_____Date:_____
inmate signature

Witness:_____
 staff signature

DISTRIBUTION
Publication Screening File
Inmate
Taylor vs Perini file

JDM:hs

